# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

XTERA COMMUNICATIONS, INC., *et al.*,

Debtors.[1]

Chapter 11

Case No. 16-12577

(Joint Administration Requested)

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507, BANKRUPTCY RULES 2002, 4001, 6004, AND 9014, AND LOCAL RULE 4001-2 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Xtera Communications, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), by and through their proposed undersigned attorneys, hereby file this motion (the "Motion"), pursuant to sections 105(a), 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order on an expedited basis (the "Interim Order"), substantially in the form annexed hereto as Exhibit

---

[1]     The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Xtera Communications, Inc. (4611); Xtera Communications, Ltd. (9610); Xtera Communications Canada, Ltd. (2053); Xtera Communications Hong Kong Ltd. (7411); PMX Holdings, Ltd (4611); Azea Networks, Inc. (7821); Neovus, Inc. (2940); and Xtera Asia Holdings, LLC (4611). The mailing address for the Debtors, solely for purposes of notices and communications, is 500 W. Bethany Drive Suite 100 Allen, TX 75013.

A, and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"), (i) authorizing the Debtors to enter into a postpetition financing arrangement on the terms set forth in the debtor in possession loan agreement attached hereto as Exhibit B (the "Postpetition Loan Agreement" or the "DIP Credit Agreement" and, together with such other documents and agreements entered into in connection therewith, the "Postpetition Documents"), (ii) granting liens and providing super-priority administrative expense status, (iii) granting adequate protection to the Debtors' prepetition secured lender, (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (v) granting related relief (the "Motion").[2]  In support of the Motion, the Debtors rely upon, and incorporate by reference, the *Declaration of Joseph R. Chinnici in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed with the Court concurrently herewith.

## SUMMARY OF RELIEF REQUESTED

1.      In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their businesses.  In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases while working towards a successful sale transaction.  Postpetition financing is necessary in order for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper servicing of customers post-petition, and fund working capital needs.  Absent postpetition financing, the Debtors will be forced to wind-down their operations due to a lack of funds.  It is therefore imperative that the Debtors have access to sufficient liquidity to avoid imminent irreparable harm and successfully consummate a sale transaction.

2.      Accordingly, by this Motion, the Debtors are seeking, *inter alia*:

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the Postpetition Loan Agreement.  To the extent that there is any conflict between this Motion and the Interim Order, the Interim Order shall control.

(a)    authorization for the Debtors to obtain a super-priority postpetition financing consisting of a term loan in a principal amount of up to $7,409,793.00 (the "<u>DIP Facility</u>") in accordance with the Postpetition Loan Agreement among Xtera Communications, Inc., as borrower (the "<u>Borrower</u>"), the remaining Debtors, as guarantors, one or more affiliates of H.I.G. European Capital Partners LLP, as lenders (the "<u>DIP Lenders</u>"), and Wilmington Trust, N.A., as administrative agent and collateral agent (the "<u>DIP Agent</u>");

(b)    authorization for the Debtors to execute and deliver the Postpetition Loan Agreement and the Postpetition Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c)    authorization for the Debtors to grant to the DIP Lenders assurances for the full and timely payment of the Debtors' obligations under the DIP Facility by granting to the DIP Lenders (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a "<u>Superpriority Administrative Expense Claim</u>") having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carveout (as defined below), and (ii) pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on, and security interests in, any and all of the DIP Collateral (as defined below), subject only to the Carveout and Permitted Liens (as defined in the Postpetition Loan Agreement);

(d)    authorization to use the proceeds of the DIP Facility in accordance with a certain budget in form and substance satisfactory to the DIP Lenders, including to fund the costs associated with the Debtors' chapter 11 cases, and to fund postpetition operating expenses of the Debtors during the chapter 11 cases;

(e)    pursuant to sections 361 and 363 of the Bankruptcy Code, authorization to grant adequate protection to the Lenders (as defined below);

(f)    pursuant to section 362 of the Bankruptcy Code, modification of the automatic stay to the extent set forth in the Postpetition Loan Agreement and other Postpetition Documents;

(g)    pursuant to Bankruptcy Rule 4001, to schedule a preliminary hearing on this Motion and obtain authorization, from the entry of the Interim Order until the final hearing (the "<u>Final Hearing</u>"), to obtain credit under the terms contained in the Postpetition Loan Agreement to avoid immediate and irreparable harm to the Debtors' estates; and

(h)    pursuant to Bankruptcy Rule 4001, to schedule a Final Hearing on this Motion to consider entry of the Final Order authorizing the Debtors to borrow the balance of the DIP Facility on a final basis on the terms and conditions set forth in the Postpetition Loan Agreement.

## JURISDICTION

3.      This Court has jurisdiction over the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).    The Debtors consent, pursuant to Local Rule 9013-1(f), to the entry of a final judgment or order with respect to this Motion, if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

## BACKGROUND

**A.      General Background**

6.      On the date hereof (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.    The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      No trustee, examiner, or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

8.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Joseph R. Chinnici in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed concurrently herewith and fully incorporated herein by reference.

**B.      The Prepetition Secured Indebtedness**

      **a.  Senior Secured Credit Facility**

9.      On January 16, 2015, Xtera Communications, Inc., Azea Networks, Inc., Neovus, Inc., and Xtera Asia Holdings, LLC (collectively, the "Senior Borrowers") entered into in a Loan and Security Agreement (the "Senior Loan Agreement") with Square 1 Bank ("Square 1") whereby Senior Borrowers obtained a $12.5 million revolving line of credit facility (as amended, the "Senior Loan") from Square 1, which was later succeeded in interest by Pacific Western Bank (as successor in interest by merger with Square 1, "Pacific"), as lender. Borrowings under the Senior Loan bear interest at the greater of (i) 7.0% and (ii) the prime rate plus 3.5%. In the event of default, the interest rate increases by 3% per annum. The Senior Borrowers' obligations under the Senior Loan Agreement are secured by a security interest on all of their assets, but excluding any voting stock in excess of 65% of the total combined voting power of all classes of stock of Debtors Xtera Communications Canada, Inc., Xtera Communications Ltd., Xtera Comunicacoes Do Brasil LTDA and PMX Holdings, Limited (collectively, the "Senior Collateral"). The Senior Loan Agreement was amended to require the use of a lockbox account under the control of Pacific, and extending the maturity date to September 1, 2016. The outstanding balance on the Senior Loan was $8.2 million as of June 30, 2016.

