**<u>EXHIBIT B</u>**

**[Postpetition Loan Agreement]**

**EXECUTION VERSION**

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

November __, 2016,

among

XTERA COMMUNICATIONS INC.,
as Borrower,

THE SUBSIDIARY GUARANTORS PARTY HERETO,

THE LENDERS PARTY HERETO

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent and Collateral Agent

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...................................................................................1
    SECTION 1.01    Defined Terms ...................................................1
    SECTION 1.02    Terms Generally ................................................24
    SECTION 1.03    Classification of Loans and Borrowings ....................................25

ARTICLE II THE CREDITS .................................................................................25
    SECTION 2.01    Commitments...................................................25
    SECTION 2.02    Loans. ............................................................25
    SECTION 2.03    Borrowing Procedure ........................................28
    SECTION 2.04    Evidence of Debt; Repayment of Loans. ....................28
    SECTION 2.05    Fees and Premiums. ..........................................29
    SECTION 2.06    Interest on Loans...............................................29
    SECTION 2.07    Default Interest .................................................30
    SECTION 2.08    Alternate Rate of Interest ..................................30
    SECTION 2.09    Termination of Commitments ..............................30
    SECTION 2.10    Conversion and Continuation of Borrowings..............30
    SECTION 2.11    Repayment of Borrowings...................................31
    SECTION 2.12    Voluntary Prepayment. ......................................31
    SECTION 2.13    Mandatory Prepayments.....................................32
    SECTION 2.14    Increased Costs; Capital Adequacy .......................33
    SECTION 2.15    Change in Legality............................................34
    SECTION 2.16    Breakage .........................................................35
    SECTION 2.17    Pro rata Treatment ...........................................35
    SECTION 2.18    Sharing of Setoffs ............................................36
    SECTION 2.19    Payments. ........................................................36
    SECTION 2.20    Taxes. .............................................................36
    SECTION 2.21    Assignment of Loans under Certain Circumstances; Duty to Mitigate. ........................................................40

ARTICLE III REPRESENTATIONS AND WARRANTIES ..................................41
    SECTION 3.01    Organization Status...........................................41
    SECTION 3.02    Power, Authority and Enforceability ..........................41
    SECTION 3.03    No Violation ....................................................42
    SECTION 3.04    Approvals ........................................................42
    SECTION 3.05    Financial Statements; Financial Condition; Undisclosed Liabilities.......................................................42
    SECTION 3.06    Litigation ........................................................43
    SECTION 3.07    True and Complete Disclosure ..................................43
    SECTION 3.08    Margin Regulations...........................................43
    SECTION 3.09    Tax Returns and Payments ....................................43
    SECTION 3.10    Compliance with ERISA ....................................44
    SECTION 3.11    [Reserved]. ......................................................44
    SECTION 3.12    Properties........................................................44

SECTION 3.13    Subsidiaries.................................................................45
SECTION 3.14    Compliance with Statutes, etc. ....................................45
SECTION 3.15    Investment Company Act...............................................45
SECTION 3.16    Environmental Matters...................................................45
SECTION 3.17    Employment and Labor Relations ................................46
SECTION 3.18    Intellectual Property, Etc...............................................46
SECTION 3.19    Economic Sanctions.......................................................46
SECTION 3.20    Foreign Corrupt Practices Act ......................................46
SECTION 3.21    Insurance ........................................................................47
SECTION 3.22    Use of Proceeds..............................................................47
SECTION 3.23    Secured, Super-Priority Obligations. ...........................47
SECTION 3.24    DIP Order ........................................................................48
SECTION 3.25    Budget .............................................................................48

ARTICLE IV CONDITIONS OF LENDING AND WITHDRAWALS....................................48

SECTION 4.01    Conditions to Borrowing ...............................................48
SECTION 4.02    Conditions to Withdrawals ............................................50
SECTION 4.03    Additional Conditions ...................................................50

ARTICLE V AFFIRMATIVE COVENANTS ...........................................................51

SECTION 5.01    Information Covenants....................................................51
SECTION 5.02    Books, Records and Inspections....................................53
SECTION 5.03    Maintenance of Property; Insurance. ............................54
SECTION 5.04    Existence; Franchises......................................................54
SECTION 5.05    Compliance with Statutes, etc. .....................................55
SECTION 5.06    Compliance with Environmental Laws..........................55
SECTION 5.07    Business...........................................................................55
SECTION 5.08    Payment of Taxes............................................................55
SECTION 5.09    Employee Benefits .........................................................55
SECTION 5.10    Use of Proceeds ..............................................................56
SECTION 5.11    Further Assurances..........................................................57
SECTION 5.12    Funding Account Deposits. ...........................................58
SECTION 5.13    Chapter 11 Cases ...........................................................58
SECTION 5.14    Cash Management...........................................................58
SECTION 5.15    Budget Compliance........................................................58
SECTION 5.16    Milestones.......................................................................58

ARTICLE VI NEGATIVE COVENANTS.................................................................59

SECTION 6.01    Liens................................................................................59
SECTION 6.02    Consolidation, Merger or Sale of Assets, Etc..............61
SECTION 6.03    Restricted Payments.......................................................62
SECTION 6.04    Indebtedness ...................................................................62
SECTION 6.05    Investments.....................................................................63
SECTION 6.06    Transactions with Affiliates ..........................................64
SECTION 6.07    Modifications of Certain Agreements; Limitations on
                Voluntary Payments, etc. ................................................65
SECTION 6.08    Adequate Protection.......................................................65

SECTION 6.09    Limitation on Certain Restrictions on Subsidiaries .......................65
SECTION 6.11    Change in Nature of Business ...................................................66
SECTION 6.12    Compliance with Certain Laws ...................................................66
SECTION 6.13    Chapter 11 Orders.........................................................................66
SECTION 6.14    Executory Contracts.....................................................................67

ARTICLE VII EVENTS OF DEFAULT AND REMEDIES ...................................................67

SECTION 7.01    Events of Default .........................................................................67
SECTION 7.02    Application of Payments and Proceeds.......................................71

ARTICLE VIII THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT .......72

SECTION 8.01    Appointment and Authority.........................................................72
SECTION 8.02    Rights as a Lender.......................................................................73
SECTION 8.03    Exculpatory Provisions ...............................................................73
SECTION 8.04    Reliance by Administrative Agent ..............................................74
SECTION 8.05    Delegation of Duties ...................................................................74
SECTION 8.06    Resignation of the Agent.............................................................74
SECTION 8.07    Non-Reliance on Agents and Other Lenders..............................75
SECTION 8.08    Collateral and Guarantee Matters ..............................................75
SECTION 8.09    Enforcement ................................................................................76
SECTION 8.10    Indemnification............................................................................76
SECTION 8.11    Withholding Taxes.......................................................................77
SECTION 8.12    Lender's Representations, Warranties and
                     Acknowledgements.....................................................................77

ARTICLE IX MISCELLANEOUS ...................................................................................78

SECTION 9.01    Notices; Electronic Communications ........................................78
SECTION 9.02    Survival of Agreement ................................................................80
SECTION 9.03    Binding Effect.............................................................................80
SECTION 9.04    Successors and Assigns...............................................................81
SECTION 9.05    Expenses; Indemnity...................................................................84
SECTION 9.06    Right of Setoff ............................................................................86
SECTION 9.07    Waivers; Amendment. .................................................................86
SECTION 9.08    Interest Rate Limitation...............................................................87
SECTION 9.09    Entire Agreement ........................................................................88
SECTION 9.10    WAIVER OF JURY TRIAL .......................................................88
SECTION 9.11    Severability.................................................................................88
SECTION 9.12    Counterparts ...............................................................................88
SECTION 9.13    Headings......................................................................................88
SECTION 9.14    Applicable Law............................................................................88
SECTION 9.15    JURISDICTION; CONSENT TO SERVICE OF
                     PROCESS....................................................................................88
SECTION 9.16    Execution of Assignments..........................................................89
SECTION 9.17    Confidentiality ............................................................................90
SECTION 9.18    Lender Action ..............................................................................91
SECTION 9.19    USA PATRIOT Act Notice.........................................................91
SECTION 9.20    No Fiduciary Duty ......................................................................91

SECTION 9.21        Acknowledgment and Consent to Bail-in of EEA Financial Institutions ................................................................................. 91

ARTICLE X THE GUARANTY ........................................................................ 92

SECTION 10.01        Guaranty. ............................................................................ 92
SECTION 10.02        Additional Guarantors ........................................................ 94

ARTICLE XI PRIORITY AND LIENS/RANKING/COLLATERAL/RELEASE .................... 95

SECTION 11.01        Prepetition Senior Loan Obligations .............................. 95
SECTION 11.02        Acknowledgment of Security Interests .......................... 95
SECTION 11.03        Binding Effect of Documents .......................................... 95
SECTION 11.04        Collateral; Grant of Lien and Security Interest. ............. 95
SECTION 11.05        Administrative Priority .................................................... 96
SECTION 11.06        Grants, Rights and Remedies .......................................... 96
SECTION 11.07        Filings Required ............................................................... 97
SECTION 11.08        Survival ............................................................................ 97

SCHEDULES

| | | |
|---|---|---|
| Schedule 1.01 | - | Subsidiary Guarantors |
| Schedule 2.01 | - | Lenders and Commitments |
| Schedule 3.06 | - | Litigation |
| Schedule 3.09 | - | Tax Sharing Arrangements |
| Schedule 3.10 | - | ERISA |
| Schedule 3.12 | - | Properties |
| Schedule 3.13 | - | Subsidiaries; Excluded Subsidiaries |
| Schedule 3.14 | - | Compliance with Statutes |
| Schedule 3.16 | - | Environmental Matters |
| Schedule 3.21 | - | Insurance |
| Schedule 6.01(c) | - | Existing Liens |
| Schedule 6.04(b) | - | Existing Indebtedness |
| Schedule 6.05(c) | - | Existing Investments |
| Schedule 6.09(c) | - | Existing Restrictive Agreements |

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Initial Budget |
| Exhibit B | - | Form of Assignment and Acceptance |
| Exhibit C | - | Form of Withdrawal Request |
| Exhibit D | - | Form of Borrowing Request |
| Exhibit E | - | Form of Interest Election Request |
| Exhibit F | - | Form of Interim Order |
| Exhibit G-1 | - | Form of U.S. Tax Compliance Certificate |
| Exhibit G-2 | - | Form of U.S. Tax Compliance Certificate |
| Exhibit G-3 | - | Form of U.S. Tax Compliance Certificate |
| Exhibit G-4 | - | Form of U.S. Tax Compliance Certificate |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of November __, 2016 (this "***Agreement***"), among XTERA COMMUNICATIONS INC., a Delaware corporation (the "***Borrower***"), the Subsidiary Guarantors party hereto, the Lenders (such term and each other capitalized term used but not defined in these introductory statements having the meaning given it in Article I) and WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent (in such capacity, including any successor thereto in such capacity, the "***Administrative Agent***") for the Lenders and as collateral agent (in such capacity, including any successor thereto in such capacity, the "***Collateral Agent***") for the Secured Parties (as defined herein).

WHEREAS, on November __, 2016 (the "***Petition Date***"), the Borrower and certain of its Subsidiaries, including the Subsidiary Guarantors (collectively, the "***Debtors***"), commenced voluntary cases (the "***Chapter 11 Cases***") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested and the Lenders have agreed to provide a secured super-priority debtor-in-possession term loan facility to the Borrower hereunder, in an aggregate principal amount of $7,409,793, the proceeds of which will be used to fund working capital and certain permitted administrative expenses of the Debtors during the pendency of the Chapter 11 Cases in accordance with the Budget and the terms of this Agreement; and

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a lien on substantially all of their respective assets, in accordance with the priorities provided in the Loan Documents and the DIP Order.

Accordingly, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01 ***Defined Terms***.  As used in this Agreement, the following terms shall have the meanings specified below:

"***363 Sale***" shall have the meaning assigned to such term in Section 5.16(a).

"***363 Sale Effective Date***" shall have the meaning assigned to such term in Section 5.16(d).

"***363 Sale Order***" shall have the meaning assigned to such term in Section 5.16(c).

"***ABR Loan***" or "ABR Borrowing" shall mean a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Alternate Base Rate.

"***Adjusted LIBO Rate***" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) (x) an interest rate per annum (rounded upward, if necessary, to the next 1/100[th] of 1%) determined by the Administrative Agent to be equal to the LIBO Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (y) 1 minus the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period and (b) 1.00% per annum.

"*Administrative Agent*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*Administrative Agent Account*" means the account designated from time to time in writing as the "Administrative Agent Account" by the Administrative Agent to the other parties hereto.

"*Administrative Agent Fees*" shall have the meaning assigned to such term in Section 2.05(a).

"*Administrative Questionnaire*" shall mean an Administrative Questionnaire in the form supplied from time to time by the Administrative Agent.

"*Affiliate*" shall mean, as to any Person, any other Person which, directly or indirectly, controls or is controlled by such Person, or is under common control with such Person. For purposes of this definition, the terms (including, with correlative meaning) "control", "controlled by" and "under common control with", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; *provided* that in no event shall the Administrative Agent, the Collateral Agent or any Lender be considered an Affiliate of the Borrower or any Subsidiary for any purpose whatsoever under the Loan Documents or in connection with the DIP Facility.

"*Agents*" shall have the meaning assigned to such term in Section 8.01.

"*Agreement*" shall have the meaning assigned to it in the introductory statement hereto.

"*Agreement Value*" shall mean, for each Hedging Agreement, on any date of determination, the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or the applicable Subsidiary would be required to pay if such Hedging Agreement was terminated on such date.

"*Alternate Base Rate*" shall mean, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1.00%, (c) the Adjusted LIBO Rate for a one-month Interest Period beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1.00% and (d) 2.00% per annum. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"*Anti-Corruption Laws*" shall have the meaning assigned to such term in Section 3.20.

"*Anti-Money Laundering Laws*" shall mean any requirements of law related to money laundering, including the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., as amended by the USA PATRIOT Act, and its implementing regulations, and the Money Laundering Control Act of 1986, 18 U.S.C. §§ 1956 and 1957.

"*Applicable Margin*" shall mean, for any day (a) with respect to any Eurodollar Loan, 6.00% per annum and (b) with respect to any ABR Loan, 5.00% per annum.

"***Approved Fund***" shall mean, any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"***Asset Sale***" shall mean any sale, transfer or other disposition by the Borrower or any of the Subsidiaries to any Person (including by way of redemption by such Person) other than to a Loan Party of any asset (including, without limitation any Equity Interests in another Person) but excluding (a) Recovery Events and (b) asset sales permitted by Section 6.02.

"***Assignment and Acceptance***" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, consented to by the Administrative Agent and/or the Borrower, as required under Section 9.04(b)(iii), and accepted by the Administrative Agent, in substantially the form of Exhibit B or such other form (including electronic documentation generated by MarkitClear or other electronic platform) as shall be approved by the Administrative Agent.

"***Avoidance Actions***" means all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"***Bail-In Action***" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"***Bail-In Legislation***" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"***Bankruptcy Code***" shall mean Title 11 of the United States Code entitled "Bankruptcy," as applicable to the Chapter 11 Cases, now and hereafter in effect, or any applicable successor statute.

"***Bankruptcy Court***" shall have the meaning assigned to such term in the preamble hereto; *provided* that "***Bankruptcy Court***" shall also mean any other court having competent jurisdiction over the Chapter 11 Cases.

"***Base Rate***" shall mean, for any day, the prime rate published in *The Wall Street Journal* for such day; *provided* that if The Wall Street Journal ceases to publish for any reason such rate of interest, "***Base Rate***" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates); each change in the Base Rate shall be effective on the date such change is effective. The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"***Bid Procedures***" shall have the meaning assigned to such term in Section 5.16(a).

"***Bid Procedures Order***" shall have the meaning assigned to such term in Section 5.16(b). "Board" shall mean the Board of Governors of the Federal Reserve System of the United States.

"***Board of Directors***" shall mean, with respect to any Person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers of such Person or, if there is none, the Board of Directors of the managing member of such Person, (iii) in the case of a partnership, the Board of Directors of the general partner of such Person and (iv) in the case of any other Person, the functional equivalent of any of the foregoing.

"*Borrower*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*Borrower Materials*" shall have the meaning assigned to such term in Section 9.01.

"*Borrower Notice*" shall have the meaning assigned to such term in the definition of Real Estate Collateral Requirements.

"*Borrowing*" shall mean Loans of the same Type made, converted or continued on the same date.

"*Borrowing Request*" shall mean a written request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit D or such other form as shall have been approved by the Administrative Agent.

"*Breakage Event*" shall have the meaning assigned to such term in Section 2.16.

"*Budget*" shall mean the Initial Budget, and as the same may be further amended, supplemented, restated or otherwise modified from time to time with the written consent of the Required Lenders in their sole discretion, including any such amendment, supplement, restatement or other modification that extends the Budget to cover additional time periods beyond the initial 13 week period covered by the Initial Budget; *provided* that the Budget shall not be amended to delete or modify the Permitted Adequate Protection Payments without the consent of the recipient thereof, unless such payments are no longer payable in accordance with the terms of the DIP Order.

"*Budget Period*" shall mean each weekly period set forth in the Budget commencing with the week in which the Petition Date occurred.

"*Business Day*" shall mean any day other than a Saturday, Sunday or day on which banks in New York City or Minneapolis, Minnesota are authorized or required by law to close; *provided* that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"*Capital Lease Obligations*" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"*Carve-Out*" shall have the meaning assigned to such term in the DIP Order.

"*Cash Equivalents*" shall mean (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government, the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "*A-1*" from S&P or at least "*P-1*" from Moody's, (c) any commercial paper rated at least "*A-1*" by S&P or "*P-1*" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B)

"adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000, (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States (*provided however*, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days) and (f) investments by any Foreign Subsidiaries in any foreign equivalents of the investments described in clauses (a) through (d) above, *provided* that, (i) investments described in this clause (f) by any Foreign Subsidiary shall be limited to (1) securities issued by a country that is a member nation of the Organisation of Economic Cooperation and Development or by issuers formed under the laws of such a country, or (2) in the case of Foreign Subsidiaries operating in countries that are not member nations of the Organisation of Economic Cooperation and Development, investments customarily used by corporations for cash management purposes in such jurisdictions in the ordinary course of business of such corporations and (ii) in the case of investments equivalent to clause (a), the issuer has an investment grade sovereign debt rating from S&P or Moody's.

"***Change in Law***" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule or regulation, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority (whether or not having the force of law) or (c) the making or issuance of any request, rule guideline or directive (whether or not having the force of law) of any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "*Change in Law*", regardless of the date enacted, adopted or issued.

A "***Change of Control***" shall mean (a) a change in the record or beneficial ownership of an aggregate of more than 35% of the outstanding Equity Interests of the Borrower, in one or more transactions, compared to the ownership of outstanding Equity Interests of the Borrower in effect on the date hereof, or (b) any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934) becomes after the date hereof the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of a sufficient number of shares of all classes of Equity Interests then outstanding of the Borrower ordinarily entitled to vote in the election of directors, empowering such "person" or "group" to elect a majority of the board of directors of the Borrower, or (c) a "change of control" or similar event shall have occured as provided in the Prepetition Senior Loan Agreement, the Prepetition Subordinated Loan Agreement, the Prepetition Bridge Loan Notes or any other promissory note, credit agreement, indenture or other agreement governing Indebtedness issued or incurred by the Borrower or any Subsidiary.

"***Chapter 11 Cases***" shall have the meaning assigned to such term in the recitals hereto.

"***Chapter 11 Orders***" shall mean, collectively, the DIP Order and any other orders entered by the Bankruptcy Court in the Chapter 11 Cases.

"***Charges***" shall have the meaning assigned to such term in Section 9.08.

"***Claim***" shall have the meaning assigned to such term in Section 101(5) of the Bankruptcy Code.

"***Closing Date***" shall mean the first date on which all of the conditions precedent set forth in Sections 4.01 and 4.03 are satisfied (or waived by each Lender and the Administrative Agent) and this Agreement becomes effective pursuant to Section 9.03.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"***Collateral***" shall have the meaning assigned to such term in Section 11.04 or any Security Document.

"***Collateral Agent***" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"***Commitment***" shall mean, with respect to each Lender, the commitment of such Lender to make Loans hereunder as set forth on Schedule 2.01 (which Schedule shall be held by the Administrative Agent, and accessible to the Borrower and the Lenders, on the same basis as the Register under Section 9.04(c)), or in the Assignment and Acceptance pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) terminated pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The aggregate amount of Commitments of all Lenders as of the Closing Date is $7,409,793.

"***Communications***" shall have the meaning assigned to such term in Section 9.01.

"***Connection Income Taxes***" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"***Contingent Obligation***" shall mean, at any time, any Obligation or any other obligation, including any Guarantee (or a portion of any of the foregoing) that is contingent in nature at such time.

"***Control***" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "***Controlling***" and "***Controlled***" shall have meanings correlative thereto.

"***Debtor Relief Laws***" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"***Debtors***" shall have the meaning assigned to the term in the recitals hereto.

"***Declined Proceeds***" shall have the meaning assigned to such term in Section 2.13(g).

"***Default***" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"***Default Rate***" shall mean, with respect to the Loans or other Obligations which accrue interest at the Default Rate hereunder, a rate per annum equal to the sum of two percent (2%) plus the interest rate otherwise applicable thereto.

"***DIP Facility***" shall mean the term loan facility provided for by this Agreement.

"***DIP Liens***" shall have the meaning set forth in Section 3.23(b).

"***DIP Order***" shall mean, collectively, the Interim Order and the Final Order.

"***Disposition***" shall mean, with respect to any Person, (a) the sale, transfer, license, lease or other disposition (by way of merger, casualty, condemnation or otherwise) of any property or asset of such Person (including, without limitation, any sale and leaseback transaction and the sale of any Equity Interest owned by such Person) to any other Person and (b) the issuance of Equity Interests by a subsidiary of such Person to any other Person.

"***Disqualified Equity Interests***" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than as a result of a change of control or asset sale so long as any rights of holders thereof upon the occurrence of such change of control or asset sale are subject to the prior payment and satisfaction in full of the Obligations), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the first anniversary of the Maturity Date or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the Maturity Date.

"***Dollars***" or "***$***" shall mean the lawful money of the United States.

"***Domestic Subsidiaries***" shall mean any Subsidiary of the Borrower that is incorporated or organized under the laws of the United States, any state thereof or the District of Columbia.

"***EEA Financial Institution***" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Eligible Assignee***" shall mean any Person that meets the requirements to be an assignee under Section 9.04(b).

"***Environmental Claims***" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance, liability or violation, investigations and/or adjudicatory proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law or to any Environmental Liability, including, without limitation, any and all of the foregoing by (a) governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (b) any third party seeking damages, contribution,

indemnification, cost recovery, compensation or injunctive relief arising out of or relating to any Environmental Law or to an alleged injury or threat of injury to human health or safety or the environment due to the presence of, or exposure to, Hazardous Materials.

"*Environmental Laws*" shall mean all former, current and future federal, state, local, supranational, and foreign laws (including statutory and common law), treaties, regulations, rules, ordinances, codes, decrees, injunctions, judgments, governmental restrictions or requirements, directives, orders (including consent orders), permits, and agreements with any Governmental Authority in each case, relating to the indoor or outdoor environment, natural resources, human health and safety or the presence, Release of or exposure to pollutants, contaminants, wastes, chemicals or otherwise hazardous materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling, disposal or handling of, or the arrangement for such activities, with respect to any pollutants, contaminants, wastes, chemicals or otherwise hazardous materials or substances.

"*Environmental Liability*" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, indemnities, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether known or unknown, actual or potential, vested or unvested, or contingent or otherwise, arising out of or relating to (a) any Environmental Law, (b) the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling, disposal or handling of, or the arrangement for such activities, with respect to any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence or Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equity Interests*" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"*ERISA Affiliate*" shall mean any person that for purposes of Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with the Borrower or any Subsidiary under Section 414(b) or (c) of the Code or Section 4001 of ERISA.

"*ERISA Event*" shall mean (a) any "*reportable event*," as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by the applicable regulation or otherwise), (b) a determination that any Plan is in "*at risk*" status (within the meaning of Section 430 of the Code or Section 303 of ERISA), (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower, any Subsidiary or any of their respective ERISA Affiliates of any liability under Title IV of ERISA (other than non-delinquent premiums payable to the PBGC under Sections 4006 and 4007 of ERISA), (e) the termination, or the filing of a notice of intent to terminate, any Plan pursuant to Section 4041(c) of ERISA, (f) the receipt by the Borrower, any Subsidiary or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (g) the cessation of operations at a facility of the Borrower, any Subsidiary or any of their respective ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA, (h) conditions contained in Section 303(k)(1)(A) of ERISA for imposition of a lien on the assets of the Borrower, any Subsidiary or any of their respective ERISA Affiliates shall have been met with respect to

any Plan, (i) the receipt by the Borrower, any Subsidiary or any of their respective ERISA Affiliates of any notice imposing Withdrawal Liability on a Loan Party or a determining that a Multiemployer Plan is "*insolvent*" (within the meaning of Section 4245 of ERISA) or in "*endangered*" or "*critical*" status (within the meaning of Section 432 of the Code or Section 304 of ERISA), (j) the occurrence of a non-exempt "*prohibited transaction*" with respect to which the Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "*party in interest*" (within the meaning of Section 406 of ERISA) or with respect to which the Borrower, any such Subsidiary or their respective ERISA Affiliates could otherwise be liable; (k) any Foreign Benefit Event; (l) the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan; or (m) any failure by any Plan to satisfy the minimum funding standards (within the meaning of Section 412 or 430 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived.

"*Eurodollar Loan*" or "*Eurodollar Borrowing*" shall mean a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"*Events of Default*" shall have the meaning assigned to such term in Section 7.01.