10.      Concurrently with entering into the Senior Loan Agreement, the Xtera issued to Square 1 a warrant to purchase 769,231 shares of the Xtera's preferred stock that expires on the tenth anniversary of its date of issuance (the "SQ1 Warrant"). As of the completion of the Company's initial public offering, the SQ1 Warrant became exercisable for 29,586 shares of Xtera's common stock.

**b. Subordinated Secured Term Loans**

11.     On May 10, 2011, Xtera entered into a Venture Loan and Security Agreement ("Horizon Loan Agreement"), as borrower, with Horizon Technology Finance Corporation ("HTF" and together with Square 1 and H.I.G., the "Lenders"), as lender,[3] that provided for an initial term loan from HTF of up to $10.0 million ("Horizon Term Loan A") and an option for an additional term loan from HTF of up to $2.0 million ("Horizon Term Loan B", and collectively with the Horizon Term Loan A, the "Horizon Loans"). Xtera's repayment obligations under the Horizon Loan Agreement are secured by a security interest on all of Xtera's assets, including its intellectual property (the "Junior Collateral"). As explained in more detail below, due to various amendments to the Horizon Loan Agreement, the current interest rate applicable to each Horizon Loan is 12.5%, and they matured on September 1, 2016. As of June 30, 2016, the outstanding balance of the Horizon Loans totaled $3.9 million.

12.     Concurrently with the execution of the Horizon Loan Agreement, Xtera issued to HTF a warrant to purchase 983,607 shares of the Xtera's preferred stock (the "Horizon Warrant"). The Horizon Warrant expires on November 17, 2020 and, upon completion of Xtera's initial public offering, is exercisable for 37,832 shares of the Company's common stock.

13.     The Horizon Term Loan A was evidenced by a certain Secured Promissory Note (Loan A) executed by Xtera in favor of HTF, dated as of May 10, 2011, in the original principal amount of ten million dollars ($10,000,000) (as subsequently amended and restated, the "Horizon Loan A Note"). The Horizon Loan Note A initially bore interest at 11.5% per annum, matured on December 1, 2014, and required interest only payments through June 1, 2012 and principal and interest payment thereafter. Xtera exercised the option to obtain the additional $2

---

[3]     As described in more detail below, HTF subsequently transferred all right, title and interest in and to the Horizon Loan to Horizon Funding 2013-1 LLC ("Funding"). Funding subsequently transferred all right, title and interest in and to the Horizon Loan to Horizon Funding Trust 2013-1, LLC ("Horizon").

million Horizon Term Loan B on December 27, 2011, which was evidence by a certain Secured Promissory Note (Loan B) executed by Xtera in favor of HTF, dated as of December 27, 2011, in the original principal amount of two million dollars ($2,000,000) (as subsequently amended and restated, "Horizon Loan B Note" and together with the Horizon Loan B Note, the "Horizon Notes"). The Horizon Loan B Note originally accrued interest at 11.5% per annum, matured on July 1, 2015, and required interest only payments through January 1, 2013 and principal and interest payments thereafter.

14.    On April 1, 2013, the Horizon Loan Agreement was amended, extending the maturity date of the Horizon Term Loan A until March 1, 2015, and the maturity date of the Horizon Term Loan B until December 1, 2015. The April 1, 2013 amendment also provided for a final payment by Xtera to HTF of $1,477,041.31 upon the repayment of the Horizon Term Loan A, and a final payment of $272,958.44 upon the repayment of the Horizon Term Loan B.

15.    On March 1, 2014, the Horizon Loan Agreement was amended to modify the repayment schedule of the Horizon Loans. The amendment increased the interest rate on the Horizon Loans to 12.50%, and increased the final payments to $1,666,666.67 with respect to Horizon Term Loan A, and to $333,333.33 with respect to Horizon Term Loan B. The March 1, 2014 amendment also provided HTF with board observation rights with respect to Xtera's board of directors.

16.    On or about June 28, 2013, HTF transferred all right, title and interest in and to the Horizon Notes to Horizon Funding 2013-1 LLC ("Funding"). On or about June 28, 2013, Funding subsequently sold all right, title and interest in and to the Horizon Notes to Horizon Funding Trust 2013-1, LLC ("Horizon").

17.     On January 16, 2015, in connection with the execution of the Senior Loan Agreement, Horizon, Square 1, and Xtera entered into a Subordination Agreement (the "Subordination Agreement").  Pursuant to the Subordination Agreement, Horizon's collection and enforcement rights under the Horizon Loan Agreement are subordinate to the rights of Pacific with respect to the Senior Loan Agreement.

### c.    Defaults

18.     As of January 31, 2016 and February 29, 2016, the Senior Borrowers breached a financial covenant in the Senior Loan Agreement by failing to maintain a minimum adjusted cash flow, which caused a cross-default with under the Horizon Loan Agreement.  The default continued through April 2016.  Despite the ongoing breach, Square 1 allowed the Company continued access to the Senior Loan during the second quarter of 2016.

19.     On April 27, 2016, the Senior Borrowers entered into a Limited Waiver and Third Amendment to Loan Agreement (the "Third Senior Loan Amendment") with Square 1 which waived the violations of the financial covenants under the Senior Loan Agreement.  Pursuant to the Third Senior Loan Amendment, the Senior Lenders and Square 1 agreed to modify certain financial covenants, and to extend the term Senior Loan Agreement through July 31, 2016.  The Third Senior Loan Amendment also required that, on or before May 31, 2016, the Senior Borrowers provide Square 1 with evidence of a term sheet (the "Senior Refinancing Documents") evidencing a proposed sale of Xtera or an equity or debt transaction pursuant to which Square 1 would receive the cash proceeds (a "Senior Refinancing Transaction") on or before July 31, 2016.  The amendment also provided that Square 1 would be paid $150,000 (the "Success Fee") upon repayment of the Senior Loan, which would be reduced to $50,000 if the

Senior Loan was repaid on or before May 31, 2016, and to $100,000 if the Senior Loan was repaid after May 31, 2016 and before June 30, 2016.