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended.

"*Excluded Subsidiary*" shall mean, unless otherwise agreed by the Borrower and the Required Lenders, (a) any Subsidiary that is not a Wholly Owned Subsidiary (as of the Closing Date), (b) any Subsidiary that is (i) a Foreign Subsidiary, (ii) a direct or indirect Subsidiary of a Foreign Subsidiary, or (iii) a U.S. Foreign Holdco, (c) any Subsidiary that is prohibited by applicable law or regulation from guaranteeing the Obligations or that would require governmental (including regulatory) consent, approval, license or authorization in order to guarantee the Obligations, to the extent such consent, approval, license or authorization is not obtained after use of the Borrower's and such Subsidiary's commercially reasonable efforts (*provided* that any payment of money or other concessions shall have been approved by the Required Lenders) or (d) any Subsidiary with respect to which the Required Lenders and the Borrower reasonably agree that the cost (including tax consequences) or burden of obtaining a guarantee of the Obligations would be excessive in relation to the benefit to the Lenders to be afforded thereby. For the avoidance of doubt, any Subsidiary that is or becomes a Subsidiary Guarantor shall not constitute an Excluded Subsidiary for any purpose under this Agreement.

"*Excluded Taxes*" shall mean, any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes (or other similar taxes imposed in lieu of net income taxes), branch profits Taxes and other similar Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.21(a)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.20(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"***FATCA***" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended version or successor provision that is substantively comparable and not materially more onerous to comply with), any agreement entered into under Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (including such amended version and successor provisions) and, in each case, any current or future regulations promulgated thereunder or official interpretations thereof.

"***Federal Funds Effective Rate***" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"***Fee Letter***" shall mean the Fee Letter dated on or about the date hereof, among the Borrower, the Collateral Agent and the Administrative Agent.

"***Fees***" shall mean the Administrative Agent Fees, Prepayment Premium and all other fees or premiums payable by the Borrower pursuant to this Agreement (including fees payable under the Fee Letter).

"***Final Order***" shall have the meaning ascribed to such term in the Interim Order.

"***Financial Officer***" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"***Flood Laws***" shall have the meaning assigned to such term in the definition of Real Estate Collateral Requirements.

"***Foreign Benefit Event***" shall mean, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, (b) the failure to make required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the incurrence of any liability in excess of $1,000,000 by the Borrower or any Subsidiary under applicable law on account of the complete or partial termination of a Foreign Pension Plan or the complete or partial withdrawal of any participating employer therein, or (d) the occurrence of any transaction that is prohibited under any applicable law and that has resulted or could reasonably be expected to result in the incurrence of any liability by the Borrower or any of the Subsidiaries, or the imposition on the Borrower or any of the Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law, in each case in excess of $1,000,000.

"***Foreign Lender***" shall mean a Lender that is not a U.S. Person.

"***Foreign Pension Plan***" shall mean any benefit plan that under applicable law other than the laws of the United States or any political subdivision thereof, is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"***Foreign Subsidiary***" shall mean any Subsidiary of a Loan Party that is not a Domestic Subsidiary.

"***Fund***" shall mean any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"***Funding Account***" shall mean a blocked, non-interest bearing trust account maintained by the Administrative Agent in which the proceeds of the Loans shall be deposited and held as provided in this Agreement. Neither the Borrower nor any of the other Loan Parties shall have any property interest of any kind in the Funding Account or the funds held therein.

"***Funding Authorization Letter***" means that certain letter agreement, dated as of the Closing Date, made by the Borrower in favor of the Administrative Agent, pursuant to which, among other things, the Borrower has authorized and directed the Administrative Agent to disburse or otherwise apply the proceeds of the Loans on the Closing Date in accordance with a funds flow memorandum attached to such letter.

"***GAAP***" shall mean United States generally accepted accounting principles applied on a basis consistent with the financial statements referred to in Section 3.05(a)(i).

"***Government Official***" shall have the meaning assigned to such term in Section 3.20.

"***Governmental Authority***" shall mean any federal, state, local, supranational or foreign court or governmental agency, registry, authority, instrumentality or regulatory body.

"***Granting Lender***" shall have the meaning assigned to such term in Section 9.04(f).

"***Guarantee***" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "***primary obligor***") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided* that, the term "***Guarantee***" shall not include endorsements for collection or deposit in the ordinary course of business.

"***Guaranty***" shall mean (a) the Guarantee of each of the Guarantors provided pursuant to Article X and (b) any other Guarantee of the Obligations of any other Person provided pursuant to a Guaranty Supplement or other documentation in form and substance acceptable to the Administrative Agent and the Required Lenders.

"***Guaranty Supplement***" shall mean a supplement to the Guaranty, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, executed and delivered to the Administrative Agent for the purpose of adding any Person as a Guarantor.

"***Guarantors***" shall mean the Subsidiary Guarantors.

"***Hazardous Materials***" shall mean (a) any petroleum products, derivatives or byproducts and all other hydrocarbons, coal ash, radon gas, lead, asbestos and asbestos-containing materials, toxic mold,

urea formaldehyde foam insulation, polychlorinated biphenyls, infectious or medical wastes and chlorofluorocarbons and all other ozone-depleting substances, (b) any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics or (c) any substance, waste or material that is prohibited, limited or regulated by or pursuant to or which can form the basis for liability under any Environmental Law.

"**Hedging Agreement**" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services, including all earn-out obligations (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (j) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests of such Person or any other Person or any warrants, rights or options to acquire such equity interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (k) all obligations of such Person as an account party in respect of letters of credit and (l) all obligations of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 9.05(b). "Information" shall have the meaning assigned to such term in Section 9.17.

"**Initial Budget**" shall mean the 13 week cash flow forecast for the 13 week period beginning on the Petition Date substantially in the form of Exhibit A, which budget shall be deemed modified to provide for the Permitted Adequate Protection Payments specified in the DIP Order; *provided* that the Initial Budget shall not be amended to delete or modify the Permitted Adequate Protection Payments without the consent of the recipient thereof, unless such payments are no longer payable in accordance with the terms of the DIP Order.

"**Initial Lenders**" shall mean the Lenders party hereto on the Closing Date.

"**Intercompany Debt**" shall mean any Indebtedness, now existing or hereafter incurred, owed by the Borrower or any Subsidiary to the Borrower or any other Subsidiary.

"**Intercompany Loan**" shall have the meaning assigned to such term in Section 6.05(e).

"*Intercompany Note*" shall mean a promissory note evidencing an Intercompany Loan, duly executed and delivered in form reasonably satisfactory to the Administrative Agent and the Required Lenders in their respective reasonable discretion pursuant to which, among other things, the Intercompany Loan evidenced by such Intercompany Note owed by any Loan Party is subordinated to the Obligations.

"*Interest Election Request*" shall mean a request by the Borrower in accordance with the terms of Section 2.10 and substantially in the form of Exhibit E or such other form as shall be approved by the Administrative Agent.

"*Interest Payment Date*" shall mean with respect to (a) any ABR Loans, (x) the last Business Day of each calendar month and (y) any date upon which a payment or prepayment thereof is made and (b) with respect to any Eurodollar Loan, (x) the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in addition, the date of any prepayment of a Eurodollar Borrowing or conversion of a Eurodollar Borrowing to an ABR Borrowing and (y) any date upon which a payment or prepayment thereof is made.

"*Interest Period*" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on (i) the corresponding day in the next succeeding week or (ii) the numerically corresponding day in the calendar month that is one month thereafter, as the Borrower may elect; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c), end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Borrowing shall extend beyond the applicable Maturity Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of the Borrowing initially shall be the date on which the Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of the Borrowing.

"*Interim Order*" shall have the meaning assigned to such term in Section 4.01(k).

"*Investment*" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of compliance with Section 6.05, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in cash by such Person with respect thereto, whether by disposition, return on capital, dividend or otherwise.

"*Investment Company Act*" shall mean the Investment Company Act of 1940, as amended from time to time.

"*IP Rights*" shall have the meaning assigned to such term in Section 3.18.

"**_IRS_**" shall mean the United States Internal Revenue Service or any successor entity thereto.

"**_Junior Indebtedness_**" shall mean Indebtedness of the Borrower or its Subsidiaries that is (i) unsecured, (ii) subordinated in right of payment to all or any portion of the Obligations or (iii) secured by a lien that is subordinated to the liens securing the Obligations, including (x) the Prepetition Senior Loan Obligations, (y) the Prepetition Subordinated Loan Obligations and (z) the Prepetition Bridge Loan Obligations.

"**_Lenders_**" shall mean (a) the Persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto as a Lender pursuant to an Assignment and Acceptance or otherwise in accordance with this Agreement.

"**_LIBO Rate_**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period therefor, the rate per annum determined by the Administrative Agent by reference to the ICE Benchmark Administration London Interbank Offered Rate for deposits in Dollars (as set forth on the applicable Bloomberg screen page or by or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period; _provided_, _however_, that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the LIBO Rate shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which the Administrative Agent is offered deposits in Dollars by major banks in the London interbank market in London, England at approximately 11:00 a.m., London, England time, two Business Days prior to the first day of such Interest Period.

"**_Lien_**" shall mean (a) with respect to any asset, (i) any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, deposit arrangement, encumbrance, license, charge preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever in or on such asset (including any conditional sale or other title retention agreement, capital lease, any easement, right of way or other encumbrance on title to real property) and (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same effect as any of the foregoing) relating to such asset and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**_Loan Documents_**" shall mean this Agreement, any amendments to this Agreement, the Security Documents, the Notes, the Fee Letter, the Funding Authorization Letter, the Budget and any other document or certificate executed by any Loan Party in connection with any of the foregoing, together with the DIP Order.

"**_Loan Parties_**" shall mean the Borrower and the Subsidiary Guarantors. "Loans" shall mean the term loans made by the Lenders pursuant to Section 2.01.

"**_Margin Stock_**" shall have the meaning assigned to such term in Regulation U.

"**_Material Adverse Effect_**" shall mean a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties, assets or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole, except as previously disclosed in writing to the Lenders and except for the commencement of the Chapter 11 Cases and the effects that customarily result from the commencement of chapter 11 cases (including the issuance of the DIP Order); (ii) the ability of any Loan Party to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against a Loan Party of a Loan Document to which it is a party; (iv) the

validity, perfection or priority of any Lien in favor of the Administrative Agent for the benefit of the Lenders on any of the Collateral with an aggregate fair market value in excess of $1,000,000 since the date hereof; and (v) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent, any Lender or any Secured Party under any Loan Document.

"*Maturity Date*" shall mean the date which is the earliest of (i) the 363 Sale Effective Date, (ii) the Scheduled Maturity Date and (iii) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"*Maximum Rate*" shall have the meaning assigned to such term in Section 9.08.

"*MNPI*" shall have the meaning assigned to such term in Section 9.01.

"*Moody's*" shall mean Moody's Investors Service, Inc., or any successor thereto.

"*Mortgaged Properties*" shall mean each parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.11.

"*Mortgages*" shall mean the mortgages, deeds of trust, deeds to secure debt, leasehold mortgages, leasehold deeds of trust or leasehold deeds to secure debt and other similar security documents delivered at any time pursuant to Section 5.11, each in form and substance reasonably acceptable to the Required Lenders and the Collateral Agent, including as may be required to account for local law matters.

"*Multiemployer Plan*" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Borrower or any Subsidiary or with respect to which the Borrower or any Subsidiary has any liability (including on account of an ERISA Affiliate).

"*Net Cash Flow*" shall mean total sources minus total operating disbursements as reflected in the "Net Cash Flow" line of the Budget.

"*Net Cash Proceeds*" shall mean:

(a)      100% of the cash proceeds received by or on behalf of the Borrower or any of the Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but in each case only as and when received) from any Asset Sale or Recovery Event, net of (i) reasonable and documented attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees and expenses actually incurred in connection therewith, (ii) the principal amount of any Indebtedness permitted by this Agreement that is secured by a permitted Lien (other than a Lien on the Collateral that ranks *pari passu* with or is subordinated to the Liens securing the Obligations) on the asset subject to such Asset Sale or Recovery Event and that is required to be repaid in connection with such Asset Sale or Recovery Event (other than Indebtedness under the Loan Documents), together with any applicable premium, penalty, interest and breakage costs, (iii) in the case of any Asset Sale or Recovery Event by a non-Wholly Owned Subsidiary, the *pro rata* portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of the Borrower or any of the Wholly Owned Subsidiaries as a result thereof, (iv) Taxes paid or reasonably estimated to be payable as a result thereof, (v) the

amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (*provided however*, that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Asset Sale or Recovery Event occurring on the date of such reduction) and (vi) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (*provided* that to the extent that any amounts are released from such escrow to the Borrower or any Subsidiary, such amounts, net of any related reasonable and documented expenses, shall constitute Net Cash Proceeds), in the case of each of clauses (i) through (vi) above, to the extent approved by the Bankruptcy Court if such approval is necessary pursuant to the Bankruptcy Code, and

(b)        100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any of the Subsidiaries of any Indebtedness, net of all Taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

"***Non-Contingent Obligation***" shall mean, at any time, any Obligation or any other obligation, including any Guarantee (or a portion of any of the foregoing) that is not a Contingent Obligation at such time.

"***Notes***" shall mean any promissory notes evidencing the Loans, executed and delivered pursuant to Section 2.04(e) and in a form approved by the Required Lenders and the Borrower.

"***Obligations***" shall mean all principal of all Loans, all interest (including Post-Petition Interest) on such Loans and all other amounts now or hereafter payable by the Borrower and the other Loan Parties pursuant to the Loan Documents.

"***Official Committee***" shall mean the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code.

"***Other Connection Taxes***" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"***Other Taxes***" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, recording, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.21(a)).

"***Participant***" shall have the meaning assigned to such term in Section 9.04(d).

"***Participant Register***" shall have the meaning assigned to such term in Section 9.04(d).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Permitted Adequate Protection Payments**" shall mean the adequate protection payments to the Prepetition Senior Loan Lender in accordance with the DIP Order.

"**Permitted Encumbrances**" shall mean with respect to any Mortgaged Property, such exceptions to title as are set forth as exceptions in the title policy delivered in connection with the Mortgage delivered with respect to such Mortgaged Property, all of which exceptions must be reasonably acceptable to the Required Lenders in their reasonable discretion.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.01.

"**Permitted Variances**" shall mean (i) all variances that are favorable to the financial condition and the interests of the Loan Parties and the interests of the Lenders, and (ii) any variance that is unfavorable to the financial condition and the interests of the Loan Parties or the interests of the Lenders and does not exceed 5.0%, tested weekly (commencing at the end of the first calendar week ending after the Petition Date) on a non-cumulative basis (other than with respect to fees and expenses of outside legal counsel set forth in the Budget, which shall be tested on a cumulative basis for the pendency of the Chapter 11 Cases), based upon the Budget.

"**Person**" or "**person**" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"**Petition Date**" shall have the meaning assigned to the term in the recitals hereto.

"**Plan**" shall mean an "employee benefit plan" as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by the Borrower or any Subsidiary or with respect to which the Borrower or any Subsidiary has any liability (including on account of an ERISA Affiliate).

"**Platform**" shall have the meaning assigned to such term in Section 9.01.

"**Pledged Foreign Equity**" shall mean, as to any direct Foreign Subsidiary of any Loan Party that is an Excluded Subsidiary, collectively, (a) all Pledged Foreign Voting Equity of such Foreign Subsidiary and (b) all of the issued and outstanding Equity Interests of such Foreign Subsidiary not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)).

"**Pledged Foreign Voting Equity**" shall mean, as to any direct Foreign Subsidiary of a Loan Party that is an Excluded Subsidiary, 65% of the issued and outstanding Equity Interests of such Foreign Subsidiary entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)).

"**Post-Petition Interest**" shall mean any interest that accrues after the commencement of any case, proceeding or other action (including the Chapter 11 Cases) relating to the bankruptcy, insolvency or reorganization of any one or more of the Loan Parties (or would accrue but for the operation of applicable Debtor Relief Laws), whether or not such interest is allowed or allowable as a claim in any such proceeding.

"**Prepayment Premium**" shall mean the premium payable pursuant to Section 2.05(b).

"***Prepetition Bridge Loan Documents***" shall mean (i) that certain Security Agreement, dated as of September 13, 2016, by and among the certain Debtors and the Prepetition Bridge Loan Lenders (including all exhibits and guarantee, security, intercreditor and other ancillary documentation in respect thereof), as amended, supplemented or otherwise modified prior to the date hereof (the "***Bridge Security Agreement***"), and (ii) all instruments and documents (including the Prepetition Bridge Loan Notes) executed at any time in connection with the Bridge Security Agreement.

"***Prepetition Bridge Loan Lenders***" shall mean, collectively, New Enterprise Associates 9, Limited Partnership ("***NEA 9***"), New Enterprise Associates 10, Limited Partnership ("***NEA 10***"), ARCH Venture Fund VI, L.P. ("***ARCH***"), Jon Hopper ("***Hopper***") and Cliff Higgerson ("***Higgerson***"), as holders of the Prepetition Bridge Loan Notes and their successors and assigns.

"***Prepetition Bridge Loan Notes***" shall mean, collectively, the Notes (as defined in the Bridge Security Agreement), which consist of the following demand notes issued by the Borrower: (i) that certain demand note purchased by NEA 9, dated September 13, 2016, (ii) that certain demand note purchased by NEA 10, dated September 13, 2016, (iii) that certain demand note purchased by Hopper, dated September 13, 2016, (iv) that certain demand note purchased by ARCH, dated September 13, 2016, (v) that certain demand note purchased by Hopper, dated September 20, 2016, (vi) that certain demand note purchased by NEA 9, dated September 27, 2016, (vii) that certain demand note purchased by NEA 10, dated September 27, 2016, (viii) that certain demand note purchased by ARCH, dated September 27, 2016, (ix) that certain demand note purchased by NEA 9, dated October 11, 2016, (x) that certain demand note purchased by NEA 10, dated October 11, 2016, (xi) that certain demand note purchased by Hopper, dated October 11, 2016, (xii) that certain demand note purchased by ARCH, dated October 11, 2016, and (xiii) that certain demand note purchased by Higgerson, dated October 17, 2016.

"***Prepetition Bridge Loan Obligations***" shall mean all indebtedness, obligations and liabilities of the Borrower and its subsidiaries to any of the Prepetition Bridge Loan Lenders incurred prior to the Petition Date arising from or related to the Prepetition Bridge Loan Documents, including, without limitation, fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"***Prepetition Senior Loan Agreement***" shall mean that certain Loan and Security Agreement, dated as of January 16, 2015, by and among certain Debtors, the Prepetition Senior Loan Lender (including all exhibits and guarantee, security, intercreditor and other ancillary documentation in respect thereof), as amended, supplemented or otherwise modified prior to the date hereof.

"***Prepetition Senior Loan Documents***" shall mean the Prepetition Senior Loan Agreement and all instruments and documents (including the Loan Documents (as defined in the Prepetition Senior Loan Agreement)) executed at any time in connection with the Prepetition Senior Loan Agreement.

"***Prepetition Senior Loan Lender***" shall mean Pacific Western Bank (as successor in interest by merger with Square 1 Bank), as lender under the Prepetition Senior Loan Agreement, and its successors and assigns.

"***Prepetition Senior Loan Obligations***" shall mean all indebtedness, obligations and liabilities of the Borrower and its Subsidiaries to the Prepetition Senior Loan Lender incurred prior to the Petition Date arising from or related to the Prepetition Senior Loan Documents, including, without limitation, fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are

direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"**_Prepetition Subordinated Loan Agreement_**" shall mean that certain Venture Loan and Security Agreement, dated as of May 10, 2011, by and among certain Debtors and the Prepetition Subordinated Loan Lender (including all exhibits and guarantee, security and other ancillary documentation in respect thereof), as amended, supplemented or otherwise modified prior to the date hereof or hereafter in compliance with this Agreement.

"**_Prepetition Subordinated Loan Documents_**" shall mean the Prepetition Subordinated Loan Agreement and all instruments and documents (including the Loan Documents (as defined in the Prepetition Subordinated Loan Agreement)) executed at any time in connection with the Prepetition Subordinated Loan Agreement.

"**_Prepetition Subordinated Loan Lender_**" shall mean, Horizon Funding Trust 2013-1, LLC (as assignee of Horizon Funding 2013-1 LLC, assignee of Horizon Technology Finance Corporation), as the lender under the Prepetition Subordinated Loan Agreement, and its successors and assigns.

"**_Prepetition Subordinated Loan Obligations_**" shall mean all indebtedness, obligations and liabilities of the Borrower and its subsidiaries to the Prepetition Subordinated Loan Lender incurred prior to the Petition Date arising from or related to the Prepetition Subordinated Loan Documents, including, without limitation, fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"**_Professional Fee Reserve_**" shall mean an attorney escrow account established at DLA Piper (US) LLP to hold the professional fees allocated to the Debtor's professionals pursuant to the Budget, which amounts shall be set forth in a Withdrawal Request and funded to the attorney escrow account on or after the Final DIP Order.  Funds in the Professional Fee Reserve may be released from the Professional Fee Reserve and transferred by DLA Piper (US) LLP to the applicable professional in accordance with the Budget and upon the entry of an order or orders of the Bankruptcy Court providing for the allowance and payment of such professional fees.  Until the funds in the Professional Fee Reserve are authorized by the Bankruptcy Court to be paid to a particular professional, all amounts in the Professional Fee Reserve shall be subject to the liens of the Collateral Agent.

"**_Public Lender_**" shall have the meaning assigned to such term in Section 9.01.

"**_Qualified Equity Interests_**" shall mean any Equity Interests that are not Disqualified Equity Interests.

"**_Real Estate Collateral Requirements_**" shall mean the requirement that, to the extent required by the Required Lenders on the Closing Date with respect to the Mortgaged Properties (if any) as of the Closing Date, and thereafter as required by Section 5.11, the Administrative Agent shall have received a Mortgage for each Mortgaged Property in form and substance reasonably acceptable to the Required Lenders and the Administrative Agent and suitable for recording or filing, together, with respect to each Mortgage for any property located in the United States, the following documents: (a) a fully paid policy of title insurance (i) in a form approved by the Required Lenders insuring the Lien of the Mortgage encumbering such property as a valid first priority Lien, subject only to exceptions to title reasonably acceptable to the Required Lenders, (ii) in an amount reasonably satisfactory to the Required Lenders,

(iii) issued by a nationally recognized title insurance company reasonably satisfactory to the Required Lenders (the "*Title Company*") and (iv) that includes (A) such coinsurance and direct access reinsurance as the Required Lenders may deem necessary or desirable and (B) such endorsements or affirmative insurance reasonably required by the Required Lenders and available in the applicable jurisdiction (including, if applicable without limitation, endorsements on matters relating to usury, zoning, variable rate, address, separate tax lot, subdivision, tie in or cluster, contiguity, access and so-called comprehensive coverage over covenants and restrictions), (b) with respect to any property located in any jurisdiction in which a zoning endorsement is not available (or for which a zoning endorsement is not available at a premium that is not excessive), if requested by the Administrative Agent or the Required Lenders, a zoning compliance letter from the applicable municipality or a zoning report from Planning and Zoning Resource Corporation (or another person acceptable to the Required Lenders), in each case reasonably satisfactory to the Required Lenders, (c) upon the request of the Administrative Agent, a survey certified to Administrative Agent and the Title Company in form and substance reasonably satisfactory to the Required Lenders, (d) upon the request of the Administrative Agent, an appraisal complying with the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, by a third-party appraiser selected by the Administrative Agent (acting at the written direction of the Required Lenders), (e) an opinion of local counsel reasonably acceptable to the Required Lenders and in form and substance reasonably satisfactory to the Required Lenders, (f) if requested by any Lender, no later than three Business Days prior to the delivery of the Mortgage, the following documents and instruments, in order to comply with the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors of the Federal Reserve System) ("*Flood Laws*"): (A) a completed standard flood hazard determination form and (B) if the improvement(s) to the improved real property is located in a special flood hazard area, a notification to the Borrower ("*Borrower Notice*") and, if applicable, notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("*NFIP*") is not available because the community does not participate in the NFIP, documentation evidencing the Borrower's receipt of the Borrower Notice and (C) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance reasonably satisfactory to the Required Lenders, (g) upon the reasonable request of the Administrative Agent (acting at the written direction of the Required Lenders), Phase I environmental site assessment reports prepared in accordance with the current ASTM E1527 standard ("*Phase Is*") (to the extent not already provided) and reliance letters for such Phase Is (which Phase Is and reliance letters shall be in form and substance reasonably acceptable to the Required Lenders) and any other environmental information as the Administrative Agent or the Required Lenders shall reasonably request and (h) such other instruments and documents (including subordination or *pari passu* confirmations, consulting engineer's reports and lien searches) as the Administrative Agent or the Required Lenders shall reasonably request and with respect to each Mortgage for any property located outside the United States, equivalent documents available in the applicable jurisdiction and required by the Administrative Agent.

"*Recipient*" shall mean (a) the Administrative Agent and (b) any Lender.

"*Recovery Event*" shall mean any event that gives rise to the receipt by Borrower or any Subsidiary of any cash insurance proceeds or condemnation awards payable by reason of casualty, theft, loss, physical destruction, damage, taking, condemnation or any other similar event with respect to any property or assets of the Borrower or any Subsidiary.

"*Register*" shall have the meaning assigned to such term in Section 9.04(c).

"***Regulation U***" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Rejection Notice***" shall have the meaning assigned to such term in Section 2.13(g).

"***Related Parties***" shall mean, with respect to any specified Person, such Person's Affiliates and the respective equityholders, managers, investors, fiduciaries, trustees, officers, directors (including directors or authorized signatories of the general partner of any Person), employees, agents, advisors, representatives, controlling persons, members, partners, successors and permitted assigns of such Person and such Person's Affiliates.