20.     On May 31, 2016, the Senior Lenders and Square 1 entered into the Fourth Amendment to Loan Agreement (the "Fourth Senior Loan Amendment"). The Fourth Senior Loan Amendment extended the deadline to provide the Senior Refinancing Documents until June 10, 2016. It also added an additional $100,000 Success Fee upon the consummation of a qualifying transaction by the Senior Borrowers. The Fourth Senior Loan Amendment also required Xtera to deposit all funds into lockbox account with Square 1.

21.     On May 31, 2016, Xtera and Horizon entered into the Eighth Amendment of Venture Loan and Security Agreement (the "Eighth Horizon Amendment"), amending certain terms of the Horizon Loan Agreement and Horizon Notes. The Eighth Horizon Amendment extended the maturity dates of the Horizon Loans to July 31, 2016. The amendment also increased the additional final payment by Xtera to $1,750,000 if the Horizon Term Loan A was repaid on or before June 30, 2016, increasing to $1,812,500.00 if not repaid on or before July 15, 2016, to $1,875,000.00 if not repaid on or before July 31, and thereafter increasing by $208,333.33 on the first day of each month until the loan is repaid. Likewise, the amendment increased the additional final payment by Xtera to $350,000 if the Horizon Term Loan B was repaid on or before June 30, 2016, increasing to $362,500 if not repaid on or before July 15, 2016, to $375,000 if not repaid on or before July 31, and thereafter increasing by $41,666.67 on the first day of each month until the loan is repaid. Like the Fourth Senior Loan Amendment, the Eighth Horizon Amendment required Xtera to provide Horizon with documents evidencing a refinancing transaction (the "Horizon Refinancing Documents", and together with the Senior Refinancing Documents, the "Refinancing Documents") on or before June 30, 2016.

22.     On June 30, 2016, Xtera and the other Senior Borrowers defaulted on their obligations to deliver the Refinancing Documents to Horizon and Square 1.  Xtera and Horizon entered into a limited waiver and amendment with respect to such default.  The Senior Borrowers entered into a limited waiver with Square 1 with respect to the failure to provide the Senior Refinancing Documents, but Square 1 did not waive the requirement that the Refinancing Transaction close on or before July 31st.

23.     In an effort to timely effectuate the Refinancing Transaction, Xtera entered into extensive negotiations with:  Callidus Capital for a term loan based upon monetizing intellectual property with Fortress Investment Group ("Fortress") whereby Callidus Capital would provide an asset-backed loan to Xtera and Fortress would provide a term loan combined with an intellectual property monetization program and a PIK loan.  However, negotiations broke down, and Xtera failed to effectuate a Refinancing Transaction by the July 31 deadline.

24.     The Debtors subsequently entered into limited waivers and amendments to the Senior Loan Documents and Horizon Loan Documents to waive the default caused by the Debtors' failure to timely effectuate a Refinancing Transaction.  Specifically, Square 1 agreed to extend the maturity date of the agreement to October 1, 2016, and required the Senior Borrowers to deliver Senior Refinancing Documents upon three days' notice from Square 1.  Likewise, Horizon agreed to extend the maturity date of the Horizon Notes to October 1, 2016, and required Xtera to deliver Horizon Refinancing Documents upon three days' notice from Horizon.

25.     The Debtors entered into a Limited Waiver and Eighth Amendment to Loan Agreement, dated September 30, 2016, by and among the Borrowers and Pacific Western Bank as Successor in Interest by Merger to Square 1 Bank (the "Eighth Amendment"), further amending the Senior Loan to (i) waive an event of default by the Debtors; (ii) modify the

definition of "Permitted Indebtedness" to allow the Debtors to incur additional indebtedness in October 2016, subject to certain limitations; and (iii) modify the maturity date of the Senior Loan to November 1, 2016.

26.    Similarly, the Debtors entered into a Limited Waiver and Twelfth Amendment to Venture Loan and Security Agreement, dated September 30, 2016, by and between Xtera Communications, Inc. and Horizon Technology Finance Corporation (the "Twelfth Horizon Amendment," and with the Eighth Amendment, the "September 30 Amendments"), further amending the Horizon Loan Agreement to (i) waive an event of default by the Debtors; (ii) modify the definition of "Permitted Indebtedness" to allow the Debtors to incur additional indebtedness in October 2016, subject to certain limitations; and (iii) modify the maturity date of the Senior Loan to November 1, 2016.

27.    As of November 1, 2016, the Senior Borrowers failed to comply with the requirement to pay all outstanding obligations under the Senior Loan Agreement and the requirement to pay all unpaid principal and accrued interest under the Horizon Loan Agreement, which triggered events of default under the Senior Loan Agreement and the Horizon Loan Agreement.  As of November 1, 2016, the outstanding principal and interest under the Senior Loan Agreement was $8.19 million and the outstanding principal and interest under the Horizon Loan Agreement was $6.91 million.

### d.  Bridge Loan

28.    On September 13, 2016, Xtera issued and sold (i) secured promissory notes (the "Notes") in the aggregate principal amount of $500,000 and warrants (the "Warrants") to purchase up to an aggregate of 500,000 shares of Xtera's common stock for gross proceeds of $500,000.  The entire principal amount and any accrued and unpaid interest on the Notes are due

and payable in case on December 31, 2016 but, holders of the Notes may demand payment any time after October 1, 2016.  The Notes bear interest at the rate of 10% per annum; provided, however, that if Xtera becomes subject to a bankruptcy proceeding, the interest rate will increase to 20% per annum.  Pursuant to a security agreement with the investors, Xtera's obligations under the Notes are secured by a general lien on all assets of Xtera.  The security interests are senior to the security interests of Square 1 and Horizon Technology Finance Corporation pursuant to a Subordination Agreement dated September 13, 2016.  In connection with the Eighth Amendment and the Twelfth Horizon Amendment, the Bridge Loan Investors (defined below) entered into an Amendment to Subordination Agreement, dated September 30, 2016 with Square 1 and Horizon Technology Finance Corporation.