"***Release***" shall mean any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, pumping, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including the air, soil and ground and surface water or into, through, within or upon any building, structure, facility or fixture.

"***Release Conditions***" shall mean the following conditions (a) all Commitments under this Agreement shall have expired or been terminated, (b) all Non-Contingent Obligations shall have been paid in full and (c) no Contingent Obligation (other than contingent indemnification obligations as to which no claim shall have been asserted) shall remain outstanding.

"***Releasees***" shall have the meaning set forth in Section 11.09.

"***Remedies Notice Period***" shall have the meaning set forth in the final paragraph of Section 7.01.

"***Required Lenders***" shall mean, at any time, Lenders having Loans and Commitments representing more than 50% of the sum of the principal amount of all Loans outstanding and unused Commitments at such time.

"***Resignation Closing Date***" shall have the meaning assigned to such term in Section 8.06.

"***Responsible Officer***" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"***Restricted Payment***" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary.

"***Restricted Proceeds***" shall have the meaning assigned to such term in Section 2.13(h).

"***Returns***" shall have the meaning assigned to such term in Section 3.09.

"***S&P***" shall mean Standard & Poor's Ratings Service or any successor thereto.

"***Sale of Guarantor***" shall have the meaning assigned to such term in Section 10.01(e).

"***Sanctioned Person***" shall mean any person that (i) (x) is publicly identified on the most current list of "*Specially Designated Nationals and Blocked Persons*" published by OFAC, (y) is publicly

identified on the most current list of "*Foreign Sanctions Evaders List*" published by OFAC or (z) is a national of or resides, is organized or chartered, or has a place of business in a country or territory that is subject to any Sanctions (including, as of the Closing Date, Cuba, Iran, North Korea, Sudan, Syria and the Crimea region of the Ukraine), (ii) is otherwise subject to or the target of any Sanctions, or (iii) is owned or controlled by (including by virtue of such person being a director or owning voting securities), or acts, directly or indirectly, for or on behalf of, any person described in clause (i) or (ii) above or a foreign government that is the subject or target of Sanctions.

"*Sanctions*" shall mean sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. State Department, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority.

"*Sanctions Laws*" shall mean any requirements of law related to counter-terrorism and economic sanctions, including the USA PATRIOT Act, The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. §§ 1 et seq.), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), any Sanctions and, in each case, their implementing rules and regulations.

"*Scheduled Maturity Date*" shall mean the date that is 13 weeks following the Petition Date.

"*Secured Parties*" shall have the meaning assigned to such term in Section 11.04.

"*Security Documents*" shall mean (x) Sections 11.04 through 11.09 and (y) any Mortgages, any security agreement, in form and substance reasonably satisfactory to the Required Lenders and the Collateral Agent, entered into by the Borrower and the Subsidiaries party thereto in favor of the Collateral Agent for the benefit of, among others, the Secured Parties in accordance with this Agreement (including any joinder agreements thereto), any Guaranty Supplement and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.11. The Security Documents shall supplement, and shall not limit, the grant of Collateral pursuant to this Agreement and the DIP Order.

"*SPV*" shall have the meaning assigned to such term in Section 9.04(f).

"*Stalking Horse*" shall have the meaning assigned to such term in Section 5.16(a).

"*Statutory Reserves*" shall mean, for any day during any Interest Period for any Eurodollar Borrowing, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained, during such Interest Period under regulations issued from time to time (including "Regulation D," issued by the Board of Governors of the Federal Reserve Bank of the United States (the "*Reserve Regulations*")) by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion Dollars against Eurocurrency funding liabilities (currently referred to as "*Eurocurrency liabilities*" (as such term is used in Regulation D)). Eurodollar Borrowings shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under the Reserve Regulations.

"*subsidiary*" shall mean, with respect to any Person (herein referred to as the "*parent*"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is

made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"*Subsidiary*" shall mean any subsidiary of the Borrower.

"*Subsidiary Guarantor*" shall mean (a) each Subsidiary listed under the heading "Subsidiary Guarantors" on Schedule 1.01 and (b) each other Subsidiary that becomes a Guarantor pursuant to a Guaranty Supplement or other documentation in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders. For the avoidance of doubt, (x) subject to Section 5.11(c), no Excluded Subsidiary shall be required to become a Subsidiary Guarantor unless the Borrower and the Required Lenders shall otherwise agree and (y) any Subsidiary that is or becomes a Subsidiary Guarantor shall not be an Excluded Subsidiary for any purpose under this Agreement.

"*Taxes*" shall mean any and all present or future taxes, levies, imposts, duties, deductions, assessments, fees, charges or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Test Period*" shall have the meaning assigned to such term in Section 5.15(a).

"*Threshold Amount*" shall mean $100,000.

"*Title Company*" shall have the meaning assigned to such term in the definition of Real Estate Collateral Requirements.

"*Transaction Costs*" shall mean the fees, costs and expenses incurred in connection with the Transactions.

"*Transactions*" shall mean collectively, (a) the execution and delivery of, and the performance under, the Loan Documents, in each case by the Loan Parties party thereto (as of the Closing Date), (b) the making of the Loans hereunder, and (c) the payment of Transaction Costs related to the foregoing.

"*Type*" when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "Rate" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"*U.S. Foreign Holdco*" shall mean a Domestic Subsidiary substantially all of the assets of which consist of Equity Interests or debt of one or more direct or indirect Foreign Subsidiaries that are Excluded Subsidiaries and assets incidental thereto.

"*U.S. Person*" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Tax Compliance Certificate*" shall have the meaning assigned to such term in Section 2.20(f).

"*Unfunded Pension Liability*" of any Plan shall mean the excess of such Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of such Plan's assets, determined in accordance with the assumptions used by the Plan's actuaries for funding the Plan pursuant to Section 412 of the Code for the applicable plan year and as set forth in Schedule SB to the most recent Form 5500 filed for such plan.

"*United States*" and "*U.S.*" shall mean the United States of America.

"*USA PATRIOT Act*" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107¬ 56 (signed into law October 26, 2001)).

"*Wholly Owned Subsidiary*" of any Person shall mean a subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more wholly owned subsidiaries of such Person or by such Person and one or more wholly owned subsidiaries of such Person.

"*Withdrawal*" shall mean a disbursement of funds from the Funding Account. "*Withdraw*" and "*Withdrawn*" shall have correlative meanings thereto.

"*Withdrawal Date*" shall have the meaning specified in Section 2.02(f).

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withdrawal Request*" shall mean a written request by the Borrower for a Withdrawal, substantially in the form of Exhibit C.

"*Withdrawal Termination Instruction*" shall have the meaning specified in Section 2.02(g). "Withholding Agent" shall mean any Loan Party and the Administrative Agent.

"*Write-Down and Conversion Powers*" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02 *Terms Generally*.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*", "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*". The word "will" shall be construed to have the same meaning and effect as the word "shall", and the words "*asset*" and "*property*" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The words "*herein*", "*hereto*", "*hereof*" and "*hereunder*" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document or any other agreement, instrument or document shall mean such document as amended, restated, amended and restated, supplemented or otherwise modified from time to time, but only to the extent that such amendment, restatements, supplements or modifications are not prohibited by this Agreement, (b) references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing, modifying or interpreting such law, (c) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any provision of

this Agreement or the other Loan Documents to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend any provision of this Agreement or any other Loan Document) regardless of whether any such notice is given before or after such change in GAAP, then such provision shall be interpreted on the basis of GAAP as in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such provision is amended in a manner satisfactory to the Borrower and the Required Lenders, (d) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein, (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof and (iii) in a manner such that any obligations relating to a lease that was accounted for by a Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by such Person shall be accounted for as obligations relating to an operating lease and not as Capital Lease Obligations, (e) for purposes of determining compliance with any provision of this Agreement, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any actual or proposed implementation of any change in accounting for leases pursuant to GAAP occurring after the date hereof and (f) where the permissibility of a transaction or determinations of any representations, warranties, covenants, required actions or circumstances under any Loan Document depends upon compliance with, or are determined by reference to, amounts stated in Dollars, such amounts shall be the Dollar equivalent thereof to the extent any component of such amount is then denominated in a currency other than Dollars, based on the relevant exchange rate in effect on the date of such transaction or determination and shall not be affected by subsequent fluctuations in exchange rate.

SECTION 1.03 *Classification of Loans and Borrowings*.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type (e.g., a "*Eurodollar Loan*" or "*Eurodollar Borrowing*").

ARTICLE II

THE CREDITS

SECTION 2.01 *Commitments*.  Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein and in the other Loan Documents, each Lender agrees, severally and not jointly, to make, on the Closing Date, a Loan to the Borrower, in Dollars, in an amount up to, but not exceeding, such Lender's Commitment. Amounts repaid or prepaid in respect of Loans may not be reborrowed. All Loans and other amounts owed hereunder shall be paid in full on the due date therefor in accordance with this Agreement.

SECTION 2.02 *Loans.*

(a)    Each Loan shall be made as part of a single Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make its Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

(b)      Subject to Sections 2.08 and 2.14, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement. Except as provided in Section 2.15, Borrowings of more than one Type shall not be outstanding at the same time hereunder and the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than one Eurodollar Borrowing outstanding hereunder at any time.

(c)      Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or elect to convert or continue, any Borrowing if the Interest Period requested or elected with respect thereto would end after the maturity date of such Borrowing.

(d)      Each Lender shall make the Loan to be made by it hereunder on the Closing Date by wire transfer of immediately available funds to the Funding Account, not later than 12:00 (noon), New York City time, on the Closing Date, and the Administrative Agent shall promptly disburse such portion of the amounts so received in accordance with the Funding Authorization Letter. The Borrower hereby represents, covenants and agrees that the disbursement or other instructions provided by it to the Administrative Agent in the Funding Authorization Letter provide for Loan proceeds to be disbursed or otherwise applied on the Closing Date (i) to pay all fees and expenses then due and payable under Section 2.05(a) and Section 9.05, (ii) to fund the initial Withdrawal in accordance with the Initial Budget and the initial Withdrawal Request, and (iii) as to all remaining amounts, to the Funding Account. If the Borrowing shall not occur on the proposed Closing Date because any condition precedent specified herein shall not have been satisfied, the Administrative Agent shall return within two Business Days the amounts so received to the respective Lenders (without interest).

(e)      Unless the Administrative Agent shall have received written notice from a Lender at least two hours prior to the time of the Borrowing on the Closing Date that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent at the time of such Borrowing in accordance with paragraph (d) above, and the Administrative Agent may, in reliance upon such assumption, make available to Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of Borrower, the interest rate applicable to ABR Loans and (ii) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan, as applicable, as part of such Borrowing for purposes of this Agreement, and Borrower's obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.02(e) shall cease.

(f)      Subject to Article 4 hereof and the other terms and conditions set forth herein, the Borrower may request Withdrawals from the Funding Account by delivering to the Administrative Agent a Withdrawal Request, not later than 12:00 (noon), New York City time, two Business Days before the proposed date of the applicable Withdrawal which date shall be a Business Day (each day, a "***Withdrawal Date***"); *provided* that the Borrower may request the initial Withdrawal on the Closing Date by delivering to the Administrative Agent a Withdrawal Request, not later than 12:00 (noon), New York City time, on the Closing Date. On the Withdrawal Date specified in the Withdrawal Request, the Administrative Agent

shall disburse funds from the Funding Account in an aggregate principal amount equal to the amount specified in such Withdrawal Request to the account of the Borrower specified in such Withdrawal Request, unless the Administrative Agent has received a Withdrawal Termination Instruction from the Required Lenders prior to 10:00 a.m., New York City time, on such Withdrawal Date (and such Withdrawal Termination Instruction has not been withdrawn by the Required Lenders in writing prior to 10:00 a.m., New York City time on such Withdrawal Date). All proceeds of the Loans (except to the extent otherwise applied on the Closing Date in accordance with Section 2.02(d)) shall be held in the Funding Account at all times until such proceeds are disbursed or otherwise applied in accordance with this Agreement, including Section 2.02(f), Section 2.05(a) or Section 2.11.

(g)    On and after the date of receipt by the Administrative Agent of a written direction from the Required Lenders instructing the Administrative Agent that it may no longer honor instructions from the Borrower with respect to the Funding Account due to any of the conditions set forth in Sections 4.02 or Section 4.03 being unsatisfied or incapable of satisfaction (a "*Withdrawal Termination Instruction*"), the Borrower shall have no right to request Withdrawals from the Funding Account and the Administrative Agent shall not honor any such request; *provided*, *however*, that the Administrative Agent shall not be liable for (i) any disbursements pursuant to instructions from the Borrower or (ii) irrevocable electronic funds transfers or wire transfers that are subject to cut-off times, in each case, that were processed or initiated prior to receipt of such Withdrawal Termination Instruction. Any Withdrawal Termination Instruction received by the Administrative Agent from the Required Lenders shall remain in effect until such time, if any, as the Administrative Agent shall have received a written termination of such Withdrawal Termination Instruction from the Required Lenders.

(h)    Each submission by the Borrower to the Administrative Agent of a Withdrawal Request shall be deemed to constitute a representation and warranty by the Borrower that the conditions set forth in Sections 4.02 and 4.03 have been satisfied as of the applicable Withdrawal Date (both before and after giving effect to the proposed Withdrawal). With respect to any disbursement, withdrawal, transfer, or application of funds from the Funding Account hereunder, the Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, (i) any Withdrawal Request submitted by the Borrower as evidence that all conditions precedent to a withdrawal and disbursement from the Funding Account to the Borrower have been satisfied (including, without limitation, those set forth in Sections 4.02 and 4.03), unless the Administrative Agent has received a Withdrawal Termination Instruction from the Required Lenders prior to 10:00 a.m., New York City time, on the applicable Withdrawal Date (and such Withdrawal Termination Instruction has not been subsequently withdrawn by the Required Lenders in writing prior to 10:00 a.m., New York City time, on such Withdrawal Date), and (ii) any Withdrawal Termination Instruction received by it. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no obligation to disburse any amount from the Funding Account in excess of the amounts then held in the Funding Account. The Administrative Agent shall have no duty to inquire or investigate whether any condition precedent to a Withdrawal has been satisfied, and shall not be deemed to have any knowledge that a condition is not satisfied unless it has received a Withdrawal Termination Instruction.

(i)    For the avoidance of doubt, all proceeds of Loans held in the Funding Account shall be Loans for all purposes hereunder and, notwithstanding that the proceeds of such Loans are held in the Funding Account, shall bear interest in accordance with this Agreement and shall be subject to all other terms and provisions of this Agreement and the other Loan Documents to the same extent as all other Loans. The Borrower shall pay to the Administrative Agent upon demand therefor from time to time all customary account opening, activity and other administrative fees and charges in connection with the maintenance of the Funding Account.

SECTION 2.03 **Borrowing Procedure**.  In order to request the Borrowing, the Borrower shall notify the Administrative Agent of such request in writing by delivering the Borrowing Request (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the proposed Borrowing and (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the proposed Borrowing (or, in the case of the Borrowing on the Closing Date, if such Borrowing is an ABR Borrowing, on the Closing Date). Each such notice shall be irrevocable and shall specify the following information: (i) whether the Borrowing then being requested is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the amount of such Borrowing; and (iv) if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto; *provided* that, notwithstanding any contrary specification in the Borrowing Request, the Borrowing shall comply with the requirements set forth in Section 2.02(c). If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), and of each Lender's *pro rata* share of the requested Borrowing.

SECTION 2.04 **Evidence of Debt; Repayment of Loans.**

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Loan of such Lender as provided in Section 2.11.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall, in accordance with its customary practice, maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and, if applicable, the Interest Period applicable thereto, the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (ii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

(e)     Any Lender may request that Loans made by it hereunder be evidenced by a Note. In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender and its registered assigns. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a Note, the interests represented by such Note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more Notes payable to the payee named therein or its registered assigns.

SECTION 2.05 *Fees and Premiums.*

(a)    The Borrower agrees to pay to the Administrative Agent, for its own account, the fees set forth in the Fee Letter at the times and in the amounts specified therein (the "*Administrative Agent Fees*"). The Administrative Agent shall be entitled to apply funds held in the Funding Account to the payment of the Administrative Agent Fees and all expenses and indemnities payable to the Collateral Agent, the Administrative Agent or the Lenders hereunder or under any other Loan Document, regardless of whether any condition precedent in Article IV has been satisfied and regardless of whether a Withdrawal Termination Instruction has been delivered to the Administrative Agent; *provided* that notice of such application is provided to the Borrower and the Lenders. The Administrative Agent Fees will be in addition to reimbursement of the Administrative Agent's and Collateral Agent's reasonable and documented out of pocket expenses in accordance with Section 9.05(a). The Administrative Agent Fees shall be fully earned when due and shall not be refundable for any reason whatsoever.

(b)    Each prepayment or repayment of the Loans prior to the Scheduled Maturity Date for any reason whatsoever (including due to acceleration under Section 7.01 or otherwise) shall be accompanied by a premium payable by the Borrower equal to 3.0% of the principal amount of the Loans so prepaid; *provided* that no such premium shall be payable in connection with a prepayment or repayment made in connection with a sale pursuant to Section 363 of the Bankruptcy Code in which the Stalking Horse is the buyer.

(c)    The Borrower agrees to pay to each Initial Lender, for its own account, on the Closing Date, a backstop premium equal to 0.50% of the amount of its *pro rata* share of the Commitments on the Closing Date (immediately prior to the making of the Loans on the Closing Date).

(d)    All Fees (other than Administrative Agent Fees) shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders. Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.06 *Interest on Loans.*

(a)    Subject to the provisions of Section 2.07, the Loans (including, for the avoidance of doubt, any Loans the proceeds of which are on deposit in the Funding Account, irrespective of whether such amounts are then unavailable or otherwise restricted for withdrawal or other utilization by the Loan Parties in accordance with the Loan Documents) comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days at all times and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b)    Subject to the provisions of Section 2.07, the Loans (including, for the avoidance of doubt, any Loans the proceeds of which are on deposit in the Funding Account, irrespective of whether such amounts are then unavailable or otherwise restricted for withdrawal or other utilization by the Loan Parties in accordance with the Loan Documents) comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)    Interest on each Loan (including, for the avoidance of doubt, any Loans the proceeds of which are on deposit in the Funding Account, irrespective of whether such proceeds are then unavailable or otherwise restricted for withdrawal or other utilization by the Loan Parties in accordance with the Loan

Documents) shall be payable on each Interest Payment Date except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.07 *Default Interest*.   During the period when any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loans (including any Loans the proceeds of which are on deposit in the Funding Account and are then unavailable for withdrawal or other utilization by the Loan Parties in accordance with the Loan Documents) shall automatically bear interest at the Default Rate.

SECTION 2.08 *Alternate Rate of Interest*.   If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)     the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) or is advised in writing by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give written notice thereof to Borrower and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Eurodollar Borrowing requested to be made on the first day of such Interest Period shall be made as an ABR Loan, (ii) any Borrowing that were to have been converted on the first day of such Interest Period to a Eurodollar Borrowing shall be continued as an ABR Loan and (iii) any outstanding Eurodollar Borrowing shall be converted, on the last day of the then-current Interest Period, to an ABR Loan.

SECTION 2.09 *Termination of Commitments*.   The Commitments shall automatically terminate in full upon the making of the Loans on the Closing Date. Notwithstanding the foregoing, all unfunded Commitments shall automatically terminate at 5:00 p.m., New York City time, on the Closing Date if the proposed Borrowing on such date shall not have occurred by such time.

SECTION 2.10 *Conversion and Continuation of Borrowings*.   The Borrower shall have the right at any time upon delivery of written notice comprising an Interest Election Request to the Administrative Agent (a) not later than 11:00 a.m., New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 11:00 a.m., New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 11:00 a.m., New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

(i)     each conversion or continuation shall be made *pro rata* among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)    no less than all the outstanding principal amount of any Borrowing shall be converted or continued;

(iii)    each conversion shall be effected for each Lender by the Administrative Agent recording for the account of such Lender the new Borrowing of such Lender resulting from such conversion and reducing the Borrowing (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv)    if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v)    any portion of the Borrowing maturing or required to be repaid in less than one week may not be converted into or continued as a Eurodollar Borrowing;

(vi)    any portion of a Eurodollar Borrowing that cannot be continued as a Eurodollar Borrowing by reason of the immediately preceding clause (v) shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing; and

(vii)    after the occurrence and during the continuance of a Default or Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each such Interest Election Request shall be irrevocable and shall specify (a) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (b) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (c) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (d) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the Lenders of any notice given pursuant to this Section 2.10. If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted into an ABR Borrowing.

SECTION 2.11 **Repayment of Borrowings.**

(a)    To the extent not previously paid, all Loans shall be due and payable on the Maturity Date together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment. On the Maturity Date, all funds in the Funding Account shall be applied by the Administrative Agent on behalf of the Borrower in accordance with the priorities of payment set forth in Section 7.02(a).

(b)    All payments pursuant to Section 2.11(a) shall be subject to Section 2.16 and, if applicable, Section 2.05(b).

SECTION 2.12 **Voluntary Prepayment.**

(a)    The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part upon at least three Business Days' prior written notice in the case of Eurodollar Loans, or written notice at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 12:00 (noon), New York City time; *provided* that each partial prepayment shall be in a principal amount that is an integral multiple of $500,000 and not less than $1,000,000 (in each case determined without regard to the Prepayment Premium, if applicable).

(b)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein; *provided* that a notice of prepayment for all of the then outstanding Loans may state that such notice is conditioned upon the effectiveness of other financing arrangements, in which case such notice may be revoked or extended by the Borrower (by notice to the Administrative Agent prior to 12:00 (noon), New York City time (or such later time as the Administrative Agent may agree in its sole discretion) on the specified effective date) if such condition is not satisfied; *provided further* that the provisions of Section 2.16 shall apply with respect to any such revocation or extension. All prepayments under this Section 2.12 shall be subject to Section 2.05(b) and Section 2.16 but otherwise without premium or penalty. All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13 *Mandatory Prepayments.*

(a)    In addition to any other mandatory prepayment pursuant to this Section 2.13, within five Business Days after each date on or after the Closing Date upon which the Borrower or any of the Subsidiaries receives any proceeds from any issuance or incurrence by the Borrower or any Subsidiary of Indebtedness (other than Indebtedness permitted to be issued or incurred pursuant to Section 6.04), an amount equal to 100% of the Net Cash Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory prepayment in accordance with the requirements of Section 2.13(f) and Section 2.13(g).

(b)    In addition to any other mandatory prepayment pursuant to this Section 2.13, within five Business Days after each date on or after the Closing Date upon which the Borrower or any Subsidiary receives any proceeds from any Asset Sale or Recovery Event, an amount equal to 100% of the Net Cash Proceeds therefrom shall be applied on such date as a mandatory prepayment in accordance with the requirements of Section 2.13(f) and Section 2.13(g).

(c)    In addition to any other mandatory prepayment pursuant to this Section 2.13, within five Business Days after each date on or after the Closing Date upon which the Borrower or any of the Subsidiaries receives any proceeds from any sale or issuance by the Borrower or any Subsidiary of Equity Interests of the Borrower or any Subsidiary to a Person that is not the Borrower or a Subsidiary, an amount equal to 100% of the net cash proceeds of such respective sale or issuance of Equity Interests shall be applied on such date as a mandatory prepayment in accordance with the requirements of Section 2.13(f) and Section 2.13(g).

(d)    The Borrower will prepay the Loans within three Business Days of any date on which the aggregate principal amount of all Loans exceeds the maximum aggregate principal amount of Loans projected to be outstanding on such date as set forth in the Budget (other than to the extent such excess resulted from the effect of Permitted Variances or Declined Proceeds pursuant to Section 2.13(g)), to the full extent of any such excess.

(e)      With respect to each prepayment of Loans required by this Section 2.13, such prepayments shall be applied on a *pro rata* basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are ABR Loans or Eurodollar Loans.

(f)      The Borrower shall deliver to the Administrative Agent, at least three Business Days prior to each prepayment required under this Section 2.13, a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and the reason for such prepayment. Each notice of prepayment shall specify the prepayment date, the Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid. All prepayments of Borrowings under this Section 2.13 shall be subject to Section 2.16 and Section 2.05(b), but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(g)      Each Lender may reject all (but not less than all) of its applicable share of any mandatory prepayment (such declined amounts, the "***Declined Proceeds***") of Loans required to be made pursuant to this Section 2.13 by providing written notice (each, a "***Rejection Notice***") to the Administrative Agent no later than 5:00 p.m., New York City time, one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment. If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above, such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Loans. All such Declined Proceeds shall be reallocated to the Lenders that have accepted such mandatory prepayment on a *pro rata* basis. If any mandatory prepayment is rejected by all Lenders, all of such Declined Proceeds shall be deposited into the Funding Account.

(h)      Notwithstanding any other provisions of this Section 2.13, except as otherwise directed by the Required Lenders in their sole discretion, (i) to the extent that any of or all the Net Cash Proceeds of any Asset Sale or Recovery Event received by any Foreign Subsidiary would be prohibited or delayed by (x) applicable local law or (y) the applicable certificate or articles of incorporation (or comparable organizational document) of such Foreign Subsidiary as in effect on the Closing Date due to a third-party minority ownership of any Person in such Foreign Subsidiary from being repatriated to the United States, an amount equal to the portion of such Net Cash Proceeds so affected (any such portion, "***Restricted Proceeds***") will not be required to be applied to prepay Loans at the times provided in Section 2.13(b), but may be retained by the applicable Foreign Subsidiary for so long, but only so long, as the applicable local law or applicable organizational document would not permit repatriation to the United States (and the Borrower hereby agree to cause the applicable Foreign Subsidiary to promptly take all actions required by or necessary under the applicable local law or applicable document to permit such repatriation), and once such repatriation of any of such Restricted Proceeds is permitted under the applicable local law or document, such repatriation will be immediately effected and such repatriated Restricted Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied to the prepayment of Loans pursuant to this Section 2.13 and (ii) to the extent that the Required Lenders, following an application therefor by the Borrower, has determined that repatriation of any of or all such Net Cash Proceeds would have material adverse tax consequences on the Loan Parties, then after the Borrower and the Subsidiaries' use of commercially reasonable efforts to (A) eliminate such tax consequences and (B) apply amounts under other cash resources that are available to the Borrower and the Subsidiaries to make such prepayments, the amount of such Net Cash Proceeds, such Net Cash Proceeds so affected may be retained by the applicable Foreign Subsidiary.