29.    The Notes and Warrants were sold in a private placement under rule 506 promulgated under the Securities Act of 1933, as amended, to certain accredited investors, including (i) Xtera's chief executive officer Jon Hopper, (ii) an entity affiliated with a member of Xtera's board of directors, and (iii) an affiliate and largest stockholder of Xtera (collectively, the "Bridge Loan Investors").  The Audit Committee of Xtera's board of directors reviewed and approved the issuance of the Notes as a potential related party transaction.  Additional Notes may be issued up to an aggregate principal amount of $1,500,000.  The proceeds of the Additional Notes were used to fund necessary expenses of the Debtors including payroll.

30.    In connection with the September 30 Amendments, the Bridge Loan Investors entered into Amendments to Subordination Agreement, dated September 30, 2016, (i) with Pacific Western Bank, successor by merger to Square 1, pursuant to which the Bridge Loan Investors expressly agreed to subordinate their liens to the liens of Pacific Western Bank and Pacific Western Bank agreed to pay, from the first proceeds received, $1,200,000 plus the

amount of outstanding indebtedness under the October 2016 New Lender Indebtedness Outstanding, as defined in the Amendment to Subordination Agreement; and (ii) with Horizon pursuant to which the Bridge Loan Investors expressly agreed to subordinate their liens to the liens of Horizon and repayment to Horizon on the Senior Debtor was subordinate to repayment to the Bridge Loan Investors of $1,200,000 plus the amount of outstanding indebtedness under the October 2016 New Lender Indebtedness Outstanding, as defined in the Amendment to Subordination Agreement.

**C.      Events Leading to the Chapter 11 Filings and Marketing Efforts**

31.     Over the course of nine months, the Debtors have experienced significant liquidity issues that have hindered their ability to make payments in the ordinary course of business.  Revenues have declined in part due to the expiration of certain key contracts, revised terms on certain renewed contracts that are less favorable for the Debtors than prior contracts.

32.     The Debtors have sought to implement a number of restructuring initiatives over the last year including, without limitation, making appropriate adjustments in staffing, increasing negotiations with vendors and suppliers, and realigning their business and seeking out additional sources of funding and business opportunities, including soliciting equity investments.  In March 2016, the Debtors retained the services of Cowen and Company ("Cowen") to undertake the Refinancing Transaction described herein.  In June, Cowen's mandate was expanded to include mergers and acquisitions activity, and in July 2016, Cowen's restructuring team began working with the Company.  Cowen was officially retained to provide restructuring investment banking services in September 2016.

33.     After careful consideration and consultation with their advisors, the Debtors ultimately determined that it was necessary to pursue a restructuring or financing transaction

with one or more potential purchasers or other financing or strategic partners.  Beginning in July 2016, the Debtors, together with their advisors, identified and contacted more than seventy (70) prospective strategic or financial partners regarding a potential financing, sale, or other restructuring transaction.

34.     The Debtors and their advisors were in regular contact with these entities and facilitated such entities' due diligence efforts, including discussions around potential transaction scenarios.  In July 2016, the Debtors and their advisors executed a term sheet with Callidus Capital in connection with a proposed term loan based upon monetizing intellectual property with Fortress whereby Callidus Capital would provide an asset-backed loan to Xtera and Fortress would provide a term loan combined with an intellectual property monetization program and a PIK loan; however, negotiations with Callidus Capital broke down during the diligence phase of the transaction.  The Debtors were unable to reach an agreement with any other party regarding a potential sale transaction or equity infusion.  As explained in more detail *infra*, the failure of the Debtors to effectuate a refinancing transaction constituted a default under the Senior Loan Agreement and the Horizon Loan Agreement.

35.     On August 17, 2016, Xtera received a notice letter from the Nasdaq Stock Market ("NASDAQ") notifying Xtera of its failure to maintain a minimum stockholders' equity of $10 million, as required by NASDAQ Marketplace Rule 5450(b)(1)(A), which was disclosed by Xtera in public filings dated August 22, 2016.  Xtera had until October 3, 2016 to demonstrate compliance with the minimum stockholders' equity requirement.

36.     On September 26, 2016, Xtera received a notice letter from the NASDAQ indicating that, based upon the closing bid price of Xtera's common stock for thirty consecutive business days, Xtera no longer met the requirement to maintain a minimum bid price of $1 per

share, as set forth in NASDAQ Listing Rule 5450(a)(1).  In accordance with NASDAQ Listing Rule 5810(c)(3)(A), NASDAQ is providing Xtera with a period of 180 calendar days, or until March 27, 2017, in which to regain compliance with the minimum bid price requirement.  In order to do so, the closing bid price of Xtera's common stock must be at least $1 per share for a minimum of ten consecutive business days during the 180 period ending March 27, 2017.

37.    On October 6, 2016, Xtera received a letter (the "Delisting Notice") from NASDAQ notifying the Xtera that it had not regained compliance with NASDAQ Marketplace Listing Rule 5550(b), the continued listing requirement to maintain a total stockholders' equity of $2.5 million and, accordingly, its common stock would be delisted from NASDAQ.  The Delisting Notice states that unless Xtera requests an appeal of the determination to delist, trading of Xtera's common stock will be suspended at the opening of business on October 17, 2016 and a Form 25-NSE will be filed with the Securities and Exchange Commission, which will remove Xtera's common stock from listing on NASDAQ.  After careful consideration, Xtera's board of directors determined not to appeal NASDAQ's delisting determination.