SECTION 2.14 ***Increased Costs; Capital Adequacy***.  (a) If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account

of or credit extended by any Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate);

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making or maintaining any Loan or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or otherwise) then the Borrower will pay to such Lender or such other Recipient, as the case may be, upon demand such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender shall have determined that any Change in Law regarding capital adequacy or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made or purchased by such Lender pursuant hereto to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity) then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender or such other Recipient setting forth the amount or amounts necessary to compensate such Lender or such other Recipient or the holding company, as applicable, as specified in paragraph (a) or (b) above shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive absent manifest error. The Borrower shall pay such Lender or such other Recipient the amount shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d)    Failure or delay on the part of any Lender or other such Recipient to demand compensation pursuant to this Section 2.14 shall not constitute a waiver of such Lender's or such other Recipient's right to demand such compensation; *provided* that the Borrower shall not be required to compensate any Lender or other such Recipient under paragraph (a) or (b) above pursuant to this Section 2.14 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or other Recipient, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's or other such Recipient's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 2.15 ***Change in Legality***.  (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)    such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)    such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under paragraph (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)    For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, (i) if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan and (ii) in all other cases, on the date of receipt by the Borrower.

SECTION 2.16 *Breakage*.  The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving, or being deemed to receive, any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "***Breakage Event***") or (b) any default in the making of any payment or prepayment required to be made hereunder. In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period. A certificate of any Lender (with a copy to the Administrative Agent) setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.17 *Pro rata Treatment*.  Except as otherwise expressly provided herein, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each reduction of the Commitments and each conversion of the Borrowing to or continuation of the Borrowing as a Borrowing of any Type shall be allocated *pro rata* among the Lenders in accordance with their respective applicable Commitment (or, if such Commitment shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans). Each Lender

agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

SECTION 2.18 **Sharing of Setoffs**. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; *provided* that:

> (i)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

> (ii)    the provisions of this Section 2.18 shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or Commitments to any assignee or participant).

The Borrower hereby consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.

SECTION 2.19 **Payments.**

(a)     The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Each such payment shall be made to the Administrative Agent Account. The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)     Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

SECTION 2.20 **Taxes.**

(a)     **Payments Free of Taxes**. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of

an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.20) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     *Payment of Other Taxes by the Loan Parties*.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     *Indemnification by the Loan Parties*.  The Borrower shall, and shall cause the other Loan Parties to, jointly and severally indemnify each Recipient, within ten 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     *Indemnification by the Lenders*.  Each Lender shall severally indemnify the Administrative Agent, within ten 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (i) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(d) relating to the maintenance of a Participant Register and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)     *Evidence of Payments*.  As soon as reasonably practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.20, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     *Status of Lenders*.  (i)  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the

Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.20(f)(ii)(A), (ii)(B) and (ii)(E) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

    (ii) Without limiting the generality of the foregoing,

      (A) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

      (B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

        (i) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, two executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

        (ii) two executed copies of IRS Form W-8ECI;

        (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "*bank*" within the meaning of Section 881(c)(3)(A) of the Code, a "*10 percent shareholder*" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) two executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

        (iv) to the extent a Foreign Lender is not the beneficial owner, two executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance

Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C)        if legally entitled to do so, any successor or supplemental Administrative Agent that is not a U.S. Person, shall deliver to the Borrower one executed copy of Internal Revenue Service Form W-8IMY certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a U.S. Person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a U.S. Person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.

(D)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals or copies, as may be required, of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(E)        if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (E), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Solely for purposes of this Section 2.20(f), the term "Lender" shall include (i) the Administrative Agent, (ii) any sub-agent acting pursuant to Section 8.05 that receives any payment from any of the Loan Parties on behalf of the Administrative Agent and (iii) any SPV providing the Borrower all or a part of any Loan pursuant to Section 9.04(f).

(g)        ***Treatment of Certain Refunds***.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid

over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)      *Survival*.  Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.21 *Assignment of Loans under Certain Circumstances; Duty to Mitigate.*

(a)      In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any Indemnified Taxes or additional amounts with respect thereto to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20 or (iv) any Lender refuses to consent to any amendment, waiver, consent or other modification of any Loan Document requested by the Borrower that requires the consent of a greater percentage of the Lenders than the Required Lenders or from all affected Lenders and such amendment, waiver, consent or other modification is consented to by the Required Lenders (or a greater percentage) then, in each case, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such assigned obligations (and, with respect to clause (iv) above, shall consent to such requested amendment, waiver, consent or other modification); *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction and (y) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender, plus all Fees and other amounts accrued for the account of such Lender hereunder with respect thereto (including any amounts under Sections 2.14 and 2.16 and, if applicable, the Prepayment Premium); *provided further* that if prior to any such transfer and assignment, the circumstances or event that resulted in such Lender's claim for compensation under Section 2.14, notice under Section 2.15, or the amounts to be paid pursuant to Section 2.20, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, cease to have the consequences specified in Section 2.15 or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event, shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such

Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.21(a).

(b)    If (i) any Lender shall request compensation under Section 2.14, (ii) any Lender delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any Indemnified Taxes or additional amount with respect thereto to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) in the case of a requirement to pay Indemnified Taxes or additional amounts with respect thereto pursuant to Section 2.20, to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights (other than its existing rights to payments pursuant to Section 2.14 or Section 2.20) and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or Section 2.20 enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans as provided herein, the Borrower makes the following representations and warranties on the Closing Date and each Withdrawal Date.

SECTION 3.01 *Organization Status*.  The Borrower and each of the Subsidiaries (a) is a duly organized and validly existing entity in good standing (or existing, as applicable) under the laws of the jurisdiction of its organization, (b) subject to the entry by the Bankruptcy Court of the DIP Order, has all requisite power and authority to own its material property and assets and to transact the business in which it is engaged and presently proposes to engage and (c) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications, except in the case of clauses (a) (other than with respect to the Borrower), (b) and (c) for failures to be so qualified or authorized or have such power which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.02 *Power, Authority and Enforceability*.  Subject to the entry by the Bankruptcy Court of the DIP Order, each Loan Party has the requisite power and authority to execute, deliver and perform the terms and provisions of each of the Loan Documents to which it is party and has taken all necessary actions to authorize the execution, delivery and performance by it of each such Loan Document. Subject to the entry by the Bankruptcy Court of the DIP Order, each Loan Party has duly executed and delivered each of the Loan Documents to which it is party, and each of such Loan Documents constitutes its legal, valid and binding obligation, enforceable in accordance with its terms, except to the extent (a) that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law), and (b) the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and Intercompany Debt owed by Foreign Subsidiaries.

SECTION 3.03 **No Violation**.  Subject to the entry by the Bankruptcy Court of the DIP Order, neither the execution, delivery or performance by any Loan Party of each of the Loan Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (a) will contravene any provision of any material law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority, except in the case of any contraventions that could not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect, (b) will conflict with, or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents or Permitted Liens) upon any of the property or assets of any Loan Party or any of the Subsidiaries pursuant to the terms of (i) the Prepetition Senior Loan Documents, (ii) the Prepetition Subordinated Loan Documents, (iii) the Prepetition Bridge Loan Documents, or (iv) any indenture, mortgage, deed of trust, promissory note, credit agreement or loan agreement, or any other material agreement, contract or instrument in each case to which any Loan Party or any Subsidiary is a party or by which it or any its property or assets is bound or to which it may be subject, except for any such contravention, breach, default, conflict or Lien that could not reasonably be expected, either individually or in the aggregate, to be materially adverse to the Borrower and its Subsidiaries taken as a whole or (c) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Loan Party or any Subsidiary.

SECTION 3.04 **Approvals**.  Subject to the entry by the Bankruptcy Court of the DIP Order, and as otherwise required under the Bankruptcy Code or by an order of the Bankruptcy Court, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority or any material consent from third parties is required to be obtained or made by, or on behalf of, any Loan Party (except for (a) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date and (b) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect) to authorize, or is required to be obtained or made by, or on behalf of, any Loan Party in connection with, (i) the execution, delivery and performance of any Loan Document or (ii) the legality, validity, binding effect or enforceability of any such Loan Document.

SECTION 3.05 **Financial Statements; Financial Condition; Undisclosed Liabilities.**

(a)      (i) The audited consolidated balance sheets and related statements of income and cash flows of the Borrower as of and for the fiscal years ended September 30, 2014 and 2015, furnished to the Lenders on or prior to the Closing Date, present fairly in all material respects the consolidated financial position of the Borrower as of such dates and for such periods and (ii) the unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower as of and for the fiscal quarter ended September 28, 2016 furnished to the Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial condition of the Borrower as of such dates and for such periods, subject to normal year-end adjustments and the absence of footnotes. All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited financial statements, to normal year-end audit adjustments and the absence of footnotes.

(b)      All financial statements delivered pursuant to Sections 5.01(b) and (c), if any, have been prepared in accordance with GAAP (except as otherwise provided in Section 5.01(b) and (c)) and present fairly in all material respects the consolidated financial position of the Borrower as of the dates and for the periods to which they relate.

(c)      Since October 31, 2016, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 3.06 **Litigation**.    Other than the Chapter 11 Cases and claims, actions, suits, investigations, litigation or proceedings stayed by 11 U.S.C. § 362 and set forth on Schedule 3.06, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened (a) with respect to the Loan Documents or (b) that have a reasonable likelihood of adverse determination, and, if adversely determined, have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

SECTION 3.07 **True and Complete Disclosure**.    All information (when furnished and taken as a whole) furnished by or on behalf of the Borrower or any Subsidiary in writing to the Administrative Agent or any Lender (including, without limitation, all information contained in the Loan Documents but excluding information of a general economic or industry nature) for purposes of, or in connection with this Agreement, the other Loan Documents or any transaction contemplated herein or therein is, and all other such information as supplemented (when furnished and taken as a whole) hereafter furnished by or on behalf of the Borrower or any Subsidiary in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date on which such information is furnished and not incomplete by omitting to state any fact necessary to make such information (when furnished and taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided; *provided* that for purposes of this Section 3.07, to the extent any such information is included in the Budget or constitutes projections, pro forma financial information or other forward looking information such representation shall be only that such information was prepared in good faith based on assumptions believed by the Borrower to be reasonable at the time made and at the time such information was furnished.

SECTION 3.08 **Margin Regulations**.    No part of any Borrowing (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. Neither the making of any Loan nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board.

SECTION 3.09 **Tax Returns and Payments**.    Except as permitted by the Bankruptcy Code, the Borrower and each of the Subsidiaries has timely filed or caused to be timely filed (or filed for extension) with the appropriate taxing authority all federal and other returns, statements, forms and reports for taxes (the "**Returns**") required to be filed by, or with respect to the income, properties or operations of, such Person, except where the failure to timely file or cause to be timely filed such Returns could not reasonably be expected to result in a Material Adverse Effect. The Returns accurately reflect all liability for taxes of such Person for the periods covered thereby, except where the failure to accurately reflect a liability for taxes could not reasonably be expected to result in a Material Adverse Effect. The Borrower and each of the Subsidiaries has paid all taxes and assessments payable by it which have become due, other than (a) those that are being contested in good faith and adequately disclosed and fully provided for on the financial statements of such Person in accordance with GAAP, (b) those the failure to pay could not reasonably be expected to result in a Material Adverse Effect and (c) those the nonpayment of which is permitted by the Bankruptcy Code or Court Order. Except as set forth on Schedule 3.09, none of the Borrower or any Subsidiary is party to, and there exist no, tax sharing agreements or similar arrangements (including tax indemnity arrangements) with respect to or involving the Borrower or any Subsidiary, other than any such agreements or arrangements (i) that are exclusively between any of the Borrower or any Subsidiaries or (ii) in the form of customary indemnification obligations contained in commercial agreements permitted by this Agreement and not principally related to taxes.

SECTION 3.10 **Compliance with ERISA**.    Schedule 3.10 sets forth each Plan and each Multiemployer Plan as of the Closing Date. Except as set forth on Schedule 3.10, each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply could not reasonably be expected to have a Material Adverse Effect. Except as could not reasonably be expected to have a Material Adverse Effect, each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a current favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the knowledge of the Borrower or any Subsidiary, nothing has occurred since the date of such determination or opinion that would reasonably be expected to result in revocation of such determination (or, in the case of a Plan with no determination, to the knowledge of the Borrower or any Subsidiary, nothing has occurred that would reasonably be expected to materially adversely affect the issuance of a favorable determination letter). No ERISA Event has occurred other than as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(a)    Except as disclosed on Schedule 3.10, there exists no Unfunded Pension Liability with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.

(b)    Neither the Borrower, nor any Subsidiary nor any of their respective ERISA Affiliates have incurred a complete or partial withdrawal from any Multiemployer Plan, and, if each of the Borrower, any of the Subsidiaries and each ERISA Affiliate were to withdraw in a complete or partial withdrawal as of the date this assurance is given or deemed given, the aggregate withdrawal liability that would be incurred could not reasonably be expected to result in a Material Adverse Effect.

(c)    There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower or any of the Subsidiaries, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, could reasonably be expected either individually or in the aggregate to have a Material Adverse Effect.

(d)    No Lien imposed under the Code or ERISA on the assets of the Borrower or any Subsidiary exists or is reasonably expected to arise on account of any Plan.

(e)    Except as could not individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, (ii) all contributions required to be made with respect to a Foreign Pension Plan have been timely made, (iii) neither the Borrower nor any of the Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan and (iv) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

SECTION 3.11 [Reserved].

SECTION 3.12 **Properties**.    All real property owned or leased by the Borrower or any of the Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth on Schedule 3.12.  The Borrower and each of the Subsidiaries has good and marketable title to all real

properties owned by it, free and clear of all Liens, other than Permitted Liens. The Borrower and each of the Subsidiaries has a valid leasehold interest in the real properties leased by it free and clear of all Liens other than Permitted Liens. The Borrower and each of the Subsidiaries has materially complied with all obligations under all leases to which it is a party and enjoys peaceful and undisturbed possession under all such leases.

SECTION 3.13 **Subsidiaries**. On and as of the Closing Date, the Borrower has no Subsidiaries other than those Subsidiaries listed on Schedule 3.13. Schedule 3.13 sets forth or lists, as applicable, as of the Closing Date, (i) the percentage ownership (direct and indirect) of each such Person in each class of Equity Interests of the Borrower and each of the Subsidiaries and also identifies the direct owner thereof, (ii) each Excluded Subsidiary and (iii) as to each Excluded Subsidiary, the basis on which such Excluded Subsidiary qualifies as an Excluded Subsidiary pursuant to the definition thereof set forth in Section 1.01. All outstanding shares of Equity Interests of the Borrower and each Subsidiary have been duly and validly issued, are fully paid and non-assessable (to the extent applicable). As of the Closing Date, none of the Borrower nor any Subsidiary has outstanding any securities convertible into or exchangeable for its or any other Person's Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of any calls, commitments or claims of any character relating to, its or any other Person's Equity Interests or any stock appreciation or similar rights except as disclosed on Schedule 3.13.

SECTION 3.14 **Compliance with Statutes, etc.**. Subject to the entry by the Bankruptcy Court of the DIP Order, and subject to the terms thereof, except as set forth on Schedule 3.14, the Borrower and each of the Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.15 **Investment Company Act**. Neither the Borrower nor any Subsidiary is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.16 **Environmental Matters**. Except for matters (i) set forth on Schedule 3.16 or (ii) as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) the Borrower and each of the Subsidiaries is and has been in compliance with all applicable Environmental Laws and has obtained and is in compliance with the terms of any permits required under such Environmental Laws; (b) there are no Environmental Claims pending or to the knowledge of the Borrower, threatened, against the Borrower or any of the Subsidiaries; (c) no Lien, other than a Permitted Lien, has been recorded or to the knowledge of the Borrower, threatened under any Environmental Law with respect to any real property owned by the Borrower or any of the Subsidiaries; (d) none of the Borrower nor any Subsidiary is or has become subject to any Environmental Liability or has agreed to contractually assume or accept responsibility, for any Environmental Liability of any other Person; (e) no Person with an indemnity or contribution obligation to the Borrower or any of the Subsidiaries relating to compliance with or liability under Environmental Law is in default with respect to such obligation; and (f) there are no facts, circumstances, conditions or occurrences with respect to the past or present business or operations of the Borrower or any of the Subsidiaries that could reasonably be expected to give rise to any Environmental Claim against the Borrower or any of the Subsidiaries or any Environmental Liability of the Borrower or any of the Subsidiaries. For purposes of this Section 3.16, the terms "**Borrower**" and "**Subsidiary**" shall include any business or business entity which is, in whole or in part, a predecessor of the Borrower or any Subsidiary.

SECTION 3.17 *Employment and Labor Relations*.  Neither the Borrower nor any Subsidiary is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against the Borrower or any Subsidiary or, to the knowledge of the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is pending against the Borrower or any of the Subsidiaries or, to the knowledge of the Borrower or any Subsidiary, threatened against any of them, (b) no strike, labor dispute, slowdown or stoppage pending against the Borrower or any of the Subsidiaries or, to the knowledge of the Borrower or any Subsidiary, threatened against any of them, (c) to the knowledge of the Borrower or any Subsidiary, no question concerning union representation with respect to the employees of the Borrower or any of the Subsidiaries, (d) no equal employment opportunity charge or other claim of employment discrimination pending or, to the knowledge of the Borrower or any Subsidiary, threatened against any of them and (e) to the knowledge of the Borrower or any Subsidiary, no wage and hour department investigation has been made of the Borrower or any of the Subsidiaries, except (with respect to any matter specified in clauses (a) – (e) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.18 *Intellectual Property, Etc.*.  The Borrower and each of the Subsidiaries owns or has the right to use all of the patents, trademarks, permits, domain names, service marks, trade names, trade dress, copyrights, licenses, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases), formulas, and other intellectual property rights (collectively, "*IP Rights*"), that are used or held for use in or otherwise required to operate their respective businesses, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

SECTION 3.19 *Economic Sanctions*.  (a)   None of the Borrower, the Subsidiaries, nor any director or officer thereof, nor, to the knowledge of the Borrower, any employee, agent or affiliate of the Borrower or any of their Subsidiaries (i) is, or is owned or controlled by Sanctioned Persons or conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person, (ii) deals in, or otherwise engages in any transaction related to, any Sanctioned Person, any property or interests in property of a Sanctioned Person or otherwise blocked pursuant to any Sanctions Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Sanctions Law.

(b)      The Borrower will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as lender, underwriter, advisor, investor or otherwise) or (iii) in any other manner that would result in a violation of Sanctions by any person (including any party to this Agreement or any other Person participating in the Loans, whether as lender, underwriter, advisor, investor or otherwise).

(c)      The Borrower and the Subsidiaries are in compliance in all material respects with all applicable Sanctions Laws and all applicable Anti-Money Laundering Laws.

SECTION 3.20 *Foreign Corrupt Practices Act*.  The Borrower and the Subsidiaries and their respective directors, officers, agents, employees, and any person acting for or on behalf of the Borrower or such Subsidiary (I) has complied with, and will comply with, the U.S. Foreign Corrupt Practices Act,

as amended from time to time, and the rules and regulations thereunder or any other applicable requirements of law relating to anti-corruption or anti-bribery (collectively, "**Anti-Corruption Laws**"), and it and they have not made, offered, promised, or authorized, and will not make, offer, promise, or authorize, whether directly or indirectly, nor will any proceeds of any Loans be used, directly or indirectly, in furtherance of, any payment of anything of value to: (a) an executive, official, employee or agent of a governmental department, agency or instrumentality, (b) a director, officer, employee or agent of a wholly or partially government-owned or -controlled company or business, (c) a political party or official thereof, or candidate for political office, or (d) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank) ("**Government Official**") while knowing or having a reasonable belief that all or some portion will be used for the purpose of: (i) influencing any act, decision or failure to act by a Government Official in his or her official capacity, (ii) inducing a Government Official to use his or her influence with a government or instrumentality to affect any act or decision of such government or entity, or (iii) securing an improper advantage; in order to obtain, retain, or direct business; and (II) will continue to maintain policies and procedures designed to promote and achieve compliance with such Anti-Corruption Laws and with the representations, warranties and covenants contained herein.

SECTION 3.21 **Insurance**.  Schedule 3.21 sets forth a true, complete and correct description of all insurances maintained by the Borrower or by each for the Subsidiaries as of the Closing Date. Such insurance is in full force and effect and all premiums have been duly paid.  The Borrower and the Subsidiaries have insurance in such amounts and covering such risks and liabilities as are in accordance with normal industry practice.

SECTION 3.22 **Use of Proceeds**.  Borrower has used and will use the proceeds of the Loans and Withdrawals solely (a) on the Closing Date, in accordance with Section 2.02(d), and (b) thereafter in accordance with Section 5.10 and Section 5.15.

SECTION 3.23 **Secured, Super-Priority Obligations.**

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motions seeking approval of the Loan Documents and the DIP Order and (y) the hearings for the approval of the DIP Order was given in each case. Borrower shall give, on a timely basis as specified in the DIP Order, all notices, pleadings and other documents required to be given to all parties specified in the DIP Order.

(b)    The provisions of the Loan Documents and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral (the "**DIP Liens**"), having the priority provided for herein and in the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, and enforceable against the Loan Parties.

(c)    Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations and all other obligations of the Loan Parties under the Loan Documents at all times shall constitute allowed super-priority administrative expense claims against the Debtors in the Chapter 11 Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out.

(d)  Pursuant to Section 364(c)(2) of the Bankruptcy Code and DIP Order, all Obligations are secured by a first priority perfected Lien on all unencumbered assets of the Loan Parties (now existing or hereafter acquired) (limited, in the case of Equity Interests in any direct Foreign Subsidiary that is an Excluded Subsidiary, to Pledged Foreign Equity) and all proceeds thereof that were not subject to a perfected, non-avoidable Lien as of the Petition Date, subject only to the Carve-Out.

(e)  Pursuant to Section 364(d)(1) of the Bankruptcy Code, all Obligations are secured by a perfected first priority senior priming Lien on all assets of the Loan Parties (now existing or hereafter acquired) and all proceeds thereof that are subject to a Lien securing any Prepetition Senior Loan Obligations, any Prepetition Subordinated Loan Obligations or any Prepetition Bridge Loan Obligations. The aforesaid perfected first priority senior priming Lien shall be senior in all respects to any Lien securing any Prepetition Senior Loan Obligations, any Prepetition Subordinated Loan Obligations or any Prepetition Bridge Loan Obligations and any adequate protection liens granted in favor of the Prepetition Senior Loan Lender, any Prepetition Subordinated Loan Lender or any Prepetition Bridge Loan Lender but shall be subject and junior to (i) the Carve-Out and (ii) any valid, perfected and unavoidable Liens in existence on the Closing Date on such assets of the Loan Parties that pursuant to the terms of the DIP Order are senior in priority the DIP Liens.

SECTION 3.24 **DIP Order**.  The DIP Order and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Administrative Agent and the Required Lenders.

SECTION 3.25 **Budget**.  The Budget was prepared in good faith by the management of the Loan Parties, based on assumptions believed by the management of the Loan Parties to be reasonable at the time made and upon information believed by the management of the Loan Parties to have been accurate based upon the information available to the management of the Loan Parties at the time such Budget was furnished.

ARTICLE IV

CONDITIONS OF LENDING AND WITHDRAWALS

SECTION 4.01 **Conditions to Borrowing**.  The obligations of the Lenders to make Loans on the Closing Date are subject to the satisfaction (or waiver by the Administrative Agent and the Initial Lenders in their sole discretion) of the following conditions:

(a)  The Administrative Agent and the Initial Lenders shall have received (i) a copy of the certificate or articles of incorporation (or comparable organizational document), including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State (or comparable entity) of the jurisdiction of its organization, and a certificate as to the good standing (where such concept is applicable) of each Loan Party as of a recent date, from such Secretary of State (or comparable entity), (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws (or comparable organizational document) of such Loan Party as in effect on the Closing Date, (B) that the certificate or articles of incorporation (or comparable organizational document) of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate or articles of incorporation (or comparable organizational document) furnished pursuant to clause (i) above, (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party and (D) that attached thereto is a certified copy of a Certificate of Good Standing of such Loan Party (in so-called "long-form", if available, from such Secretary of State (or other applicable Governmental Authority); and (iii) a

certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above.

(b)    The Administrative Agent and the Initial Lenders shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in Sections 4.01(g) and (h).

(c)    The Administrative Agent and the Initial Lenders shall have received all Fees, all fees payable under the Fee Letter and all other amounts due and payable to the Agents, the Initial Lenders and their respective Affiliates on or prior to the Closing Date, including, to the extent (x) invoiced at least one Business Day prior to the Closing Date or (y) set forth in the Funding Authorization Letter, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by any Loan Party hereunder or under any other Loan Document.

(d)    The Administrative Agent and each Initial Lender shall have received duly executed counterparts of this Agreement from each party hereto.

(e)    The Administrative Agent and each Initial Lender shall have received, at least three Business Days prior to the Closing Date, all documentation and other information with respect to the Loan Parties requested by the Administrative Agent or any such Initial Lender, as applicable, as required by regulatory authorities under applicable "*know your customer*" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(f)    The Administrative Agent and the Lenders shall have received a Borrowing Request in respect of the Loans to be made on the Closing Date, in accordance with Section 2.03.