38.    The Debtors, together with their advisors, carefully considered all options and determined in their business judgment that the commencement of these chapter 11 cases and the pursuit of a post-petition marketing and sale process is in the best interest of all creditors and the estate since it will maximize the value of the Debtors' assets.  The Debtors do not have sufficient liquidity to continue operating outside of bankruptcy, and the pursuit of a sale transaction during these chapter 11 cases presents the best available option to maximize value for the Debtors' estates.

39.    The Debtors, together with their advisors, solicited debtor-in-possession financing ("DIP FInancing") proposals from forty-four potential lenders.  Of those, seventeen signed non-

disclosure agreements and received documentation.  The Debtors received five term sheets for DIP Financing, of which three had conditions precedent that the Company could not satisfy.

40.     Ultimately, the Debtors and their advisors engaged in negotiations with the two remaining  parties in contemplation of a sale and debtor in possession financing.  Both of these transactions contemplated "priming" financing senior to existing secured indebtedness.  After consultation with Square 1 and exploration of the alternatives, the Debtors believed that it was in the best interests of all interested parties to pursue the currently contemplated transaction with H.I.G.

41.     The agreement with H.I.G. contemplates approximately $7.4 million in senior debtor in possession financing secured by substantially all assets of the Debtors to fund the Debtors through a sale process.  Additionally, an affiliate of H.I.G. is acting as stalking horse bidder to purchase all of the Debtor's assets for a purchase price of $10.0 million inclusive of amounts due under the DIP Financing.

**D.     The Debtor in Possession Financing**

42.     In connection with the Debtors' overall restructuring efforts, the Debtors engaged in extensive negotiations with H.I.G. regarding additional financing and, leading up to the Petition Date, H.I.G. engaged in discussions with Pacific and Horizon.  Pacific has agreed to allow the DIP financing to "prime" its existing prepetition lien. H.I.G. also provided the Debtors with a term sheet for potential debtor in possession financing, which was negotiated among the parties and culminated in the Postpetition Loan Agreement.   Under the Postpetition Loan Agreement, H.I.G. agreed to provide financing to the Debtors on the terms and conditions set forth therein and described below, and the Debtors believe that such postpetition financing is the

best available under the circumstances and adequately addresses the Debtors' reasonably foreseeable working capital needs.

43.     Immediate access to postpetition financing is necessary to enhance the Debtors' liquidity, provide necessary working capital during the pendency of these chapter 11 cases, and provide customers, employees, vendors, suppliers, and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course while working towards a sale transaction in accordance with the bidding procedures described in the Sale Motion.  The Debtors determined that they do not have sufficient liquidity for the Debtors to operate their businesses in an appropriate manner or fund a sale of all or substantially all of the Debtors' assets.  If the Debtors are unable to access this postpetition financing, the Debtors' business operations, ability to effectively consummate a sale transaction, and ability to satisfy obligations to customers will be irreparably harmed.  For the foregoing reasons, the DIP Facility is in the best interest of the Debtors' estates, creditors, and other parties in interest.

## **THE DIP FINANCING**

44.     Consistent with Bankruptcy Rule 4001(c)(1) and this Court's requirements under Local Rule 4001-2(a)(ii), the principal terms of the DIP Facility and Interim Order are as follows:[4]

---

[4]     The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such.  This summary is qualified in its entirety by the provisions of the Postpetition Loan Agreement and the Interim Order.  Unless otherwise specified, terms used in this section have the same definitions as those in the Postpetition Loan Agreement.

| | |
|---|---|
| <u>Borrower</u>: | Xtera Communications, Inc. |
| <u>Guarantor</u>: | Xtera Communications Ltd.; Azea Networks Inc.; Neovus Inc.; Xtera Asia Holdings, LLC; Xtera Communications Canada, Inc.; Xtera Comunicacoes Do Brasil LTDA; Xtera Communications Hong Kong Limited; and PMX Holding, Limited. |
| <u>DIP Lenders</u>: | Initially, one or more affiliates of H.I.G. European Capital Partners LLP (collectively, "<u>H.I.G.</u>" or "<u>DIP Lenders</u>"). |
| <u>DIP Agent</u>: | Wilmington Trust, National Association, as administrative agent and collateral agent for the DIP Lenders (the "<u>DIP Agent</u>"). |
| <u>DIP Facility</u>: | Up to $7,409,793 term loan (the "<u>DIP Facility</u>"), which is subject to a budget acceptable to the DIP Lenders (the "<u>Budget</u>"), the initial version of which will be attached to the Interim Order prior to entry.[5] Upon entry of an interim order approving the DIP Facility, the entire principal amount of the DIP Loans will be available to be borrowed by the Debtors for immediate deposit into a blocked account held by the DIP Agent in trust for the DIP Lenders (the "<u>Funding Account</u>"). |
| <u>Use of Proceeds</u>: | The Borrower shall be entitled, subject to certain withdrawal conditions, to use the proceeds of the DIP Facility and any other cash held in the Funding Account solely as follows:  (i) to pay (x) all fees due to DIP Lenders and DIP Agent (including without limitation the fees described below) under the DIP Loan Documents, and (y) all reasonable pre- and post-petition professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Lenders and the DIP Agent, including, without limitation, those incurred in connection with the preparation, negotiation, documentation and court approval of the documentation and transactions contemplated by the DIP Documents; (ii) to provide working capital to the Debtors in compliance with the Budget (but not, for the avoidance of doubt, any equityholder or other affiliate of the Company); and (iii) to fund the administration costs of the Chapter 11 Cases (including Debtors' and Committee's professionals fees and expenses), subject to the |

---

[5]     The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget.