(g)    The representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects on and as of such earlier date.

(h)    At the time of and immediately after the Borrowing on the Closing Date, no Default or Event of Default shall have occurred and be continuing.

(i)    The Administrative Agent shall have received the Funding Authorization Letter duly executed by the Borrower.

(j)    The Debtors shall have commenced the Chapter 11 Cases and all of the "first day motions", "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Initial Lenders and the Administrative Agent and shall be in form and substance acceptable to the Initial Lenders and the Administrative Agent in their sole respective discretion.

(k)    The Administrative Agent and the Initial Lenders shall have received a signed copy of an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit F (the "***Interim Order***"), which shall be certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the Initial Lenders and Administrative Agent and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by the Loan Parties of their respective obligations under the Loan Documents shall be the

subject of a presently effective stay pending appeal. The Loan Parties shall be in compliance in all respects with the Interim Order.

(l)    All orders entered by the Bankruptcy Court pertaining to cash management, including the DIP Order, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Initial Lenders and the Administrative Agent in their respective sole discretion.

(m)    (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no motion shall be pending seeking any other relief in the Bankruptcy Court to exercise control over Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions; *provided* that this clause (ii) shall not apply to any motion that is being contested in good faith by the Debtors and which contest the Debtors and the Lenders reasonably believe will be successful.

(n)    Administrative Agent and the Initial Lenders shall have received the Initial Budget, which shall be in form and substance acceptable to the Initial Lenders, and such other information (financial or otherwise) as the Initial Lenders or the Administrative Agent shall have reasonably requested prior to the Closing Date.

For purposes of determining compliance with the conditions specified in this Section 4.01, each Initial Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to an Initial Lender unless the Administrative Agent shall have received written notice from such Initial Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 4.02 *Conditions to Withdrawals*.  The Borrower may make a Withdrawal subject to the satisfaction or waiver of the following conditions precedent:

(a)    With respect to any Withdrawal Date that is on or after the date which is 30 days following the date of the entry of the Interim Order, the Final Order shall have been signed and entered by the Bankruptcy Court, and (i) the Administrative Agent and the Lenders shall have received a true and complete copy of such order, (ii) such order shall be in form and substance reasonably satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent or the Collateral Agent, the Administrative Agent and the Collateral Agent) in their respective sole discretion and (iii) such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent or the Collateral Agent, the Administrative Agent and the Collateral Agent).

(b)    The Borrower shall have paid to the Administrative Agent and the Lenders the fees and expenses then due and payable under the Loan Documents subject to and in accordance with the Bankruptcy Court Orders.

(c)    The Borrower shall have delivered to the Administrative Agent, an appropriate Withdrawal Request, duly executed and completed, in accordance with Section 2.02(f) specifying, in reasonable detail with reference to applicable lines items in the Budget, all amounts to be Withdrawn on the applicable Withdrawal Date in accordance with the Budget.

SECTION 4.03 *Additional Conditions*.  The obligation of each Lender to make the Loan on the Closing Date, and the Borrower's right to make a Withdrawal on each Withdrawal Date (other than a

Withdrawal used solely to pay fees and expenses set forth in Section 2.02(d)(i)), also are subject to the satisfaction, or waiver in accordance with this Agreement, of the following further conditions precedent:

(a)     The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal.

(b)     The Debtors shall be in compliance with the Interim Order or the Final Order, as the case may be.

(c)     The Administrative Agent and the Lenders shall have received all periodic updates required under Sections 5.01, each in form and substance satisfactory to the Required Lenders, and the Borrower shall be in compliance with Section 5.15 and the Administrative Agent shall have received a certificate, dated the applicable Withdrawal Date and signed by a Financial Officer of the Borrower, confirming compliance (subject to Permitted Variances thereto) with Section 5.15 and Section 4.03(e)(ii).

(d)     Except as disclosed to the Administrative Agent and the Lenders, since the Petition Date, no event, circumstance or change shall have occurred that has caused, could be reasonably expected to cause, or evidences, either in any case or in the aggregate, to have a Material Adverse Effect.

(e)     The following statements shall be true and correct:

(i)     the representations and warranties contained in Article III hereof and in each other Loan Document are true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such Closing Date or Withdrawal Date, as applicable, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date); and

(ii)     no Default or Event of Default shall have occurred and be continuing on such Closing Date or Withdrawal Date, as applicable, or would result from the making of such Loan or Withdrawal on such date.

ARTICLE V

AFFIRMATIVE COVENANTS

The Borrower hereby covenants and agrees that on and after the Closing Date and until the Commitments have been terminated and the Loans and Notes (in each case, together with interest thereon), Fees and all other Obligations (other than contingent obligations which are not then due and payable) incurred hereunder and thereunder, are paid in full:

SECTION 5.01 *Information Covenants*.  The Borrower will furnish to the Administrative Agent (for further distribution to the Lenders):

(a)     *Monthly Financial Statements*.  Within 21 days after the close of each calendar month, the consolidated balance sheet of the Borrower and the consolidated Subsidiaries as at the end of such monthly accounting period and the related consolidated statements of income and retained earnings and

statement of cash flows for such monthly accounting period and for the elapsed portion of the fiscal year ended with the last day of such monthly accounting period, in each case setting forth comparative figures for the corresponding monthly accounting period in the prior fiscal year, all of which shall be certified by a Financial Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and the consolidated Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(b)      *Quarterly Financial Statements*.   Within 45 days after the close of each quarterly accounting period in each fiscal year of the Borrower, (i) the consolidated balance sheet of the Borrower and the consolidated Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, all of which shall be certified by a Financial Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and the consolidated Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes and (ii) customary management's discussion and analysis of the important operational and financial developments during the then elapsed portion of such fiscal year consistent with the Borrower's historical practices.

(c)      *Annual Financial Statements*.   Within 105 days after the close of each fiscal year of the Borrower, (i) the consolidated balance sheet of the Borrower and the consolidated Subsidiaries as at the end of such fiscal year and the related consolidated statements of income and retained earnings and statement of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and certified by an independent certified public account reasonably acceptable to the Required Lenders, accompanied by an opinion of such accounting firm (which opinion shall be without qualification or exception as to scope of audit) and (ii) customary management's discussion and analysis of the important operational and financial developments during such fiscal year consistent with the Borrower's historical practices.

(d)      *Management Letters*.   Promptly after the Borrower's or any of the Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto in connection with each annual audit of the financial statements of the Borrower made by such accountants, subject to such confidentiality limitations as may be required by such independent public accountants in writing.

(e)      *Notice of Default, Litigation and Material Adverse Effect*.   Except with respect to the Chapter 11 Cases, promptly, and in any event within five Business Days after any senior officer of the Borrower or any of the Subsidiaries obtains knowledge thereof (other than in the case of the following clause (i), in which case notice is to be provided within five days after occurrence thereof and), notice of (i) the occurrence of any event which constitutes a Default or an Event of Default, (ii) any litigation or governmental investigation or proceeding pending against the Borrower or any Subsidiary (x) which, either individually or in the aggregate, has been adversely determined or has a reasonable likelihood of adverse determination and such adverse determination has had, or could reasonably be expected to have, a Material Adverse Effect or (y) with respect to any Loan Document, (iii) any other event, change or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect, (iv) any ERISA Event or (v) any strike, labor dispute, slowdown or stoppage pending against the Borrower or any of the Subsidiaries.

(f)     **Other Information**. Promptly following reasonable request, such other information or documents (financial or otherwise) (i) regarding the operations, business affairs, material contracts and financial condition of the Borrower or any of the Subsidiaries, or (ii) necessary for any Lender or the Administrative Agent to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, in each case as the Administrative Agent or any Lender may reasonably request.

(g)     **Management Reports**. Simultaneously with the delivery of each set of financial statements referred to in Sections 5.01(a), (b) and (c) above, a management report containing the financial statements and corresponding figures from the forecasted financials set forth in the budget for the current fiscal year (including "build-up" figures for the corresponding periods covered by such financial statements delivered pursuant to such Sections).

(h)     **Chapter 11 Cases**. No later than the first day after the filing thereof, copies of all pleadings, motions, applications, judicial information, financial information and other papers and documents filed by or on behalf of any Debtor in the Chapter 11 Cases.

(i)     **Budget Reports**.  By 5:00 p.m. (New York time) on each Wednesday after the Petition Date (or, if such day is not a Business Day, the Business Day immediately following such day), the Borrower shall deliver to the Prepetition Senior Loan Lender, the Administrative Agent and Lenders, a report, in form and substance reasonably satisfactory to the Required Lenders, setting forth (i) for the immediately preceding week (ending on the Sunday immediately preceding the applicable Wednesday reporting deadline) and for the cumulative period from the Petition Date through the immediately preceding Sunday, the actual and budgeted results for such week and cumulative post-Petition Date time period by line item in the Budget, together with a reasonably detailed written explanation of all material variances, and (ii) for the 13-week period beginning on the immediately preceding Monday, the projected weekly results by line item in the Budget, together with a reasonably detailed written explanation of all projected material variances (as compared to the immediately preceding rolling 13-week forecast delivered by the Borrower).

SECTION 5.02 **Books, Records and Inspections**.  The Borrower will, and will cause each of the Subsidiaries to, keep proper books of record and accounts in which full, true and correct (in all material respects) entries in conformity with GAAP (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles that are applicable in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder) and all requirements of law shall be made of all material dealings and transactions in relation to its business and activities. The Borrower will, and will cause each of the Subsidiaries to, permit officers and designated representatives of the Administrative Agent and each Lender to visit and inspect, under guidance of officers of the Borrower or any Subsidiary, any of the properties of the Borrower or any Subsidiary, and to examine the books of account of the Borrower or any Subsidiary and discuss the affairs, finances and accounts of the Borrower or any Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or any Lender may reasonably request; *provided* that the Administrative Agent and any such Lender shall give the Borrower an opportunity to participate in any discussions with its accountants; *provided further* that none of the Borrower nor any Subsidiary shall be required to disclose (i) records of the Board of Directors of the Borrower or such Subsidiary, (ii) information subject to confidentiality agreements or attorney/client work privilege and (iii) other information (x) that constitutes non-financial trade secrets or non-financial proprietary information or (y) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law; *provided* that the Borrower or such

Subsidiary shall (A) notify the Administrative Agent or the requesting Lender that such information is being withheld and (B) use commercially reasonable efforts to disclose such information in a way that would not violate the applicable agreement, rule, regulation, law or risk waiver of such privilege.

SECTION 5.03 *Maintenance of Property; Insurance.*

(a)        The Borrower will, and will cause each of the Subsidiaries to, (i) keep all tangible property necessary to the business of the Borrower and the Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty and condemnation events, except if the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower and the Subsidiaries (after giving effect to any self-insurance reasonable and customary for similar situated Persons engaged in the same or similar business as the Borrower and the Subsidiaries) as reasonably determined by the Borrower, and (iii) furnish to the Administrative Agent or any Lender (through the Administrative Agent), promptly following its reasonable request therefor, full information as to the insurance carried; provided so long as no Event of Default exists, the Administrative Agent may only make such request one time in any fiscal year. Such insurance shall include physical damage insurance on all material real and personal property (whether now owned or hereafter acquired) on an all risk basis and business interruption insurance. The provisions of this Section 5.03 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents or the DIP Order that require the maintenance of insurance.

(b)        The Borrower will, and will cause each of the Subsidiaries to, at all times keep the Collateral insured to the extent required in Section 5.03(a) above in favor of the Collateral Agent, and all policies or certificates (or copies thereof) with respect to such insurance (and any other insurance maintained by the Borrower and such Subsidiaries) (i) shall be endorsed to the Administrative Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as lender loss payee, additional insured and/or mortgagee), (ii) shall state that such insurance policies shall not be canceled without at least 30 days' prior written notice thereof by the respective insurer to the Administrative Agent and the Collateral Agent, (iii) shall request that such insurance provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Parties and (iv) shall be deposited with the Administrative Agent or the Collateral Agent.

(c)        If the Borrower or any of the Subsidiaries shall fail to maintain insurance in accordance with this Section 5.03, or if the Borrower or any of the Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation), upon seven Business Days' prior written notice from the Administrative Agent, to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all reasonable out-of-pocket costs and expenses of procuring such insurance.

(d)        If at any time the improvements on a Mortgaged Property are located in an area identified as a special flood hazard area by the Federal Emergency Management Agency or any successor thereto or other applicable agency and the Borrower will, and will cause each of the Subsidiaries to, at all times keep and maintain flood insurance in an amount sufficient to comply with the Flood Laws.

SECTION 5.04 *Existence; Franchises*.    The Borrower will, and will cause each of the Subsidiaries to, do or cause to be done, all things necessary, to preserve and keep in full force and effect its existence and its rights, franchises, permits, and IP Rights; *provided however*, that nothing in this

Section 5.04 shall prevent (a) sales of assets, dispositions and other transactions by the Borrower or any of the Subsidiaries in accordance with the terms herein, (b) the withdrawal by the Borrower or any of the Subsidiaries of its qualification as a foreign company in any jurisdiction or (other than with respect to the Borrower) failure to otherwise preserve or keep in full force and effect its existence or rights, franchises, permits, or IP Rights, if such withdrawal or failure could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (c) the expiration of copyrights or patents at the end of their statutory term.

SECTION 5.05 **Compliance with Statutes, etc.**. Except as otherwise excused by the Bankruptcy Code, the Borrower will, and will cause each of the Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including Anti-Corruption Laws, Sanctions Laws and Anti-Money Laundering Laws), except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 5.06 **Compliance with Environmental Laws**. The Borrower will (a) comply, and will cause each of the Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of any real property now or hereafter owned, leased or operated by the Borrower or any of the Subsidiaries, except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (b) conduct any investigatory, cleanup, response or remedial action required under Environmental Law with respect to the Release or threatened Release of Hazardous Materials, (c) promptly respond to and pursue final resolution in a reasonably favorably manner of, any Environmental Claim brought against the Borrower or any of the Subsidiaries, except such Environmental Claims as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (d) will keep or cause to be kept all such real property free and clear of any Liens (other than Permitted Liens) imposed pursuant to such Environmental Laws.

SECTION 5.07 **Business**. Except to the extent required by the Bankruptcy Court, the Borrower will only, and will only permit the Subsidiaries to, engage directly or indirectly in the businesses engaged in by the Borrower and the Subsidiaries as of the Closing Date.

SECTION 5.08 **Payment of Taxes.**

(a)       In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court, the Borrower will timely pay all material obligations arising after the Petition Date promptly and in accordance with their terms and timely pay and discharge promptly all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property arising after the Petition Date, as well as all material lawful claims for labor, materials and supplies or otherwise arising after the Petition Date which, if unpaid, would become a Lien or charge upon such properties or any part thereof, before the same shall become in default; *provided* that the Borrower and each of its Subsidiaries shall not be required to pay and discharge or to cause to be paid and discharged any such obligation, tax, assessment, charge, levy or claim so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings (if the Borrower or its Subsidiaries shall have set aside on their books adequate reserves therefor) or (ii) non-payment and discharge thereof is permitted or required under the Bankruptcy Code or order of the Bankruptcy Court.

SECTION 5.09 **Employee Benefits**. Except as could not reasonably be expected to have a Material Adverse Effect, the Borrower and each Subsidiary will comply in all respects with the provisions of ERISA and the Code applicable to employee benefit plans as defined in Section 3(3) of ERISA and the

laws applicable to any Foreign Pension Plan. The Borrower and any Subsidiary will furnish to the Administrative Agent as soon as possible after, and in any event within 10 days after any Responsible Officer of the Borrower or any Subsidiary knows or has reason to know that, any ERISA Event has occurred or is reasonably expected to occur that, alone or together with any other ERISA Event that has occurred or is reasonably expected to occur that has resulted or would reasonably be expected to result in a liability of the Borrower, any Subsidiary or any ERISA Affiliate in excess of the Threshold Amount, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event and the action, if any, that the Borrower proposes to take with respect thereto. Each Loan Party shall promptly and in any event within 30 days after a request by the Administrative Agent or any Lender (through the Administrative Agent), furnish to the Administrative Agent copies of each Schedule SB (Actuarial Information) to the Annual Report (Form 5500 Series) with respect to each Plan sponsored by the Borrower, any Subsidiary or any of their respective ERISA Affiliates.

SECTION 5.10 *Use of Proceeds*.   The proceeds of the Loans and each Withdrawal shall be applied and used, on the Closing Date in accordance with Section 2.02(d), and at all times thereafter in accordance with the Loan Documents, including Section 5.15. Notwithstanding the foregoing, no part of the proceeds of any Loan will be used, directly or indirectly:

(a)    in any manner that causes or would reasonably be expected to cause such Loan or the application of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Exchange Act;

(b)    for any purpose that is prohibited under the Bankruptcy Code or the DIP Order;

(c)    to finance in any way: (a) payment of any fees or expenses incurred by any party in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, suits, arbitrations, proceedings, applications, motions or other litigation of any type (i) adverse to any of the Secured Parties (whether in such capacity or otherwise), the Prepetition Senior Loan Lender (whether in such capacity or otherwise) or any of the affiliates, agents or representatives of the foregoing, or their respective rights and remedies under or in respect of the DIP Facility, the Prepetition Senior Loan Documents, or any interim or final order with respect to the DIP Facility or the adequate protection granted to the Prepetition Senior Loan Lender under the DIP Order; (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Loan Documents or the Prepetition Senior Loan Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; or (iii) attempting to prevent, hinder or otherwise delay any of the Lenders', the Administrative Agent's or the Collateral Agent's assertion, enforcement or realization upon any DIP Collateral (as defined in the DIP Order) in accordance with the Loan Documents, including the DIP Order, other than to seek a determination that an Event of Default has not occurred or is not continuing during the Remedies Notice Period; (b) any purpose that is prohibited under the Bankruptcy Code or the DIP Order; (c) making any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, which payment is not provided for in the Budget, without the prior written consent of the Required Lendersor; or (d) after delivery of a Carve-Out Trigger Notice (as defined in the DIP Order), paying any success, completion, back end or similar fees; *provided* that, notwithstanding anything to the contrary herein, the Official Committee may use the Restricted Sources (as defined in the DIP Order) to investigate (i) the claims and liens of the Prepetition Secured Parties (as defined in the DIP Order) and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties (as defined in the DIP Order), so long as no more than an aggregate of $25,000 of the proceeds of the Restricted Sources (as defined in the DIP Order) may be used for the purposes set forth in the preceding proviso;

(d)      for the payment of fees, expenses, interest or principal with respect to any Junior Indebtedness (other than any Permitted Adequate Protection Payments); or

(e)      to make any distribution under a plan of reorganization in the Chapter 11 Cases.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

SECTION 5.11 *Further Assurances.*

(a)      The Borrower will, and will cause each of the other Loan Parties to, at the expense of the Borrower, make, execute, endorse, acknowledge, authorize, file and/or deliver to the Administrative Agent and the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory collateral assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports, assignments, and other documents, assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents as the Administrative Agent, the Collateral Agent or the Required Lenders may reasonably require. Furthermore, with respect to the Mortgaged Properties, the Borrower will, and will cause each of the other Loan Parties to deliver to the Administrative Agent and the Collateral Agent all such documentation in accordance with the Real Estate Collateral Requirements

(b)      The Borrower agree that each action required by clause (a) of this Section 5.11 shall be completed within 10 Business Days after such action is requested to be taken by the Administrative Agent or the Required Lenders (as such time may be extended by the Administrative Agent and the Required Lenders in their reasonable discretion).

(c)      Subject to Bankruptcy Court approval, if, following the Closing Date, any Subsidiary is acquired or organized or any Subsidiary ceases to be an Excluded Subsidiary, the Borrower shall promptly (and in any event within 10 Business Days (or such longer period as the Required Lenders shall agree in their reasonable discretion) of such event or, where applicable, following such request) (i) notify the Administrative Agent thereof, (ii) cause such Subsidiary (other than any Excluded Subsidiary) to become a Loan Party by executing a Guaranty Supplement, (iii) cause all outstanding Equity Interests in such Subsidiary owned by or on behalf of any Loan Party to be pledged and deliver to the Collateral Agent all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank, (iv) cause all documents and instruments, including Uniform Commercial Code financing statements and Mortgages (subject to Section 5.11(d)), required by law or reasonably requested by the Administrative Agent, the Collateral Agent or the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and perfect or record such Liens to the extent, and with the priority, required by the Security Documents, to be filed, registered or recorded or delivered to the Administrative Agent and the Collateral Agent for filing, registration or recording, (v) cause each Loan Party to take all other action required by law, under the Security Documents or reasonably requested by the Administrative Agent, the Collateral Agent or the Required Lenders to perfect, register and/or record the Liens granted by it thereunder to the extent perfection is required hereunder and (vi) cause to be delivered to the Lenders all such instruments and documents (including legal opinions, title insurance policies and lien searches) as the Administrative Agent, the Collateral Agent or the Required Lenders shall reasonably request to evidence compliance with this Section 5.11(c).

(d)      If any fee owned real property is owned by any Subsidiary acquired as described in Section 5.11(c) or is acquired by any Loan Party after the Closing Date, the Borrower shall notify the Administrative Agent thereof, and, if requested by the Administrative Agent or the Required Lenders, the Borrower will, no later than 30 days (or such longer period as the Required Lenders shall agree to) after such acquisition, cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be requested by the Administrative Agent to grant and perfect such Liens, including the satisfaction of the Real Estate Collateral Requirements, all at the expense of the Borrower.

SECTION 5.12 *Funding Account Deposits.*  The Loan Parties shall cause all cash (including all cash proceeds of Collateral) received or held by any of the Loan Parties or their Subsidiaries at any time (other than the Professional Fee Reserve and any cash withdrawn from the Funding Account pursuant to Section 2.02(f) in accordance with this Agreement and the applicable Chapter 11 Orders  and promptly expended in accordance with the Budget) to be deposited, no later than the first Business Day following receipt, into the Funding Account (it being understood that no interest shall accrue on such amounts under Section 2.06 solely due to such amounts being on deposit in the Funding Account), unless such proceeds are applied to prepay the Loans as required under Section 2.13.  For the avoidance of doubt, Withdrawals shall only be disbursed by the Agreement to an account of the Borrower designated in a Withdrawal Request, and not to any payees of the Borrower or any other Person.

SECTION 5.13 *Chapter 11 Cases*.  The Loan Parties will comply with each Chapter 11 Order.

SECTION 5.14 *Cash Management*.  The Borrower and its Subsidiaries shall maintain cash managements systems reasonably acceptable to the Required Lenders and in accordance with the applicable Chapter 11 Orders.

SECTION 5.15 *Budget Compliance*.  The proceeds of the Loans and each Withdrawals, and all proceeds of Collateral, shall be used by the Loan Parties (x) in accordance with the Budget, subject to Permitted Variances and (y) otherwise to pay any (i) Fees required to be paid hereunder and (ii) reimbursement or indemnification obligations owing to any of the DIP Secured Parties pursuant to Section 9.05.

SECTION 5.16 *Milestones*.  The Loan Parties shall ensure that the following actions are completed on a timely basis, in each case subject to the Bankruptcy Court having entered the Final Order (it being understood and agreed that if the Final Order is entered after the deadline set forth below for any particular action or occurrence, such action or occurrence shall be instead required to be taken or to occur, as applicable, no later than the first Business Day following the entry of the Final Order):

(a)      the Debtors shall have filed a motion with the Bankruptcy Court in form and substance satisfactory to the Required Lenders and the Administrative Agent in their respective reasonable discretion (the "*Bid Procedures*") by no later than the Petition Date seeking approval of bid procedures for a sale, pursuant to Section 363 of the Bankruptcy Code of substantially all of the Debtors' assets with H.I.G. Europe - Neptune, Ltd, an exempted company incorporated in the Cayman Islands with limited liability, as the proposed stalking horse bidder (the "*Stalking Horse*") with the ability to credit bid up to the full amount of its claims (whether arising from the DIP Facility or the Prepetition Senior Loan Agreement (if applicable) and which credit bid may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition vehicle) (the "*363 Sale*");

(b)      the Bid Procedures shall have been approved by the Bankruptcy Court no later than 21 days after the Petition Date (the "*Bid Procedures Order*"), which Bid Procedures Order shall provide for a stalking horse bid from the Stalking Horse pursuant to which the Stalking Horse may credit bid up to the full amount of its claims (whether arising from the DIP Facility or the Prepetition Senior Loan

Agreement (if applicable)) and otherwise be in form and substance satisfactory to the Required Lenders and the Administrative Agent;

(c)        an order approving the 363 Sale in form and substance acceptable to the Required Lenders and the Administrative Agent (the "*363 Sale Order*") shall have been entered by no later than 75 days after the Petition Date; and

(d)        the 363 Sale (the "*363 Sale Effective Date*") pursuant to the Bid Procedures shall have been consummated no later than 90 days after the Petition Date.