Budget.

| | |
|---|---|
| Termination Date: | The earliest to occur of:  13 weeks following the Petition Date, (ii) the 363 Sale Effective Date (as defined below) and (iii) the date that the DIP Loans shall become due and payable in full in accordance with the terms of the DIP Facility, including due to acceleration or an event of default. |
| Carveout: | The liens, security interests, and Superpriority Administrative Expense Claims granted in favor of the DIP Lenders in connection with the DIP Facility shall be subject to a Carve-Out.  The "Carve-Out" shall mean (a) all administrative expenses pursuant to 28 U.S.C. § 156(c) and 28 U.S.C. § 1930(a)(6) for fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee, respectively, without regard to the amounts set forth in the Budget; and (b) all accrued and unpaid fees, disbursements, costs and expenses of professionals (collectively, the "Carve-Out Professionals") retained by the Debtors and any official committee of unsecured creditors appointed in these cases (the "Committee"), to the extent allowed by the Court by an interim or final order at any time, incurred prior to and up to the Termination Date, subject to and in accordance with the Budget and any order entered by the Court with respect to the interim payment of professional fees and expenses. |
| Interest: | The DIP Loans will bear interest at a rate of Adjusted LIBOR (subject to a 1.00% floor) plus 6.00% per annum, which interest shall be paid in cash monthly (or weekly, at the Borrower's option) and upon any repayment of prepayment of principal; *provided that* upon the occurrence of any event of default under the DIP Facility such interest rate margin shall automatically increase by an additional 2.00%. |
| Fees: | The Company shall pay a commitment fee with respect to any undrawn DIP Commitments at a rate per annum equal to 0.50%, which commitment fee shall be paid in cash monthly.<br><br>The Company shall pay a backstop premium in an amount equal to 0.50% of the aggregate amount of the DIP Commitments on the Closing Date, to be paid in cash on the Closing Date to the DIP Lenders. |
| Security: | The DIP Facility shall be at all times secured by perfected, senior, first priority, liens on all or substantially all of the |

assets of the Borrower and each Guarantor (collectively, the "Obligors") whether existing as of the Petition Date or after-acquired, tangible or intangible, and comprising real or personal property (collectively, the "DIP Collateral"), subject to certain limited exceptions to be set forth in the DIP Loan Documents.  The DIP Facility and all obligations of the Obligors to the DIP Lenders and the DIP Agent under the DIP Loan Documents (collectively, the "DIP Obligations") shall, subject to the Carve-Out (as defined below), (x) be secured pursuant to Sections 364(d) of the Bankruptcy Code and the liens securing the DIP Obligations shall prime all other liens and claims on assets of the Obligors, including the respective liens securing the Prepetition Senior Obligations and the Prepetition Subordinated Obligations, and (y) be entitled to superpriority administrative claims and liens pursuant to section 364(c) of the Bankruptcy Code customary for transactions of this type or as otherwise required by the DIP Agent or the DIP Lenders.

Superpriority Administrative Expense Claim:

The indebtedness of the Obligors under the DIP Facility shall constitute, in accordance with section 364(c) of the Bankruptcy Code, a superpriority administrative claim having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject to the Carveout.

Milestones:

The Postpetition Loan Agreement contains the following milestones (the "Milestones") to be satisfied by the Debtors,

(a) the Debtors shall file a motion in form and substance reasonably acceptable to the DIP Lenders (the "Bid Procedures") on the Petition Date seeking approval of bid procedures for a sale, pursuant to section 363 of the Bankruptcy Code of all or a portion of the Debtors' assets with H.I.G. (or a designated affiliate) as the proposed stalking horse bidder (the "Stalking Horse") with the ability to credit bid the full amount of its claims (whether arising from the DIP Facility or the Prepetition Senior Term Facility and which credit bid may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition vehicle) (the "363 Sale");

(b) subject to entry by the Bankruptcy Court of a final order with respect to the Chapter 11 Case and the DIP Facility (in form and substance satisfactory to the DIP Lenders and the DIP Agent granting final approval of the DIP Facility, the

"<u>Final Order</u>" and together with the Interim Order, the "<u>Orders</u>"), the Bid Procedures shall have been approved by the Bankruptcy Court no later than 21 days after the Petition Date (the "<u>Bid Procedures Order</u>"), which Bid Procedures Order shall provide for a stalking horse bid from the Stalking Horse pursuant to which the Stalking Horse may credit bid the full amount of its claims (whether arising from the DIP Facility or the Prepetition Senior Term Facility) and otherwise be in form and substance acceptable to the DIP Lenders;

(c) subject to the Final Order being entered, an order approving the 363 Sale in form and substance reasonably acceptable to the DIP Lenders (the "<u>363 Sale Order</u>") shall have been entered by no later than 60 days after the Petition Date; and

(d) subject to the Final Order being entered, the 363 Sale (the "<u>363 Sale Effective Date</u>") pursuant to the Bid Procedures shall have been consummated no later than 90 days after the Petition Date.

<u>Performance Covenant</u>:   Borrower shall adhere to the Budget, subject to Permitted Variances. For purposes hereof: (a) "<u>Budget</u>" means a 13-week operating budget, in substantially the form attached to the DIP Documents, which forecast shall be in form and substance satisfactory to the DIP Lenders, setting forth all forecasted receipts and disbursements of the Debtors and their subsidiaries on a weekly basis for such 13-week period beginning as of the week of the Petition Date; and (b) "<u>Permitted Variances</u>" means (i) all favorable variances, and (ii) an unfavorable variance of no more than 5.00%, in each case tested weekly (commencing at the end of the first calendar week ending after the Petition Date) on a non-cumulative basis, with the exception of professional fees, which shall be tested on a cumulative basis for the pendency of the Chapter 11 Cases based upon the Budget. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the written consent of the DIP Lenders in their sole discretion.

<u>Events of Default</u>:   Any one or more of the following events shall constitute an Event of Default under the DIP Facility: (a) if the Obligors fail to pay when due and payable, or when declared due and payable, all or any portion of the obligations consisting of principal, interest, fees, or charges due to the DIP Lenders under the DIP Facility, reimbursement of the DIP Lenders'

expenses, or other amounts (other than any portion thereof constituting principal) constituting obligations under the DIP Facility (including any portion thereof that accrues after the commencement of an insolvency proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such insolvency proceeding); (b) if the Obligors:  (i) fail to comply with any of the Chapter 11 Milestones; (ii) fail to comply with the Performance Covenants; (iii) fail to perform or observe any covenant or other agreement contained in Postpetition Loan Agreement or DIP Credit Agreement (as applicable), the Interim Order or the Final Order; (iv) breach or fail to comply with any provision of the Interim Order or Final Order entered by the Bankruptcy Court; and (c) such other defaults as are usual or customary.