## ARTICLE VI

## NEGATIVE COVENANTS

The Borrower hereby covenants and agrees that on and after the Closing Date and until the Commitments have terminated and the Loans, Notes, Fees and all other Obligations (other than any contingent obligations not then due and payable) incurred hereunder and thereunder, are paid in full:

SECTION 6.01 *Liens*.  The Borrower will not, and will not permit any of the Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property of the Borrower or any of the Subsidiaries, whether now owned or hereafter acquired; *provided* that the provisions of this Section 6.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "*Permitted Liens*"):

(a)        Liens for Taxes which are not more than thirty (30) days overdue or which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(b)        warehousemen's, materialmen's and mechanics' liens and other similar Liens, in each case, arising in the ordinary course of business and (i) which do not in the aggregate materially detract from the value of the Borrower's or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Borrower or such Subsidiary or (ii) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(c)        Liens in existence on the Petition Date which are listed, and the property subject thereto described, on Schedule 6.01(c);

(d)        Liens in favor of the Secured Parties securing the Obligations;

(e)        (i) licenses, sublicenses, leases or subleases granted by the Borrower or any of the Subsidiaries to other Persons in the ordinary course of, and not materially interfering with the conduct of, the business of the Borrower or any of the Subsidiaries, and (ii) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease or license agreement permitted by this Agreement to which the Borrower or any of the Subsidiaries is a party;

(f)        Liens upon assets of the Borrower or any of the Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 6.04(c); *provided* that (i) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (ii) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any other asset of the Borrower or any Subsidiary other than the proceeds of the assets

giving rise to such Capitalized Lease Obligation; *provided further*, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(g)     Liens placed upon equipment, machinery or other fixed assets acquired or constructed after the Closing Date and used in the ordinary course of business of the Borrower or any of the Subsidiaries and placed at the time of the acquisition or construction thereof by the Borrower or such Subsidiary or within 270 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition or construction of any such equipment, machinery or other fixed assets or renewals, replacements, refinancings, restructurings or extensions of any of the foregoing for the same or a lesser amount; *provided* that (i) the Indebtedness secured by such Liens is permitted by Section 6.04(c) and (ii) in all events, the Lien encumbering the equipment, machinery or other fixed asset so acquired or constructed does not encumber any other asset of the Borrower or any Subsidiary (other than the proceeds and products thereof and accessions thereto); *provided further*, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(h)     Liens which may arise as a result of zoning, building codes, and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority and which are not violated in any material way by the current use or occupancy of such real property, easements, rights-of-way, restrictions, encroachments, minor survey defects and other similar charges or encumbrances, minor title defects or irregularities affecting real property, in each case not securing Indebtedness and not materially interfering with the ordinary conduct of the business of the Borrower and the Subsidiaries, taken as a whole;

(i)     Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business of the Borrower and the Subsidiaries;

(j)     statutory and common law landlords' liens under leases to which the Borrower or any of the Subsidiaries is a party;

(k)     Liens (other than Liens imposed under ERISA) incurred in the ordinary course of business of the Borrower and the Subsidiaries in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, public utilities or private utilities, leases and contracts in the ordinary course of business of the Borrower and the Subsidiaries, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business (exclusive of obligations in respect of the payment for borrowed money);

(l)     with respect to any Mortgaged Property, Permitted Encumbrances;

(m)     Liens described in Section 11.02;

(n)     (i) bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business of the Borrower or any Subsidiary in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management, automated clearing house transfers and operating account arrangements, (ii) Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (iii) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iv) Liens that are contractual

rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business of the Borrower and any Subsidiary;

(o)      Liens granted in the ordinary course of business of the Borrower and the Subsidiaries on insurance policies and proceeds thereof securing liability for premiums or reimbursement or indemnification obligations thereunder to the extent the financing is permitted under Section 6.04;

(p)      ground leases in respect of real property on which facilities owned or leased by the Borrower or any Subsidiary are located; and

(q)      Liens permitted pursuant to the DIP Order.

SECTION 6.02 *Consolidation, Merger or Sale of Assets, Etc.*.  The Borrower will not, and will not permit any Subsidiary to, wind up, liquidate or dissolve its affairs enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (other than sales of inventory in the ordinary course of business), or enter into any sale-leaseback transactions, except that (in each case, subject to the requirements of Section 5.12 to the extent applicable):

(a)      the Borrower and the Subsidiaries may liquidate or otherwise dispose of obsolete or worn-out, uneconomical, surplus or no longer used property in the ordinary course of business or dispose of inventory, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to be cancelled, to lapse or go abandoned) in the ordinary course of business;

(b)      Investments may be made to the extent permitted by Section 6.05;

(c)      the Borrower and the Subsidiaries may convey, sell or otherwise transfer property to the Borrower or any other Subsidiary; *provided* that if the transferor of such property is a Loan Party, the transferee thereof must be a Loan Party;

(d)      any Subsidiary may merge, amalgamate or consolidate with and into, or be dissolved or liquidated into, (x) the Borrower; *provided* that the Borrower shall be the continuing or surviving Person, or (y) one or more other Subsidiaries; *provided* that if any party to any such transaction is a Loan Party, the surviving entity of such transaction shall be a Loan Party;

(e)      the Borrower and the Subsidiaries may liquidate or otherwise dispose of Cash Equivalents to the extent otherwise permitted hereunder;

(f)      the Borrower and the Subsidiaries may cancel or abandon or allow lapse of any intellectual property rights (x) where the cost of registering, maintaining or renewing such rights is excessive in relation to the value thereof and (y) which are no longer material to, and no longer used or useful in, the business of the Borrower and the Subsidiaries;

(g)      the Borrower and the Subsidiaries may dispose of property and assets to the extent they were the subject of a casualty or of condemnation proceedings upon the occurrence of the related Recovery Event;

(h)      the Borrower and the Subsidiaries may dispose of property in the ordinary course of business to the extent that such property is exchanged at fair market value for credit against the purchase

price of similar replacement property or the proceeds of such disposition are promptly applied to the purchase price of such replacement property;

(i)     to the extent constituting dispositions, the Borrower and the Subsidiaries may grant liens in the form of Permitted Liens and issue Restricted Payments permitted by Sections 6.01 and 6.05, respectively; and

(j)     the Borrower and the Subsidiaries may swap assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and the Subsidiaries as a whole, as determined in good faith by the management of the Borrower; *provided* that to the extent any such assets constitutes Collateral, the assets received in return shall become Collateral and the Borrower shall comply with Section 5.11 with respect to any such assets received in return.

To the extent the Required Lenders waive the provisions of this Section 6.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.02 (other than to the Borrower or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents and the DIP Order, and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect and/or evidence the foregoing; provided, that, if requested by the Administrative Agent, the Borrower shall have delivered to the Administrative Agent a certificate signed by a Responsible Officer of the Borrower at least five (5) Business Days prior to the date any action is taken by the Administrative Agent and/or the Collateral Agent in connection with the foregoing certifying that the contemplated sale is permitted under this Section 6.02 (and the Lenders hereby authorize the Administrative Agent and Collateral Agent to conclusively rely on such certificate as evidence that such sale is permitted under this Section 6.02).

SECTION 6.03 **Restricted Payments**.  The Borrower will not, and will not permit any of the Subsidiaries to, declare or pay any Restricted Payments, except that:

(a)     any Wholly Owned Subsidiary of the Borrower may pay Restricted Payments to its equity holders;

(b)     to the extent constituting Restricted Payments, the Borrower and the Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 6.02, Section 6.05 or Section 6.06.

SECTION 6.04 **Indebtedness**.  The Borrower will not, and will not permit any of the Subsidiaries to create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness incurred pursuant to this Agreement and the other Loan Documents;

(b)     Indebtedness outstanding on the Closing Date and listed on Schedule 6.04(b), *provided* that no such Indebtedness shall be permitted to be refinanced;

(c)     Indebtedness of the Borrower and the Subsidiaries constituting (i) Capitalized Lease Obligations or (ii) Indebtedness incurred to finance the acquisition or construction of equipment, machinery or other fixed assets acquired before the Closing Date with respect to equipment, machinery or other fixed assets acquired or constructed before the Closing Date and secured by a lien on such (to the extent permitted by Section 6.01(g); *provided* that such Indebtedness is incurred prior to or within 270 days after such acquisition or completion of such construction and *provided further* that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations (other than Capital Lease

Obligations incurred by the Borrower or any Subsidiary to replace or refinance operating leases existing on the Closing Date) and purchase money Indebtedness permitted by this clause (d) exceed at any time outstanding $25,000;

(d)     Indebtedness described in Section 11.01;

(e)     Guarantees by the Borrower and any Subsidiary in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; *provided* that (i) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (ii) such Guarantee is permitted by Section 6.05(e);

(f)     Indebtedness arising under customary cash management services, netting arrangements, automated clearing house transfers, or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within 10 Business Days of its incurrence;

(g)     Indebtedness with respect to performance bonds, surety bonds, appeal bonds or customs bonds required in the ordinary course of business of the Borrower or any Subsidiary or in connection with the enforcement of rights or claims of the Borrower or any of the Subsidiaries or in connection with judgments that do not result in a Default or an Event of Default;

(h)     Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Borrower or any Subsidiary, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of such insurance for the period in which such Indebtedness is incurred;

(i)     Indebtedness representing deferred compensation or similar obligations to employees of incurred in the ordinary course of business;

(j)     Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business;

(k)     Indebtedness in respect of letters of credit, bank guarantees, supporting obligations, bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; *provided* that any reimbursement obligations in respect thereof are reimbursed within 30 days following the due date thereof;

(l)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Subsidiaries; and

(m)     all premiums (if any), interest (including Post-Petition Interest), fees, expenses, charges and additional or contingent interest on obligations described above.

SECTION 6.05 ***Investments***.  The Borrower will not, and will not permit any of the Subsidiaries to, directly or indirectly, make any Investment in any other Person, except:

(a)      the Borrower and the Subsidiaries may acquire and hold accounts receivables, notes receivable and other extensions of trade credit owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(b)      the Borrower and the Subsidiaries may acquire and hold cash and Cash Equivalents, subject to the requirements of Section 5.12;

(c)      the Borrower and the Subsidiaries may hold the Investments held by them on the Closing Date and described on Schedule 6.05(c) (and any increase in the value of such Investments not resulting from an additional Investment); *provided* that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 6.05;

(d)      the Borrower and the Subsidiaries may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers or in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon foreclosure with regard to any secured Investment or other transfer of title with regard to a secured Investment;

(e)      (i) the Borrower or the Subsidiaries may make Investments in (or for the benefit of) any other Loan Party and (ii) any Wholly Owned Subsidiary which is not a Loan Party may make Investments in any Wholly Owned Subsidiary which is not a Loan Party (such Investments in the form of intercompany loans and advances referred to in preceding clauses (i) and (ii), collectively, the "***Intercompany Loans***"); *provided* that (x) each Investment in the form of an Intercompany Loan shall be evidenced by an Intercompany Note and (y) each such Intercompany Note owned or held by a Loan Party shall constitute Collateral;

(f)      Investments consisting of (i) transactions permitted under Sections 6.01 and 6.02, (ii) Restricted Payments permitted by Section 6.03 and (iii) repayments or other acquisitions of Indebtedness of the Borrower or any Subsidiary not prohibited by Section 6.09;

(g)      Guarantees permitted by Section 6.04 (other than Section 6.04(e)), to the extent constituting Investments;

(h)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(i)      Investments outstanding on the date hereof in the nature of pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business; and

(j)      Investments expressly permitted pursuant to any Chapter 11 Order and consented to by the Required Lenders.

SECTION 6.06 ***Transactions with Affiliates***.  The Borrower will not, and will not permit any of the Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of the Borrower or any of the Subsidiaries, other than in the ordinary course of business and on terms and conditions substantially as favorable to the Borrower or such Subsidiary as would reasonably be obtained by Borrower or such Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(a)      Restricted Payments may be paid to the extent provided in Section 6.03;

(b)      Subsidiaries of the Borrower may pay management fees, licensing fees and similar fees to the Borrower or to any Subsidiary Guarantor; and

(c)      the Borrower and the Subsidiaries may make payments under employment agreements and employee benefit plans with officers, employees and directors of the Borrower and the Subsidiaries, in each case in existence on the Closing Date and approved by the Initial Lenders, in the ordinary course of business and in compliance with such applicable agreements and plans.

SECTION 6.07 *Modifications of Certain Agreements; Limitations on Voluntary Payments, etc.*.  The Borrower will not, and will not permit any Subsidiary to:

(a)      except as required by the Bankruptcy Code or any order of the Bankruptcy Court (including any Chapter 11 Order), amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, unless such amendment, modification, change or other action contemplated by this clause (a) could not reasonably be expected to be materially adverse to the interests of the Lenders;

(b)      other than payments authorized by the Bankruptcy Court and in accordance with the Budget, make or offer to make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Junior Indebtedness;

(c)      amend or modify, or permit the amendment or modification of, any provision of any Junior Indebtedness, on and after the execution and delivery thereof (or, if later, the date hereof) in any manner that is adverse to the Lenders or the Borrower or any Subsidiary; or

(d)      amend or modify, or permit the amendment, modification or waiver of, any provision of any other material agreement, contract or instrument in each case to which any Loan Party or any subsidiary of a Loan Party is a party or by which it or any its property or assets is bound or to which it may be subject, in each case after the original execution and delivery thereof (or, if later, the date hereof) in any substantive manner without the written consent of the Required Lenders.

SECTION 6.08 *Adequate Protection*.  The Borrower will not, and will not permit any Subsidiary to, incur, create, assume, suffer to exist or permit (i) any administrative expense, unsecured claim, or other super-priority claim or Lien, in each case that is *pari passu* with or senior to the claims of the Secured Parties against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out, or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than Permitted Adequate Protection Payments as and to the extent provided in the DIP Order.

SECTION 6.09 *Limitation on Certain Restrictions on Subsidiaries*. The Borrower will not, and will not permit any Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its Equity Interest owned by the Borrower or any Subsidiary, or pay any Indebtedness owed to the Borrower or any Subsidiary, (b) make loans or advances to the Borrower or any Subsidiary or (c) transfer any of its properties or assets to the Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, rule, regulation or order, (ii) this Agreement and the other Loan Documents, (iii) customary provisions

restricting subletting, transfer, license or assignment of any lease governing any leasehold interest of the Borrower or any Subsidiary or otherwise relating to the assets subject thereto, (iv) customary provisions restricting transfer, license or assignment of any licensing agreement or other contract (or otherwise relating to the assets subject thereto) entered into by the Borrower or any Subsidiary in the ordinary course of business, (v) restrictions on the transfer of any asset or Subsidiary pending the close of a permitted sale of such asset or Subsidiary, (vi) restrictions on the transfer of any asset subject to a Lien permitted by Sections 6.01(c), (f), (g) or (h), (vii) negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money permitted under Section 6.04 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Secured Parties with respect to the DIP Facility established hereunder and the Obligations under the Loan Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably or on a junior basis, (viii) contractual obligations which exist on the Closing Date and (to the extent not otherwise permitted by this Section 6.09) are listed on Schedule 6.09(c), and (ix) encumbrances or restrictions pursuant to the Prepetition Senior Loan Documents, the Prepetition Subordinated Loan Documents, and the Prepetition Bridge Loan Documents in each case existing on the Closing Date.

SECTION 6.11 *Change in Nature of Business*.  Except as required by the Bankruptcy Code or any order of the Bankruptcy Court, the Borrower will not, and will not permit any Subsidiary to engage in any line of business substantially different from those lines of business carried on by it on the Closing Date and business ancillary thereto and logical extensions thereof.

SECTION 6.12 *Compliance with Certain Laws*.

(a)      The Borrower will not, and will not permit any Subsidiary to:

(i)      directly or indirectly, in connection with any Loans, (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; (ii) deal in, or otherwise engage in any transaction relating to, any Sanctioned Person, any property or interests in property of any Sanctioned Person or otherwise blocked pursuant to any Sanctions Law or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Sanctions Law.

(ii)      directly or indirectly, in connection with the Loans, repay the Loans with funds derived from any unlawful activity, with the result that the making of the Loans or the repayment of the Loans would be in violation of any Sanctions Law, any Anti-Money Laundering Law, any Anti-Corruption Law or any other requirements of law.

(iii)      Directly or indirectly, cause or permit (i) any Sanctioned Person to have any direct or indirect interest in or benefit of any nature whatsoever in the Loan Parties or (ii) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property or interest in property of, or be beneficially owned directly or indirectly by, a Sanctioned Person.

(b)      The Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this Section 6.12.

SECTION 6.13 *Chapter 11 Orders*.  Without the prior consent of the Administrative Agent and the Required Lenders, make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to any Chapter 11 Order.

SECTION 6.14 *Executory Contracts*.  Except with the consent of the Required Lenders, assume any executory contract or unexpired lease not assumed on or before the date hereof or reject any executory contract or unexpired lease not rejected on or before the date hereof.

## ARTICLE VII

## EVENTS OF DEFAULT AND REMEDIES

SECTION 7.01 *Events of Default*.  Upon the occurrence of any of the following specified events (each, an "*Event of Default*"):

(a)      *Payments*.  Any Loan Party shall (i) default in the payment, when due, of any principal of any Loan or any Note or (ii) default in the payment, when due, of any interest on any Loan or Note, any Fee or any other amount owing hereunder or under any other Loan Document and such default shall continue unremedied for three Business Days; or

(b)      *Representations*.  Any representation, warranty or statement made or deemed to be made by any Loan Party herein or in any other Loan Document or in any certificate delivered to the Administrative Agent, the Collateral Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which it is made or deemed to be made; or

(c)      *Covenants*.  Any Loan Party shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Article VI, Article X, Section 5.01(e)(i), Section 5.02, Section 5.04 (as to the Borrower's existence), Section 5.10, Section 5.12, Section 5.15 or Section 5.16, (ii) default in the due performance or observance by it of any term, covenant or agreement contained in Section 5.01 (other than Section 5.01(e)(i)) and such default shall continue unremedied for a period of two Business Days after such default, or (iii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Loan Document and such default shall continue unremedied for a period of 30 days after the earlier of (x) the first date on which any of the Borrower or any Subsidiary has knowledge of such default and (y) the date on which written notice thereof is given to the Borrower by the Administrative Agent or the Required Lenders; or

(d)      *Default Under Other Agreements*.  Except to the extent resulting or arising from the Chapter 11 Cases, (i) the Borrower or any Subsidiary shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond the grace period, if any, provided in an instrument or agreement under which such Indebtedness is governed or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit any holder of such Indebtedness (or a trustee or agent on behalf of such holder) to cause (after delivery of any notice, if required by any such instrument or agreement, and after giving effect to any waiver, amendment, cure or grace period), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of the Borrower or any Subsidiary shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof (other than, in the case of this clause (ii), (x) any secured Indebtedness that is required to be prepaid as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any Indebtedness that is required to be converted into Qualified Equity Interests upon the occurrence of certain designated events so long as no payments in cash or otherwise are required to be made in accordance with such conversion and the issuance of such Equity Interests is otherwise permitted under Article VI and (z) any failure under this clause (ii) if such failure is remedied or waived by the requisite holders of such Indebtedness prior to any acceleration of the Loans

pursuant to this Article VII); *provided* that it shall not be a Default or an Event of Default under this clause (d) unless the aggregate principal amount of all Indebtedness as described in this clause (d) equals to or exceeds the Threshold Amount; or

(e)  ***Bankruptcy, Etc***.  Any non-Debtor Subsidiary shall commence a voluntary case concerning itself under the Bankruptcy Code; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of any such non-Debtor Subsidiary, to operate all or any substantial portion of the business of any such non-Debtor Subsidiary, or, except to the extent expressly permitted by Section 6.02, any such non-Debtor Subsidiary commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to any such non-Debtor Subsidiary, or there has commenced against any such non-Debtor Subsidiary any such proceeding which remains undismissed for a period of 45 days after the filing thereof, or any such non-Debtor Subsidiary is adjudicated insolvent or bankrupt; or any order of relief is entered in any such proceeding; any such non-Debtor Subsidiary makes a general assignment for the benefit of creditors; or any action is taken by any such non-Debtor Subsidiary for the purpose of authorizing any of the foregoing; or any such non-Debtor Subsidiary become unable, admit in writing its inability or fail generally to pay its debts as they become due; or

(f)  ***ERISA***.

(i)  One or more ERISA Events shall have occurred that either alone or together results in a liability to Borrower or any Subsidiary (including on account of an ERISA Affiliate) that equals or exceeds or is reasonably expected to equal or exceed the Threshold Amount,

(ii)  there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability) that is reasonably expected to result in a liability to Borrower or any Subsidiary (including on account of an ERISA Affiliate) that equals or exceeds, or that would reasonably be expected to equal or exceed, the Threshold Amount, or

(iii)  there is or arises any potential Withdrawal Liability under Section 4201 of ERISA, if the Borrower or any Subsidiary or their respective ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans and the liability to Borrower or any Subsidiary (including on account of an ERISA Affiliate) equals or exceeds, or is reasonably expected to equal or exceed the Threshold Amount; or

(g)  ***Security Documents***.  Any of the Security Documents shall cease to be in full force and effect (other than in accordance with its terms or as a result of the action or inaction of the Administrative Agent, the Collateral Agent or any Lender, so long as such act or omission does not result from the breach or non-compliance by any Loan Party with the terms of any Loan Document), or shall cease to give the Collateral Agent for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral, in favor of the Collateral Agent for the benefit of the Secured Parties); or

(h)  ***Guaranties***.  Any Guarantee of the Obligations or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations with respect to such Guarantee by such Guarantor; or

(i)        [*Reserved*];

(j)        ***Change of Control***.  A Change of Control shall occur; or

(k)        ***Invalidity of Loan Documents***.  Any material provision of the Loan Documents, taken as a whole, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the satisfaction in full of all the Obligations (other than contingent obligations not then due and payable as of such date), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of the Loan Documents, taken as a whole; or any Loan Party denies in writing that it has any or further liability or obligation under the Loan Documents to which it is a party, taken as a whole (other than as a result of repayment in full of the Obligations (other than contingent obligations not then due and payable as of such date) and termination of the Commitments), or purports in writing to revoke or rescind the Loan Documents, taken as a whole; or

(l)        ***The Chapter 11 Cases***.

(i)        A Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 30 days after the entry of the Interim Order, which Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without prior consent of the Administrative Agent and the Required Lenders;

(ii)       Any Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any Chapter 11 Case), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Loan Party shall file any pleading requesting any such relief; or a motion shall be filed by any Loan Party for the approval of, or there shall arise (i) any other Claim having priority senior to or *pari passu* with the claims of the Administrative Agent and Lenders under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (in each case, other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein and in the DIP Order, except, in the case of clauses (i) and (ii), as expressly provided herein and in the DIP Order;

(iii)      Any Loan Party files a motion in the Chapter 11 Cases without the express prior written consent of Required Lenders, to obtain additional financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code;

(iv)      Any Loan Party shall (A) file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of or granting adequate protection with respect to any pre-petition Claim other than as (x) provided for in the DIP Order and included in the Budget (together with such variances thereto as are permitted pursuant to Section 5.15) or (y) otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets or to permit any other action that could reasonably be expected to have a material adverse effect on the Loan Parties or their estates, or (iii) approving any settlement or other stipulation not approved by the Required Lenders and not included in the Budget (together with such variances thereto as are permitted pursuant to Section 5.15) with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, or (B) make any payment in respect of any pre-petition Claim other than (x) as provided for in the a Chapter 11 Order and included in the Budget

(together with such variances thereto as are permitted pursuant to Section 5.15) or (y) otherwise consented to by the Required Lenders in writing;

(v)    (A) any Chapter 11 Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Loan Party shall apply for authority to do so) without the prior written consent of the Required Lenders and the Administrative Agent (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this subparagraph) or (B) any Chapter 11 Order shall cease to be in full force and effect;

(vi)    Any of the Loan Parties shall fail to comply with the terms and conditions of any Chapter 11 Order in any material respect;

(vii)    The Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers in the Chapter 11 Cases (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this subparagraph);

(viii)    Entry of an order by the Bankruptcy Court (A) terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders or (B) confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases which does not (1) contain a provision for the discharge of the Obligations on or before the effective date of such plan upon entry thereof, or is not otherwise acceptable to the Required Lenders, and (2) provide for the continuation of the DIP Liens and any other security interests created in favor of the Collateral Agent with the priorities provided for in this Agreement and in the DIP Order until such plan effective date;

(ix)    The Loan Parties or any of their Affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the Collateral Agent;

(x)    (A) The Loan Parties or any of their Affiliates shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or to challenge the validity, perfection and enforceability of the Liens in favor of the Collateral Agent or contest any material provision of any Loan Document, (B) such Liens and/or super-priority claims in favor of the Collateral Agent shall otherwise cease to be valid, perfected and enforceable in all respects with the priority described herein or (C) or any material provision of any Loan Document shall cease to be effective;

(xi)    Any judgments which are in the aggregate in excess of the Threshold Amount as to any postpetition obligation shall be rendered against any of the Loan Parties and the enforcement thereof shall not be stayed; or there shall be rendered against any of the Loan Parties a non-monetary judgment with respect to a postpetition event which causes or could reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Loan Parties to perform their obligations under the Loan Documents or the value of the Collateral;

(xii) (A) The Loan Parties or any of their Affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or (B) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the Lenders;

(xiii) Any Loan Party shall fail to execute and deliver to the Administrative Agent or the Collateral Agent, as the case may be, any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the Administrative Agent, the Collateral Agent or the Required Lenders may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the Collateral Agent (for the benefit of the Secured Parties) under the DIP Order; or

(xiv) An application for any of the orders described in clauses (l)(ii), (v) or (vii) above shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within 30 days after filing;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, in each case, without further order of, or application to, the Bankruptcy Court, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Loan Party (*provided* that, if an Event of Default specified in clause (e) shall occur with respect to any non-Debtor Subsidiary, the result which would occur upon the giving of written notice by the Administrative Agent as specified below shall occur automatically without the giving of any such notice): (i) declare the Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately; (ii) declare the principal of, and any accrued interest in respect of, all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived (to the extent permitted by applicable law) by each Loan Party; (iii) enforce or direct the Collateral Agent to enforce all of the Liens and security interests created pursuant to the Security Documents in accordance with the terms thereof; and (iv) enforce each Guarantee of the Obligations in accordance with the terms thereof.