<table>
<tr><td>Representations and Warranties:</td><td>The DIP Credit Agreement contains representations and warranties customarily found in loan agreements for similar debtor in possession financings, including, without limitation, with respect to organization in good standing, validity of agreements, tax status, and compliance with laws.</td></tr>
<tr><td>Indemnification:</td><td>The Obligors shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Agent (and sub-agent thereof), the DIP Lenders and each of their respective affiliates, equityholders, partners, managers, investors, officers, directors, fiduciaries, employees, agents, trustees, advisors, attorneys and representatives (each, an "<u>Indemnified Person</u>") from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, the reasonable and documented out-of-pocket fees and disbursements of counsel (including local counsel and specialist counsel, if relevant) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility, the Prepetition Senior Term Facility, the Prepetition Subordinated Term Facility or any transaction contemplated in this Term Sheet except to the extent arising from any dispute solely among Indemnified Persons which does not arise out of any act or omission of the Obligors (other than any proceeding against any Indemnified Person solely in its capacity or in fulfilling its role as DIP Agent or any similar role); provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the gross negligence or willful misconduct of such Indemnified</td></tr>
</table>

Person.

_____

### Highlighted Provisions Under Local Rule 4001-2(a)(i)

45.     Local Rule 4001-2(a)(i) requires the Debtors to highlight certain provisions included in the Postpetition Loan Agreement and the Interim Order.  As discussed herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these cases and should be approved.  The provisions under Local Rule 4001-2(a)(i) included in the Postpetition Loan Agreement and Interim Order are as follows:

(a)     Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors. Neither the Postpetition Loan Agreement nor the Interim Order contains any such provision.

(b)     Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition liens or the waiver of claims against the secured creditor without first giving parties in interest an opportunity to conduct an investigation. The Postpetition Loan Agreement and Interim Order contain stipulations by the Debtors with respect to, among other things, the valid, perfection, and amount of liens held by the Prepetition Lenders. (Interim Order, ¶4(b)).

(c)     Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. The Interim Order does not contain provisions that seek to waive rights of the estate under section 506(c) without notice. (Interim Order, ¶14).

(d)     Local Rule 4001-2(a)(i)(D) requires the disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code. The Interim Order does not provide for immediate grant of liens on actions arising under section 544, 545, 547, 548, and 549 of the Bankruptcy Code. (Interim Order, ¶10(a)).

(e)     Local Rule 4001-2(a)(i)(E) requires the disclosure of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(a) of the

Bankruptcy Code. Neither the Postpetition Loan Agreement nor the Interim Order contains any such provision.

(f)     Local Rule 4001-2(a)(i)(F) requires the disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carveout. The Interim Order provides for disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the   debtor (Interim Order, ¶¶8(b), [professional fee reserve provision]).

(g)     Local Rule 4001-2(a)(i)(G) requires the disclosure of provisions that prime any secured lien without the consent of that lienor. The Postpetition Loan Agreement nor the Interim Order provide for the priming of any secured lien without the consent of HTF. (Interim Order, ¶10(b)).

(h)     Local Rule 4001-2(a)(i)(H) requires the disclosure of provisions that seek to affect the Court's power to consider the equities of the cases under 11 U.S.C. § 552(b)(1). (Interim Order, ¶¶10(b), 11(d)).

## **BASIS FOR RELIEF**

**A.     THE REQUESTED RELIEF SHOULD BE GRANTED PURSUANT
TO SECTIONS 364(c) AND 364(d)(1) OF THE BANKRUPTCY CODE**

46.     As set forth above, the Debtors' ability to maximize the value of their estates and successfully sell their business operations hinges upon their being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  *See* 11 U.S.C. § 364(c).

47.     Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

**I.     The Debtors Have Exercised Their Business Judgment in Entering Into the DIP Facility**

48.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also, In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

49.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  *See, e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  (Citing *Matter of Lifeguard Indust., Inc.*, 37 B.R. 3 (Bankr. S.D. Ohio 1983)).  Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

50.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see also, Trans World Airlines,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor).  Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513–14.

51.     The Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the Postpetition Loan Agreement.  The Postpetition Loan Agreement contains terms and conditions that are the best available under the circumstances and provides the Debtors with sufficient liquidity during the period of the Budget.  In addition, the Interim Order preserves the rights of other parties in interest, including any statutory committee

of unsecured creditors, to investigate and challenge the validity, enforceability, perfection, and priority of the Prepetition First Priority Obligations and the liens and security interests granted in connection therewith.   This Court has previously approved similar debtor-in-possession financing agreements where the debtor was not able to obtain postpetition financing under other conditions.[6] *See, e.g., In re Imris, Inc., et al.*, Case No. 15-11133 (Bankr. D. Del. May 25, 2015); *In re Cal Dive Int'l, Inc., et al.*, Case No. 15-10458 (Bankr. D. Del. April 20, 2015); *In re Digital Domain Media Group, Inc., et al.*, Case No. 12-12568 (BLS) (Bankr. D. Del. Nov. 7, 2012); *In re Real Mex Rests., Inc. et al.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011); *In re Landsource Cmtys. Dev. LLC, et al.*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 21, 2008)

52.   The funds provided by the DIP Facility are essential to enable the Debtors to continue to operate during the course of these chapter 11 cases while working towards a sale transaction that is in the best interest of the estates.  Indeed, failure to obtain approval of the DIP Facility will lead to a wind-down of the Debtors' business operations which, in turn, will preclude any sale of the Debtors' assets and adversely affect the value ultimately received by stakeholders.

53.   Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to obtain financing from the DIP Lenders on the terms set forth in the Postpetition Loan Agreement.