In addition, subject solely to the Remedies Notice Period as set forth below, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, and the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents, including all rights and remedies with respect to the Collateral and the Guarantors. In addition to the remedies set forth above, the Administrative Agent and/or Collateral Agent may exercise any other remedies provided for by this Agreement and the Collateral Documents in accordance with the terms hereof and thereof or any other remedies provided by applicable law. Notwithstanding the foregoing, any exercise of remedies hereunder is subject to the requirement of the giving of three days' prior written notice to the Loan Parties, counsel for the Loan Parties, the Office of the U.S. Trustee and counsel for the Official Committee (the "***Remedies Notice Period***") in accordance with the terms of the DIP Order. For the avoidance of doubt, it is understood and agreed that the Remedies Notice Period is a one-time requirement and is not required to be delivered with any exercise of remedies after the first such exercise.

SECTION 7.02 *Application of Payments and Proceeds.*

(a)     Following the occurrence and during the continuance of an Event of Default, (x) all payments received by the Administrative Agent (including any payments received in respect of optional and mandatory prepayments), (y) the proceeds of any collection or sale of Collateral or Mortgaged Property, and, (z) upon written notice to the Administrative Agent by the Required Lenders, all funds credited to the Funding Account, in each case shall be applied as follows:

(i)     first, to the payment of all fees, costs, expenses and indemnities due and owing to each Agent under this Agreement or any other Loan Document, and any other Obligations owing to any Agent in respect of sums advanced by any Agent to preserve or protect the Collateral or to preserve or protect its security interest in the Collateral (whether or not such Obligations are then due and owing to such Agent);

(ii)     next, subject to Section 2.17, to the payment in full of the Obligations (the amounts so applied to be distributed among the Secured Parties *pro rata* in accordance with the respective amounts of the Obligations) owed to them on the date of any such distribution; and

(iii)     finally, to the Borrower or other Persons entitled thereto, or as a court of competent jurisdiction may direct.

(b)     If, despite the provisions of this Agreement, any Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the Obligations to which it is then entitled in accordance with this Agreement, such Secured Party shall hold such payment or other recovery in trust for the benefit of all Secured Parties hereunder for distribution in accordance with Section 7.02(a).

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

SECTION 8.01 ***Appointment and Authority***.  (a)  Each Lender hereby irrevocably appoints Wilmington Trust, National Association, as Administrative Agent and Collateral Agent (the Administrative Agent and the Collateral Agent are referred to collectively as the "***Agents***") hereunder and under the other Loan Documents, and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article VIII are solely for the benefit of the Agents and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "Agent" or "agent" herein or in any other Loan Documents (or any other similar term) with reference to an Agent, is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between the contracting parties. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (a) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents, including to reflect the appointment of a successor Collateral Agent or entry into such additional, amended or supplemental Security Documents to preserve, perfect or protect the priority of the Liens, or grant additional Liens, on the Collateral to the Collateral Agent, including any successor Collateral Agent, for the benefit of the Secured Parties to secure the Obligations and (b) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the written direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

(b)        Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable legal requirement, a security interest can be perfected by possession or control. Should any Lender (other than the Collateral Agent) obtain possession or control of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly following the Collateral Agent's request therefor, shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions. The Lenders hereby acknowledge and agree that the Collateral Agent may act as the collateral agent for the Lenders.

SECTION 8.02 *Rights as a Lender*.    Each person serving as an Agent hereunder shall, if applicable, have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as an Agent hereunder in its individual capacity. If applicable, such person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Borrower or any Subsidiary or other Affiliate thereof as if such person were not an Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03 *Exculpatory Provisions*.    Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing (it being understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or implied (or express) obligations arising under agency doctrine or any applicable law), (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.07 or the applicable Loan Document); *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law, *provided further*, the Administrative Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any Subsidiary that is communicated to or obtained by the Person serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders, or such other number or percentage of the Lenders as shall be required hereunder or under the applicable Loan Document or as such Agent shall in good faith believe to be required under the circumstances as provided in Section 9.07, or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. Neither Agent shall be deemed to have knowledge of any Default or Event of Default unless and until a written notice thereof is given to such Agent by the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any

certificate, report, instrument or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, certificate, report, instrument or other document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.

Each party to this Agreement acknowledges and agrees that the Administrative Agent may use an outside service provider for the tracking of all UCC financing statements required to be filed pursuant to the Loan Documents and notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that any such service provider will be deemed to be acting at the request and on behalf of Borrower and the other Loan Parties. No Agent shall be liable for any action taken or not taken by any such service provider.

SECTION 8.04 *Reliance by Administrative Agent*.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan or Withdrawal, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan or prior to such Withdrawal, as applicable. Each Agent may consult with legal counsel (who may be counsel for the Borrower, any Subsidiary or any of their Affiliates), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 8.05 *Delegation of Duties*.  Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory and reliance provisions of the preceding Sections 8.03 and 8.04 shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities as Agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

SECTION 8.06 *Resignation of the Agent*.  Any Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor to the Agent. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 10 Business Days after the retiring Agent gives notice of its resignation (the "Resignation Closing Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent, which successor shall be a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, in each case, having combined capital and surplus of at

least $500,000,000; *provided* that if no such successor Agent has been appointed by the 30th day after the resigning Agent gave notice of its resignation, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Agent. Upon the acceptance of its appointment as the Agent hereunder by a successor, such successor shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this paragraph). The Administrative Agent Fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed in writing between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article VIII and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as the Agent.

SECTION 8.07 ***Non-Reliance on Agents and Other Lenders***. Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender further represents and warrants that it has had the opportunity to review each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof. Each Lender further acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

SECTION 8.08 ***Collateral and Guarantee Matters***.  (a)  The Lenders irrevocably authorize the Collateral Agent, at its option and in its sole discretion, subject to, to the extent required, authorization by the Bankruptcy Court:

(i)   to release any Lien on any property granted to, or held by, the Collateral Agent under any Loan Document (x) on or after the date that the Obligations (other than contingent indemnity and expense reimbursement obligations as to which no claim has been made as of such date) have been paid in full, (y) with respect to any property that is sold or otherwise disposed of, or to be sold or otherwise disposed of, as part of, or in connection with, any sale or other disposition permitted under the Loan Documents or (z), if approved, authorized or ratified in writing by the Required Lenders (or such other percentage of Lenders as shall be required hereunder);

(ii)   to subordinate any Lien on any property granted to, or held by, the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.01(f) ; and

(iii)   to release any Subsidiary from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

(b)   Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing, the Collateral Agent's authority to release or subordinate its security interest in particular types or items of property, or to release any Subsidiary from its obligations under the Loan Documents pursuant to this Section 8.08.

(c)     The Collateral Agent shall not be responsible for, or have a duty to, ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any Collateral, the existence, priority or perfection of the Collateral Agent's Liens thereon, or any certificate, report, instrument or other document prepared by any Loan Party in connection therewith, nor shall the Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(d)     In the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Required Lenders or the Collateral Agent (or any Lender not constituting the Required Lenders, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) (including, for the avoidance of doubt, acting through an acquisition vehicle) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and (i) the Required Lenders or (ii) the Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders not constituting the Required Lenders), upon instructions from Required Lenders, shall be entitled for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent (or any applicable acquisition vehicle) at such sale or other disposition.

(e)     Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations.

SECTION 8.09 **Enforcement**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent and the Collateral Agent, or as the Required Lenders may require or otherwise direct in writing, for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as an Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any bankruptcy or insolvency law.

SECTION 8.10 **Indemnification**.  The Lenders severally agree to indemnify each Agent (and each sub-agent thereof) in its capacity as such and each Related Party of each Agent (and each sub-agent thereof), to the extent not reimbursed by Borrower or the Guarantors and without limiting the obligation of Borrower or the Guarantors to do so, ratably according to their respective outstanding Loans and Commitments in effect on the date on which indemnification is sought under this Section 8.10 (or, if indemnification is sought after the date upon which all Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such outstanding Loans and Commitments as in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, fines, penalties, actions, claims, suits, judgments, litigations, investigations, inquiries or proceedings, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent (or sub-agent thereof) or Related Party in any way relating to or arising out of, the Commitments, the Loans, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein, the Transactions, the Chapter 11 Cases or any of the other transactions contemplated hereby or thereby or any action taken or omitted by such Agent (or sub-agent thereof) or Related Party

under or in connection with any of the foregoing (IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF ANY AGENT OR RELATED PARTY); *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, claims, suits, judgments, litigations, investigations, inquiries or proceedings, costs, expenses or disbursements that are found by a final and nonappealable judgment of a court of competent jurisdiction to have directly resulted solely and directly from such Agent's (or sub-agent's) or Related Party's, as the case may be, gross negligence or willful misconduct. The agreements in this Section 8.10 shall survive the payment of the Loans and all other amounts payable hereunder, any foreclosure under, or modification, release or discharge of, any or all of the Loan Documents, termination of this Agreement and the resignation or replacement of any Agent. To the extent any Lender fails to make any payment owing by such Lender under this Section 8.10, any payment of principal, interest, fees or other amounts received by the Administrative Agent or the Collateral Agent for the account of such Lender (whether voluntary or mandatory or otherwise) shall be applied at such time or times as may be determined by the Administrative Agent to the payment of any amounts owing by such Lender under this Section 8.10.

SECTION 8.11 ***Withholding Taxes***. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

SECTION 8.12 ***Lender's Representations, Warranties and Acknowledgements.***

(a)     Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Borrower and its Subsidiaries in connection with credit extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Borrower and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders. Each Lender acknowledges that no Agent or Related Party of any Agent has made any representation or warranty to it. Except for documents expressly required by any Loan Document to be transmitted by an Agent to the Lenders, no Agent shall have any duty or responsibility (either express or implied) to provide any Lender with any credit or other information concerning any Loan Party, including the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of a Loan Party, that may come in to the possession of an Agent or any of its Related Parties.

(b)     Each Lender, by delivering its signature page to this Agreement or an Assignment and Acceptance and funding its Loan, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, the Required Lenders or the Lenders, as applicable, on the Closing Date.

# ARTICLE IX

## MISCELLANEOUS

SECTION 9.01 ***Notices; Electronic Communications***.    Except for notices and other communications expressly permitted to be given by telephone hereunder (and except as provided in this Section 9.01), notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, as follows:

(a)     if to the Borrower or any Subsidiary, to the Borrower at:

Xtera Communications, Inc.
500 W. Bethany Dr., Ste. 100
Allen, TX 75013
Attention: General Counsel;

with a copy to:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Attention: Thomas R. Califano
Email:  Thomas.Califano@dlapiper.com

(b)     if to the Administrative Agent or Collateral Agent:

Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention: Jeffery Rose
Fax No.: (612) 217-5651
Email:  JRose@WilmingtonTrust.com

with a copy to

Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, IL 60602
Attention: Michael D. Messersmith and Alan Glantz
Fax No.: (312) 583-2360; (212) 836-6763
Email:  Michael.Messersmith@kayescholer.com and Alan.Glantz@kayescholer.com; or

(c)     if to a Lender, to it at its address (or fax number or e-mail address) set forth in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto, in accordance with the provisions of this Agreement, shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01, or in accordance with the latest unrevoked direction from such party given

in accordance with this Section 9.01. As agreed to among the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the e-mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, and will cause the Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article V, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to the Borrowing Request, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such nonexcluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an e-mail address as directed by the Administrative Agent. In addition, the Borrower agrees, and agrees to cause the Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent or the Required Lenders.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by, or on behalf of, the Borrower hereunder (collectively, the "***Borrower Materials***") by posting the Borrower Materials on Intralinks or another similar electronic system (the "***Platform***") and (b) certain of the Lenders may be "***public-side***" Lenders (i.e., Lenders that do not wish to receive material nonpublic information ("***MNPI***") with respect to the Borrower, the Subsidiaries or their respective securities) (each, a "***Public Lender***"). The Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "*PUBLIC*" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "*PUBLIC*", the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any MNPI with respect to the Borrower, the Subsidiaries or their respective securities for purposes of United States Federal and state securities laws; *provide*d that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.16, (iii) all Borrower Materials marked "*PUBLIC*" are permitted to be made available through a portion of the Platform designated as "Public Investor" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "***Public Investor***". Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "*PUBLIC*", unless the Borrower notifies the Administrative Agent promptly that any such document contains MNPI: (A) the Loan Documents (including all exhibits, schedules, annexes and other attachments thereto, except to the extent redacted), (B) any notification of changes in the terms of the DIP Facility and (C) all information delivered pursuant to Section 5.01.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "*Private Side Information*" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information

with respect to the Borrower, the Subsidiaries or their respective securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "*AS AVAILABLE*". NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL AND NON-APPLICABLE RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02 *Survival of Agreement*.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates, reports, instruments or other documents prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated. The provisions of Sections 2.14, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

SECTION 9.03 *Binding Effect*.  Subject to Sections 4.01 and 4.03, this Agreement shall become effective when it shall have been executed by the Borrower, the Subsidiary Guarantors and the

Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04 *Successors and Assigns.*

(a)      *Successors and Assigns Generally*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by any Loan Party without such consent shall be null and void), and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 9.04(b), (ii) by way of participation in accordance with the provisions of Section 9.04(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 9.04(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 9.04(d) and, to the extent expressly contemplated hereby, the Collateral Agent and the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      *Assignments by Lenders*.  Any Lender may at any time assign to one or more assignees (other than as provided in Sections 9.04(b)(v) and 9.04(b)(vi) below) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)      *Minimum Amounts*.

(A)      in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in Section 9.04(b)(i)(B) in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)      in any case not described in Section 9.04(b)(i)(A), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Acceptance, as of such "Trade Date"), shall be in an amount that is an integral multiple of $250,000 and not less than $500,000, unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed).

(ii)      *Proportionate Amounts*. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii)      *Required Consents*. No consent shall be required for any assignment except to the extent required by paragraph Section 9.04(b)(i)(B) and, in addition, the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be

required for assignments in respect of any Loans unless such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund.

(iv)    *Assignment and Assumption*.  The parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, in each case, together with a processing and recordation fee of $3,500; *provided*, such processing and recordation fee shall not apply to an assignment by a Lender to an Affiliate or Approved Fund of such Lender; *provided, further*, that the Administrative Agent may, in its sole discretion, elect to waive or reduce such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms required hereunder.

(v)    *No Assignment to Certain Persons*.  No such assignment shall be made to the Borrower, any Subsidiary or any of their respective Affiliates. The Administrative Agent and each assignor of a Loan or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or participant in the relevant Assignment and Acceptance or participation agreement, as applicable, that such assignee or purchaser is an Eligible Assignee, *provided* that such reliance by such assignor or seller is in good faith and reasonable under the circumstances existing at the time of sale.

(vi)    *No Assignment to Natural Persons*.  No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 9.04(c), from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.14, 2.20 and 9.05, with respect to facts and circumstances occurring prior to the effective date of such assignment as well as to any Fees accrued for its account and not yet paid. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(d).

(c)    *Register*.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, with respect to such Lender's Commitments or Loans only, at any reasonable time and from time to time upon reasonable prior notice.

Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Acceptance and (ii) promptly record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph.

(d)     *Participations*.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than (a) a natural Person or (b) the Borrower or any of their Affiliates, the Subsidiaries, or any of their Affiliates) (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Collateral Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to any of the matters set forth in Section 9.07(b) requiring the prior written consent of each Lender or each Lender directly adversely affected thereby to the same extent as its participating Lender would have been entitled to. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14 and 2.20 (subject to the requirements and limitations therein, including the requirements under Section 2.20 (it being understood that the documentation required under Section 2.20(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.04(b); *provided* that such Participant (A) agrees to be subject to the provisions of Sections 2.21 as if it were an assignee under Section 9.04(b) and (B) shall not be entitled to receive any greater payment under Sections 2.14 or 2.20, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.21 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.06 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.18 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "*Participant Register*"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the

Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    *Certain Pledges*. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement or the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or thereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    *Special Purpose Vehicles*. Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle (an "*SPV*"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (x) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent (and, to the extent made by a Lender to a Granting Lender affiliated with such Lender, without paying any processing fee therefor), assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (y) disclose on a confidential basis any nonpublic information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

SECTION 9.05 *Expenses; Indemnity.*

(a)    The Borrower agrees, promptly following a written demand, to pay all reasonable and documented out-of-pocket expenses incurred (i) by the Administrative Agent, the Collateral Agent and each of their respective Affiliates, in connection with (x) the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, and (y) any amendment or waiver of the provisions hereof or thereof (whether or not the transactions contemplated thereby shall be consummated), (ii) by the Initial Lenders and their respective Affiliates in connection with (x) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents, and (y) any amendment or waiver of the provisions hereof or thereof (whether or not the transactions contemplated thereby shall be consummated), or (iii) by the Administrative Agent, the Collateral Agent, each of their respective Affiliates and each Lender in connection with the enforcement or protection of their rights in connection with (x) this Agreement and the other Loan Documents or (y) the Loans made hereunder (but limited in each case, in the case of legal fees and expenses, to the reasonable fees, disbursements and other charges of (x) one counsel for the Administrative Agent and the Collateral Agent

and one separate counsel for the Lenders, (y) one regulatory counsel and one local counsel in each relevant jurisdiction for the Administrative Agent and the Collateral Agent and one separate regulatory counsel and one separate local counsel in any relevant jurisdiction to the Lenders and (z) in the case of an actual or potential conflict of interest, of one additional counsel to the affected Lenders to the extent such Lenders are similarly situated and one "conflicts counsel" for the Agents to the extent the Agents determine in their reasonable discretion that a conflict exists.

(b)     The Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "***Indemnitee***") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented out-of-pocket counsel and consultant or other expert fees, charges and disbursements (but limited in each case, in the case of legal fees and expenses, of (x) one primary counsel, one local counsel in each relevant jurisdiction, and one special counsel for each relevant specialty, in each case to the Administrative Agent and the Collateral Agent and their respective Related Parties, (y) one primary counsel and one local counsel to the other Indemnitees, taken as a whole, and, if necessary, a single special counsel for each relevant specialty and (z) in the case of an actual or potential conflict of interest, one additional firm of outside counsel to the affected Indemnitees, taken as a whole, to the extent such Indemnitees are similarly situated) incurred by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties thereto of their respective obligations hereunder or thereunder, the Chapter 11 Cases, the consummation of the Transactions and the other transactions contemplated by the Loan Documents (including any actions taken by the Administrative Agent, the Initial Lenders and their respective Related Parties in connection with such transactions), (ii) the use or proposed use of the proceeds of the Loans, (iii) any Environmental Liability or Environmental Claim related in any way to the Loan Parties, any of their respective subsidiaries or predecessors or any property currently or formerly owned, leased or operated by the Loan Parties or any of their respective subsidiaries or predecessors, including the Mortgaged Properties, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by the Borrower, any other Loan Party or any of their respective Affiliates or any other Person); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have arisen from (i) the gross negligence, bad faith or willful misconduct of such Indemnitee or of its Related Parties or (ii) any disputes solely among Indemnitees (other than any claims, litigation, investigation or proceeding against an Indemnitee in its capacity or in fulfilling its role as the Administrative Agent, the Collateral Agent or any similar role under the this Agreement). This Section 9.05(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, liabilities and related expenses arising from any non-Tax claim.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by them to the Administrative Agent, the Collateral Agent or each of their respective Affiliates or any Related Party of any of the foregoing under paragraph (a) or (b) of this Section 9.05, each Lender severally agrees to pay to the Administrative Agent, the Collateral Agent or each of their respective Affiliates or Related Parties, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or if such unreimbursed expense or indemnity payment is sought after the date on which the Loans have been paid in full, in accordance with each Lender's *pro rata* share immediately prior to the date on which the Loans are paid in full)) of such unpaid amount; (including any such unpaid amount in respect of a claim asserted by such Lender). For purposes hereof, a Lender's "*pro rata* share" shall be determined based upon its share of the outstanding Loans at the time.

(d)      To the extent permitted by applicable law, no Indemnitee or Loan Party shall assert, and each such Person hereby waives, any claim against such other Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided however*, that the foregoing shall not affect the Borrower's indemnification obligations under this Section 9.05. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)      The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender. All amounts due under this Section 9.05 shall be payable on written demand therefor.

SECTION 9.06 **Right of Setoff**.  Upon written notice by any Lender to the Administrative Agent following the occurrence and during the continuance of an Event of Default, such Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower or the other Loan Parties, now or hereafter existing under this Agreement and other Loan Documents held by such Lender (or its Affiliate, as applicable), irrespective of whether or not such Lender (or its Affiliate) shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender and its respective Affiliates under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender (or its Affiliate) may have.

SECTION 9.07 **Waivers; Amendment.**

(a)      No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)      No Loan Document or provision thereof may be waived, amended or modified (it being understood that the giving of any notice, making of any election or other determination or otherwise exercising any option, right or discretion pursuant to the terms of this Agreement or the other Loan Documents shall not constitute a waiver, amendment or modification) except, in the case of this Agreement, by an agreement or agreements in writing entered into by the Borrower and the Required

Lenders or, in the case of any other Loan Document, by an agreement or agreements in writing entered into by the parties thereto; *provided* that, in addition to the approval of the Required Lenders, as applicable, no such waiver, amendment or other modification shall:

      (i)   decrease the principal amount of, or extend the maturity of, or any scheduled principal payment date or date for the payment of any interest on, or any fee or other amount owed to any Lender with respect to, any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on, or any fee or other amount owed to any Lender with respect to, any Loan (other than as to default interest), without the prior written consent of each Lender directly adversely affected thereby,

      (ii)   increase or extend the Commitment of any Lender without the prior written consent of such Lender,

      (iii)   amend or modify the *pro rata* requirements of Section 2.13(e), Section 2.17 or the provisions of Section 9.04(a) relating to an assignment or other transfer by the Borrower or any other Loan Party of any of its rights or obligations hereunder, without the prior written consent of each Lender,

      (iv)   release all or substantially all of the value of the Guarantors or all or substantially all of the value of the Collateral (other than in connection with a Sale of Guarantor or in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Required Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents), without the prior written consent of each Lender, or

      (v)   reduce the percentage contained in (x) the definition of the term "Required Lenders" or (y) in the provisions of Section 9.04(i) or this Section 9.07 (or any other amendment having such effect), in each case without the prior written consent of each Lender;

*provided further* that, notwithstanding the foregoing, (i) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, respectively, and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived in a writing executed only by the parties thereto (without the need for the consent of any other party hereto).

      SECTION 9.08 ***Interest Rate Limitation***.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively, the "***Charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 9.08 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.09 *Entire Agreement*.   This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Unless otherwise specified therein, any other previous agreement (other than the Fee Letter) among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents. Notwithstanding anything to the contrary contained herein, the terms and conditions hereunder shall be subject to the terms and conditions of the Chapter 11 Orders.

SECTION 9.10 *WAIVER OF JURY TRIAL*.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

SECTION 9.11 *Severability*.   In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.12 *Counterparts*.   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03. Delivery of an executed signature page to this Agreement by facsimile transmission or other customary means of electronic transmission (e.g. "*pdf*") shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.13 *Headings*.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.14 *Applicable Law*   This Agreement shall be governed by, and construed in accordance with, the law of the State of New York, except to the extent New York law is superseded by the Bankruptcy Code.

SECTION 9.15 *JURISDICTION; CONSENT TO SERVICE OF PROCESS.*

(a)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE LOAN PARTIES AT THEIR ADDRESS FOR NOTICES AS SET FORTH IN SECTION 9.01. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b)    EACH LOAN PARTY, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND THE LENDERS ENTERING INTO THIS AGREEMENT.

SECTION 9.16 *Execution of Assignments*.  The words "execution", "signed", "signature", and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or

enforceability as a manually executed signature or the use of a paper-based record keeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.17 *Confidentiality*.  Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' Related Parties or service providers (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and be instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) to any other party hereto and, subject to an agreement containing provisions no less restrictive than this Section 9.17, to (i) any actual or prospective assignee of or Participant in any of its rights or obligations under this Agreement and the other Loan Documents (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and be instructed to keep such Information confidential), or (ii) any actual or prospective counterparty (or its advisors) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower or any Subsidiary or any of their respective obligations, this Agreement or payments hereunder (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and be instructed to keep such Information confidential), (f) with the consent of the Borrower, (g) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.17, or (y) becomes available to the Administrative Agent, any Lender or any of their selective Affiliates on a non-confidential basis from a source other than the Borrower, (h) for purposes of establishing a "due diligence" defense" and (i) on a confidential basis to (x) any rating agency in connection with rating the Borrower or the Subsidiaries or any DIP Facility or (y) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to any DIP Facility or market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent in connection with the settlement, administration and management of this Agreement and the Loan Documents. For the purposes of this Section 9.17, "*Information*" shall mean all information received from the Borrower or any Subsidiary and related to the Borrower, any Subsidiary or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrower or any Subsidiary; it being understood that, in the case of Information received from the Borrower or any Subsidiary after the date hereof, all such information shall be deemed confidential unless such information is clearly identified at the time of its receipt by the Administrative Agent, the Collateral Agent or the Lenders, as applicable, as not being confidential; *provided* that, the Borrower and each Subsidiary shall use commercially reasonable efforts to clearly identify at the time of its delivery of any Information to the Administrative Agent, the Collateral Agent or the Lenders, as applicable, whether such Information is confidential or non-confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.17 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include MNPI concerning a Loan Party or a Subsidiary thereof, as the case may be, it (b) has developed compliance procedures regarding the use of MNPI and (c) will handle such MNPI in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 9.18 ***Lender Action***.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent (acting at the written direction of the Required Lenders). The provisions of this Section 9.18 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 9.19 ***USA PATRIOT Act Notice***.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and the other Loan Parties, which information includes the name and address of the Borrower and the other Loan Parties and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower and the other Loan Parties in accordance with the USA PATRIOT Act.