## II.   The DIP Facility Represents the Best Financing Available

54.   A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from

---

[6]   The referenced orders are voluminous in nature and are not attached to this Motion; however, in light of the requirements of Local Rule 7007-2(a)(vii), undersigned counsel will make copies of each order available to the Court or to any party that requests them.

every possible source. *See, e.g., Ames Dep't Stores,* 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

55.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 (N.D. Ga. 1989); *see also, In re Garland Corp.,* 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames Dep't Stores,* 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

56.     The Debtors and their advisors conducted an extensive marketing process pre-petition to solicit both financing and sale proposals. The Debtors have determined that the terms and conditions of the DIP Facility are the best available under the circumstances and address the Debtors' working capital needs, and no other entity was willing to provide financing on any better terms. Postpetition financing is not otherwise available without granting, pursuant to

section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code (in each case subject to the Carveout and Permitted Liens).  The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable than those provided by the DIP Facility. Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

### III. The DIP Facility Is Necessary to Maintain the Debtors' Ongoing Business Operations and to Successfully Consummate a Sale of the Debtors' Assets in These Cases

57.     The DIP Facility, if approved, will provide essential working capital, allowing the Debtors to maintain the value of their assets and their ongoing business operations while working towards a sale of the Debtors' assets in these chapter 11 cases.  In addition, the DIP Facility will provide the Debtors' various constituencies, including employees, vendors, and service providers, with confidence in the Debtors' ability to maintain operations while working towards a sale transaction.

58.     If the relief sought in this Motion is denied or delayed, the Debtors likely will experience immediate business disruptions, and the Debtors' ability to consummate a sale transaction and maximize value for the estates may be irreparably damaged.  Accordingly, the DIP Facility is necessary to maximize value for the Debtors' estates and inures to the benefit of creditors and all parties in interest.

### IV.   The Terms of the DIP Facility Are Fair, Reasonable, and Adequate Under the Circumstances

59.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See, Farmland Indus., Inc.*, 294 B.R. at 886; *see also, Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See, Transcript of Record* at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

60.     The terms and conditions of the DIP Facility were negotiated in good faith and at arm's length among the parties, culminating in the Postpetition Loan Agreement that is designed to provide the Debtors with essential working capital and maintain the Debtors' ongoing business operations while working towards a sale of the Debtors' assets.  Indeed, when viewed in its totality, the DIP Facility reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and is supported by fair consideration.

### V.   Section 364(e) Protections Should Apply to the DIP Facility

61.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of Bankruptcy Code section 364(e), and is entitled to all of the protections afforded by that section.

**B.      THE PROPOSED ADEQUATE PROTECTION IS APPROPRIATE**

62.     By this Motion, the Debtors do not request authorization to use of Cash Collateral.  Further, the Debtors have received confirmation that Square 1 consents to the terms and conditions of and entry into the Postpetition Loan Agreement.  Nevertheless, the Debtors can demonstrate that Square 1 and HTF are adequately protected. The focus of the requirement for adequate protection is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

63.     Courts have also held that adequate protection may be demonstrated by showing that the secured creditor's interest in the collateral is preserved by the debtor's use of the cash collateral in a manner that maintains or enhances the collateral's value.  *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105–06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); *accord in re Atrium Dev. Co.*, 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) ("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest."); *McCombs Props. VI, Ltd. V. First Tex. Sav. Ass'n (In re McCombs Props. VI, Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that committing to use cash collateral for operating expenses substantially eliminated the risk of diminution in the secured creditor's interest in the collateral).  The proposed adequate protection

is appropriate under the circumstances.  Specifically, here, absent the financing described herein, the Debtors will certainly be forced to liquidate.  Accordingly, the Debtors should be authorized to enter into the Postpetition Loan Agreement as set forth herein.

## C.    MODIFICATION OF THE AUTOMATIC STAY ON A LIMITED BASIS IS WARRANTED

64.    The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the Postpetition Loan Agreement, the Postpetition Documents, the Interim Order, and the Final Order, and to take various actions without further order of or application to the Court.

65.    Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the Postpetition Loan Agreement and Postpetition Documents and the proposed DIP Orders.

## D.    INTERIM APPROVAL AND SCHEDULING OF FINAL HEARING

66.    As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

67.    Absent relief on an interim basis pursuant to the Interim Order, the Debtors will be unable to satisfy their immediate and projected payment obligations, including payroll and

other operating expenses.  Given the immediate and irreparable harm to be suffered by the Debtors absent interim relief, the Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and (a) authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the Postpetition Loan Agreement, and (b) schedule the Final Hearing.

## E.     WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

68.     The Debtors believe an efficient and expeditious approval and implementation of the DIP Facility is in the best interests of their creditors and other parties in interest, including patients.  Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

69.     No trustee, examiner, or statutory committee of unsecured creditors has been appointed in these chapter 11 cases.  Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to H.I.G. European Capital Partners LLP and its affiliates, as DIP lenders; (iii) counsel to Pacific Western Bank as successor in interest by merger to Square 1 Bank, as senior lender; (iv) counsel to Horizon Funding Trust 2013-1, LLC as subordinated lender; (v) counsel to Wilmington Trust, National Association, as administrative agent and collateral agent to that certain Debtor-in-Possession Credit Agreement dated as of November 15, 2016 between Xtera Communications, Inc. and Wilmington Trust, National Association.; (vi) the parties included on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (vii) the Internal Revenue Service; and (viii) the United States Attorney for the District of Delaware and all other states in which the Debtors operate.  The

Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

## **NO PRIOR REQUEST**

70.    No previous request for the relief sought in this Motion has been made to this Court or any other court.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the proposed Interim Order attached hereto as Exhibit A, (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court, and (iii) grant such other and further relief as this Court deems just and proper.

Dated:  November 15, 2016
     Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

/s/ Stuart Brown
Stuart M. Brown (DE 4050)
Maris Kandestin (DE 5294)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com
Email:  maris.kandestin@dlapiper.com

-- and --

Thomas R. Califano (*pro hac vice* admission pending)
Jamila Justine Willis (*pro hac vice* admission pending)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
Email:  thomas.califano@dlapiper.com
Email:  jamila.willis@dlapiper.com

*Proposed Counsel to Debtors and Debtors in Possession*