SECTION 9.20 ***No Fiduciary Duty***.  Each Agent, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "***Lenders***"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their Affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its Affiliates, on the other. The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its Affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person. Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

SECTION 9.21 ***Acknowledgment and Consent to Bail-in of EEA Financial Institutions***. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-in Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Each party hereto acknowledges that the provisions of Section 9.21 do not apply to any amounts owing by any EEA Financial Institution to any Agent or Related Party of an Agent under the Loan Documents.

## ARTICLE X

## THE GUARANTY

SECTION 10.01      *Guaranty.*

(a)      Subject to the entry by the Bankruptcy Court of the Order, and subject to the terms thereof, subject to this Article X, each Guarantor hereby, jointly and severally, irrevocably and unconditionally, as primary obligor and not merely as surety, guarantees to each Secured Party and its successors and assigns, irrespective of the validity and enforceability of this Agreement or any of the Obligations, (x) the full and punctual payment of the Obligations when due, whether at stated maturity, upon acceleration or otherwise and (y) in the case of any extension in time of repayment or renewal of this Agreement or the other Loan Documents or any of the Obligations, the full and punctual payment of the Obligations in accordance with the terms of such extension or renewal, whether at stated maturity, upon acceleration or otherwise. Failing the payment of any of the Obligations in full when due for whatever reason, each Guarantor shall be, jointly and severally, obligated to immediately pay the amount not so paid. Each Guarantor agrees that this is a guarantee of payment and performance and not a guarantee of collection.

(i)      Subject to the entry by the Bankruptcy Court of the Order, and subject to the terms thereof, each Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of this Agreement or the other Loan Documents, the absence of any action to enforce this Agreement or the other Loan Documents, any waiver or consent by the Administrative Agent, the Collateral Agent or any Secured Party with respect to any provisions hereof or thereof, the recovery of any judgment against the Borrower or the other Loan Parties, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor. Each Guarantor hereby (x) waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Borrower or any other Loan Party, any right to require a proceeding first against the Borrower or such Loan Party, protest, notice and all demands whatsoever and (y) covenants that this Agreement shall not be discharged except by the full payment of the Obligations in accordance with the terms hereof.

(ii)    If any Secured Party is required by any court or otherwise to return any payment in respect of the Obligations to the Borrower, any Guarantor or any custodian, trustee, liquidator or other similar official acting in relation to either the Borrower or any Guarantor, the Guaranties, to the extent theretofore discharged, shall be reinstated in full in respect thereto in full force and effect.

(iii)    Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Secured Parties in respect of any of the Obligations until the payment in full of all of the Obligations. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Administrative Agent and the Secured Parties, on the other hand, (x) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article VII for the purposes of its Guaranty, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations and (y) in the event of any declaration of acceleration of the Obligations as provided in Article VII, such Obligations (whether or not due and payable at such time) shall forthwith become due and payable by such Guarantor for the purpose of its Guaranty. Each Guarantor shall have the right to seek contribution from any nonpaying Guarantor so long as the exercise of such right does not impair the rights of the Secured Parties under this Agreement.

(iv)    If, at any time, any payment of the Obligations is rescinded or reduced in any amount, or must otherwise be restored or returned by any obligee, whether as a "voidable preference", "fraudulent transfer" or otherwise, the Obligations shall, to the fullest extent permitted by law, be reinstated as though such payment had been due but not made at such time and reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(v)    Each Guaranty shall be a general secured senior obligation of each Guarantor and shall rank at least equally in right of payment with all existing and future Indebtedness of such Guarantor, if any.

(b)    **Right of Set-Off**. Each payment to be made by a Guarantor in respect of its Guaranty shall be made without set-off, counterclaim, reduction or diminution of any kind or nature. If any Obligation is not paid promptly when due (subject to any applicable grace periods), each of the Secured Parties and their respective Affiliates is authorized, to the fullest extent permitted by law, to set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and other obligations at any time owing, by such Secured Party or its Affiliate to, or for the credit or account of, any Guarantor against the obligations of such Guarantor under its Guaranty, irrespective of whether or not such Secured Party shall have made any demand thereunder and although such obligations may be unmatured. The rights of each Secured Party under this Section 10.01(b) are in addition to all other rights and remedies (including other rights of set-off) that such Secured Party may have.

(c)    **Limitation on Guarantor Liability**. Each Guarantor and each Secured Party hereby confirms that it is the intention of all such parties that the Guaranty of such Guarantor not constitute a fraudulent transfer or fraudulent conveyance, or similar limitation, for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guaranty. To effectuate the foregoing intention, the Administrative Agent, the Secured Parties and the Guarantors hereby irrevocably agree that the obligations of each Guarantor shall be limited to the maximum amount as shall, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from the rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Agreement, result in the obligations of such Guarantor under its Guaranty not

constituting a fraudulent transfer or fraudulent conveyance, or similar limitation, under applicable law. Each Guarantor that makes a payment under its Guaranty shall be entitled upon payment in full of all Obligations under this Agreement to a contribution from each other Guarantor in an amount equal to such other Guarantor's *pro rata* portion of such payment based on the respective net assets of all of the Guarantors at the time of such payment determined in accordance with GAAP.

(d)        ***Subrogation***. Each Guarantor shall be subrogated to all of the rights of the Secured Parties against the Loan Parties in respect of any amounts paid by such Guarantor pursuant to the provisions of this Agreement; *provided* that, if an Event of Default has occurred and is continuing, no Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all of the Obligations shall have been paid in full.

(e)        ***Release of Guaranty***.  (i) All of the Guaranties shall automatically be released and discharged and no further action by the Loan Parties or the Administrative Agent is required for the release of each Guaranty when all of the Release Conditions are satisfied.

(ii)        The Guaranty of any Guarantor shall be released and discharged by the Administrative Agent upon the Borrower's written request and its delivery of the applicable certificate referred to below, and no other action by the applicable Guarantor, the other Loan Parties, the Lenders or the Administrative Agent shall be required for the release of such Guaranty upon any sale or transfer of all of the Equity Interests of the Guarantor to any Person other than the Borrower or one of the Subsidiaries in a transaction permitted by Section 6.02 (any such sale, a "***Sale of Guarantor***") and the Administrative Agent shall be fully protected in relying on a certificate of a Responsible Officer of the Borrower as to whether any particular sale or transfer constitutes a Sale of Guarantor; *provided* that, if the proceeds from such sale or transfer are required, pursuant to Section 2.13 or any other provision of any other Loan Document, to be applied to repay any Loans, arrangements satisfactory to the Administrative Agent shall have been made to apply the Net Cash Proceeds thereof as required by Section 2.13 or such other provision.

(iii)   In addition to any release effected or permitted by clauses (i) and (ii) above, the Administrative Agent shall release any Guarantor upon receipt of the prior written consent of the Required Lenders; *provided* that any release of all or substantially all of the Guaranties shall require the written consent of all of the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.07(b)(iii)).

(f)        ***Continuing Guarantee***. Each Guaranty is a continuing guarantee, shall be binding on the relevant Guarantor and its successors and assigns, and shall be enforceable by the Administrative Agent or the Secured Parties. If all or a part of any Secured Party's interest in any Obligation is assigned or otherwise transferred, the transferor's rights under the Guaranty, to the extent applicable to the Obligation so transferred, shall automatically be transferred with such Obligation.

SECTION 10.02        ***Additional Guarantors***.  Pursuant to Section 5.11(c), certain Subsidiaries may be required to enter into this Agreement as a Subsidiary Guarantor after the Closing Date. Upon the execution and delivery by the Administrative Agent and any Subsidiary of a Guaranty Supplement, such Subsidiary shall become a Subsidiary Guarantor under this Agreement with the same force and effect as if it has originally been named as a Subsidiary Guarantor in, and a party to, this Agreement. The execution and delivery of any Guaranty Supplement shall not require the consent of the Administrative Agent or any other Loan Party hereunder. The rights and obligations of each Subsidiary Guarantor under this Agreement shall remain in full force and effect notwithstanding the addition of any additional Subsidiary Guarantor as a party to this Agreement.

## ARTICLE XI

### PRIORITY AND LIENS/RANKING/COLLATERAL/RELEASE

SECTION 11.01        ***Prepetition Senior Loan Obligations***.  Each of the Loan Parties hereby acknowledges, confirms and agrees that the Borrower and its Subsidiaries (including the Loan Parties) are indebted to the Prepetition Senior Loan Lender for the Prepetition Senior Obligations, as of the Petition Date, in an aggregate principal amount of not less than $7,843,896.84 plus accrued and unpaid interest of at least $103,120.43, in respect of Prepetition Senior Loan Obligations under the Prepetition Senior Loan Agreement plus fees, costs, expenses, charges and disbursements incurred in connection therewith (including attorneys' fees), indemnities, reimbursement obligations and other charges now or hereafter owed by the Borrower and its Subsidiaries (including the Loan Parties) to the Prepetition Senior Loan Lender pursuant to the terms of the Prepetition Senior Loan Documents, all of which are unconditionally owing by the Borrower and its Subsidiaries (including the Loan Parties) to the Prepetition Senior Loan Lender, without offset, defense or counterclaim of any kind, nature and description whatsoever.

SECTION 11.02        ***Acknowledgment of Security Interests***.  As of the Petition Date, each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (i) the Prepetition Senior Loan Lender has valid, enforceable and perfected first priority and senior liens (subject only to "Permitted Liens" (as defined in the Prepetition Senior Loan Documents) upon and security interests in all of the Collateral (as defined in the Prepetition Senior Loan Documents) granted pursuant to the Prepetition Senior Loan Documents and the other "Collateral Documents" (as defined in the Prepetition Senior Loan Documents) as in effect on such Petition Date to secure all of the Prepetition Senior Loan Obligations and (ii) such Liens are not subject to avoidance, set off, counterclaim, recharacterization, reduction, disallowance, impairment or subordination (whether contractual, equitable or otherwise) or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

SECTION 11.03        ***Binding Effect of Documents***.  Each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (i) each of the Prepetition Senior Loan Documents to which it is a party is in full force and effect as of the date hereof (ii) the agreements and obligations of the Borrower and each of its Subsidiaries contained in the Prepetition Senior Loan Documents constitute the legal, valid and binding obligations of each of the Borrower and its Subsidiaries enforceable against each of them in accordance with their respective terms and neither the Borrower nor any of its Subsidiaries has any valid defense, offset or counterclaim to the enforcement of such obligations and (iii) the Prepetition Senior Loan Lender is and shall be entitled to all of the rights, remedies and benefits provided for in the Prepetition Senior Loan Documents, except to the extent clauses (ii) and (iii) above are subject to the automatic stay under the Bankruptcy Code upon commencement of the Chapter 11 Cases.

SECTION 11.04        ***Collateral; Grant of Lien and Security Interest.***

(a)        Pursuant to the DIP Order and in accordance with the terms thereof, as security for the full and timely payment and performance of all of the Obligations, each of the Loan Parties hereby assigns, pledges and grants to the Collateral Agent, for the benefit of itself, the Administrative Agent and the Lenders (collectively, the "***Secured Parties***"), a security interest in, and Lien on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, tangible and intangible existing as of the Petition Date or thereafter acquired or created, including all property of the "estate" (within the meaning of the Bankruptcy Code) of the Loan Parties, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit

rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all (or, in the case of a Foreign Subsidiary that is an Excluded Subsidiary, the Pledged Foreign Voting Equity) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and all of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956- 2(c)(2)) of each Subsidiary of the Borrower, all of the Equity Interests of all other Persons that are not Subsidiaries directly owned by the Borrower, money, investment property, deposit accounts, securities accounts, all commercial tort claims and other causes of action other than Avoidance Actions, the proceeds of all Avoidance Actions, all books, records, and other property related to or referring to any of the foregoing and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of collateral described above (all property of the Loan Parties subject to the security interest referred to in this Section 11.04(a) being hereinafter, collectively, referred to as the "*Collateral*"; *provided* that, for the avoidance of doubt, the Collateral shall in no event include (i) any assets of any direct Foreign Subsidiary that is an Excluded Subsidiary (including any Equity Interests in any Subsidiary of such direct Foreign Subsidiary that is an Excluded Subsidiary) or (ii) any Equity Interests in any direct Foreign Subsidiary that is an Excluded Subsidiary that do not constitute Pledged Foreign Equity). Unless otherwise defined herein, the foregoing terms in this paragraph shall have the meanings ascribed to such terms in the UCC.

(b)     The security interests and Liens in favor of the Collateral Agent in the Collateral shall be effective immediately upon the entry of the Interim Order and subject and subordinate only to the Carve-Out and the terms and conditions set forth in the DIP Order. Such Liens and security interests and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations shall have been paid in full.

(c)     Notwithstanding anything herein to the contrary (A) all proceeds received by the Administrative Agent, the Collateral Agent and the Lenders from the Collateral subject to the Liens granted in Section 11.04(a) and in each other Loan Document shall be, upon the occurrence and during the continuation of an Event of Default or a default under the DIP Order, subject and subordinate to the prior payment of the Carve-Out and (B) no Person entitled to the Carve-Out shall be entitled to sell or otherwise dispose of any Collateral, and without limiting such Person's right to receive proceeds of a sale up to the amount of the Carve-Out owed to such Person, such Person shall not seek or object to the sale or other disposition of any Collateral.

(d)     Subject only to prior payment of the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Administrative Agent against any Loan Party in respect of any Obligation.

SECTION 11.05     ***Administrative Priority***.   Each Loan Party agrees that its Obligations shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to prior payment of the Carve-Out and the terms and conditions of the DIP Order.

SECTION 11.06     ***Grants, Rights and Remedies***.   The Liens and security interests granted pursuant to Section 11.04(a) and the administrative priority granted pursuant to Section 11.05 may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the DIP Order and such other Loan Documents supplement each other, and the grants,

priorities, rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and thereunder are cumulative.

SECTION 11.07        *Filings Required*.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the DIP Order. The Administrative Agent and the Collateral Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the DIP Order or any other Loan Document.

SECTION 11.08        *Survival*.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent, the Collateral Agent and the Lenders pursuant to this Agreement, the DIP Order and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Loan Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)        except to the extent of the Carve-Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Administrative Agent, the Collateral Agent and the Lenders against the Loan Parties in respect of any Obligation. For the avoidance of doubt, no fees, costs, expenses, charges and disbursements shall be payable by the Loan Parties to their attorneys, accountants or other professionals or to attorneys, accountants or other professionals of the Official Committee;

(b)        the Liens in favor of the Administrative Agent, the Collateral Agent and the Lenders set forth in Section 11.04(a) shall constitute valid and perfected first priority Liens and security interests, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)        the Liens in favor of the Administrative Agent, the Collateral Agent and the Lenders set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Administrative Agent or the Collateral Agent file financing statements or mortgages, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**XTERA COMMUNICATIONS INC.**
**AZEA NETWORKS INC.**
**NEOVUS INC.**
**XTERA ASIA HOLDINGS, LLC**


By: _____
     Name:
     Title:

**H.I.G. EUROPE - NEPTUNE, LTD**,
as Lender


By: _____
Name:
Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent and Collateral Agent

By: _____
Name:     Jeffrey Rose
Title:     Vice President

*[Signature Page to Debtor-In-Possession Credit Agreement]*

Schedule 1.01
to DIP Credit Agreement

<u>Subsidiary Guarantors</u>

Xtera Communications, Ltd.
Xtera Communications Canada, Ltd.
Xtera Comunicacoes Do Brasil LTDA
Xtera Communications Hong Kong Ltd.
PMX Holdings, Ltd
Azea Networks, Inc.
Neovus, Inc.
Xtera Asia Holdings, LLC

Schedule 2.01

Schedule 2.01
to DIP Credit Agreement

<u>Lenders and Commitments</u>

| **Lender** | **Commitment** |
|:---:|:---:|
| H.I.G. Europe - Neptune, Ltd | $7,409,793 |
| **Total:** | **$7,409,793** |

Schedule 2.01

Exhibit A
to DIP Credit Agreement

**FORM OF
INITIAL BUDGET**

[*See Attached.*]

Exhibit A

Exhibit B<br>
to Credit Agreement

**FORM OF**
**ASSIGNMENT AND ACCEPTANCE**

This Assignment and Acceptance (the "***Assignment and Acceptance***") is dated as of the Effective Date set forth below and is entered into by and between [the][each] Assignor identified in item 1 below ([the][each, an] "***Assignor***") and [the][each] Assignee identified in item 2 below ([the][each, an] "***Assignee***"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees] hereunder are several and not joint.] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "***Credit Agreement***"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below (including without limitation any letters of credit, guarantees, and swingline loans included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "***Assigned Interest***"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by [the][any] Assignor.

1.     Assignor[s]:      _____

2.     Assignee[s]:      _____

     [Assignee is an [Affiliate][Approved Fund] of *[identify Lender]*]

3.     Borrower:      Xtera Communications Inc., a Delaware corporation

4.     Administrative Agent:      Wilmington Trust, National Association, as the administrative agent for the Lenders under the Credit Agreement

5.     Credit Agreement:      That certain Debtor-in-Possession Credit Agreement, dated as of [●], 2016 (as amended, amended and restated, supplemented,

B-1

waived or otherwise modified from time to time), among the Borrower, the Subsidiary Guarantors party thereto, the Lenders from time to time party thereto, the Administrative Agent and Wilmington Trust, National Association, as Collateral Agent.

6.    Assigned Interest[s]:

| Assignor[s] | Assignee[s] | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/ Loans |
|---|---|---|---|---|
| | | $ | $ | % |
| | | $ | $ | % |
| | | $ | $ | % |

[Page break]

Effective Date: _____ _____, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Acceptance are hereby agreed to:

ASSIGNOR[S]<br/>[NAME OF ASSIGNOR]

By: _____
Title:

[NAME OF ASSIGNOR]

By: _____
Title:

ASSIGNEE[S]<br/>[NAME OF ASSIGNEE]

By: _____
Title:

[NAME OF ASSIGNEE]

By: _____
Title:

[Consented to and]¹ Accepted:

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent

By: _____
Title:

[Consented to:]²

[NAME OF RELEVANT PARTY]

By: _____
Title:

---

¹ To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

² To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

B-3

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE

1.      Representations and Warranties.

1.1     Assignor[s]. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee[s]. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 9.04(b) of the Credit Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 3.05(a), Section 3.05(b) and Section 5.01(a) - (c) thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, and (vii) if it is a Foreign Lender attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of

B-4

interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

3.      <u>General Provisions</u>. This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance. This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of New York, except to the extent New York law is superseded by the Bankruptcy Code.

Exhibit C
to DIP Credit Agreement

**FORM OF
WITHDRAWAL REQUEST**

Wilmington Trust, National Association,
as Administrative Agent for
the Lenders referred to below,
50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402

[Date]

Ladies and Gentlemen:

Reference is made to that certain Debtor-in-Possession Credit Agreement, dated as of [●], 2016 (as amended, amended and restated, supplemented, waived or otherwise modified from time to time, the "***Credit Agreement***"), among Xtera Communications Inc., a Delaware corporation ("***Borrower***"), the Subsidiary Guarantors party thereto, the Lenders from time to time party thereto and Wilmington Trust, National Association, as administrative agent for the Lenders (in such capacity, the "***Administrative Agent***") and as collateral agent for the Secured Parties. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement. This notice constitutes a Withdrawal Request pursuant to Section 2.02(f) of the Credit Agreement.

1.      The date of the withdrawal from the Funding Account shall be [ ] (the "Withdrawal Date"), which is a Business Day.

2.      The aggregate amount of the Withdrawal shall be [$[●]](the "Withdrawal").

3.      [The proceeds of the Withdrawal shall be disbursed in accordance with the Funding

Authorization Letter.][1]  [The proceeds of the Withdrawal shall be disbursed to the following account of the Borrower:

Bank Name: [_____]
Account Number: [_____]
ABA Number: [_____]
Account Name: [_____]
Reference: [_____]][2]

4.      The Borrower hereby represents and warrants that the conditions to the Withdrawal on the Withdrawal Date set forth in Sections 4.02 and 4.03 are satisfied. In accordance with Section 4.02(c), the Borrower is making this Withdrawal in accordance with the following line items in the Budget: [_____ _____].

---

[1]    To be used for the initial Withdrawal occurring on the Closing Date.

[2]    o be used for all Withdrawals other than the initial Withdrawal occurring on the Closing Date.

C-1

5.      The Withdrawal requested herein complies, and the application of the funds so disbursed to the Borrowers will comply, with the terms of the Credit Agreement, including without limitation the Budget, in all respects.

[Signature page follows]

**XTERA COMMUNICATIONS INC.,**
as Borrower


By: _____
Title:

Exhibit D
to DIP Credit Agreement

**FORM OF**
**BORROWING REQUEST**

Wilmington Trust, National Association,
as Administrative Agent for
the Lenders referred to below,
50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402

Re:  XTERA COMMUNICATIONS INC.

[Date][1]

Ladies and Gentlemen:

Reference is made to that certain Debtor-in-Possession Credit Agreement dated as of [●], 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), among Xtera Communications Inc., a Delaware corporation (the "***Borrower***"), the subsidiary guarantors party thereto, the lenders from time to time party thereto and Wilmington Trust, National Association, as administrative agent for the lenders and as collateral agent for the secured parties. Terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

The undersigned Borrower hereby gives you notice pursuant to Section 2.03 of the Credit Agreement that it requests a Borrowing under the Credit Agreement, and in that connection sets forth below the terms on which such Borrowing is requested to be made:

(A)     Type of Borrowing                                              [ABR Borrowing]
                                                                                   [Eurodollar Borrowing]

(B)     Date of Borrowing (which is a Business Day)     _____

(C)     Funds are requested to be disbursed in accordance with
          the Funding Authorization Letter

(D)     Principal amount of Borrowing

(E)     For Eurodollar Borrowing, the Interest Period      _____

---

[1]     Signed Borrowing Request must be irrevocable and delivered in writing (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three (3) Business Days before a proposed Borrowing and (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, one (1) Business Day before a proposed Borrowing (or, in the case of the Borrowing on the Closing Date, if such Borrowing is an ABR Borrowing, on the Closing Date).

D-1

XTERA COMMUNICATIONS INC.


By: _____
     Name:
     Title:

Exhibit E
to DIP Credit Agreement

**FORM OF**
**INTEREST ELECTION REQUEST**

Wilmington Trust, National Association,
as Administrative Agent for
the Lenders referred to below,
50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402

Re:  XTERA COMMUNICATIONS INC.

[DATE][1]

Ladies and Gentlemen:

Reference is made to that certain Debtor-in-Possession Credit Agreement dated as of [●], 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among Xtera Communications Inc., a Delaware corporation (the "*Borrower*"), the subsidiary guarantors party thereto, the lenders from time to time party thereto and Wilmington Trust, National Association, as administrative agent for the lenders and as collateral agent for the Secured Parties. Terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

This notice constitutes an Interest Election Request and the undersigned Borrower hereby makes an election with respect to Loans under the Credit Agreement, and in that connection such Borrower specifies the following [continuation][conversion] with respect to such election:

1.      Amount of Borrowing:

2.      After the conversion or continuation of the related Loans, the resulting Borrowing in respect of such Loans will be [an ABR] [a Eurodollar] Borrowing.

3.      If this Interest Election Request requests a conversion, the date of such conversion (which shall be a Business Day) shall be:

4.      If this Interest Election Request is in respect of a conversion to or continuation of Eurodollar Loans, then the Interest Period shall be _____ months.

---

[1]     Signed Interest Election Request must be irrevocable and delivered (a) not later than 11:00 a.m., New York City time, one (1) Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 11:00 a.m. New York City time, three (3) Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 11:00 a.m., New York City time, three (3) Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period.

E-1

This Interest Election Request is issued pursuant to and is subject to the Credit Agreement executed as of the date set forth above.

XTERA COMMUNICATIONS INC.

By: _____

       Name:

       Title:

Exhibit F
to DIP Credit Agreement

**FORM OF
INTERIM ORDER**

[*See Attached.*]

G-3

Exhibit G-1
to DIP Credit Agreement

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to that certain Debtor-in-Possession Credit Agreement dated as of [●], 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), among Xtera Communications Inc., a Delaware corporation (the "***Borrower***"), the subsidiary guarantors party thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent for the lenders and as collateral agent for the secured parties. Terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

Pursuant to the provisions of Section 2.20 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E (or an applicable successor form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Administrative Agent and the Borrower, and (2) the undersigned shall have at all times furnished the Administrative Agent and the Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By: _____

      Name:

      Title:

Date: _____ ___, 20[  ]

H-1-1

Exhibit G-2
to DIP Credit Agreement

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to that certain Debtor-in-Possession Credit Agreement dated as of [●], 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), among Xtera Communications Inc., a Delaware corporation (the "***Borrower***"), the subsidiary guarantors party thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent for the lenders and as collateral agent for the secured parties. Terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

Pursuant to the provisions of Section 2.20 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E (or an applicable successor form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By: _____

      Name:

      Title:

Date: _____ ___, 20[  ]

Exhibit G-3
to DIP Credit Agreement

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to that certain Debtor-in-Possession Credit Agreement dated as of [●], 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), among Xtera Communications Inc., a Delaware corporation (the "***Borrower***"), the subsidiary guarantors party thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent for the lenders and as collateral agent for the secured parties. Terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

Pursuant to the provisions of Section 2.20 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (or an applicable successor form) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E (or an applicable successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By: _____

      Name:
      Title:

Date: _____ ___, 20[ ]

H-3-1

Exhibit G-4
to DIP Credit Agreement

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to that certain Debtor-in-Possession Credit Agreement dated as of [●], 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), among Xtera Communications Inc., a Delaware corporation (the "***Borrower***"), the subsidiary guarantors party thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent for the lenders and as collateral agent for the secured parties. Terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

Pursuant to the provisions of Section 2.20 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to the Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (or an applicable successor form) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E (or an applicable successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform Administrative Agent and the Borrower, and (2) the undersigned shall have at all times furnished the Administrative Agent and the Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By: _____
    Name:
    Title: