## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| XTERA COMMUNICATIONS, INC., *et al.*, | Case No. 16-12577 |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF JOSEPH R. CHINNICI IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Joseph R. Chinnici, being duly sworn, depose and say:

1.    I am the Chief Financial Officer ("CFO") of Xtera Communications, Inc. ("Xtera"), which is the ultimate parent company of Xtera Communications Ltd., Xtera Communications Canada, Inc., Xtera Communications Hong Kong Limited, PMX Holdings, Limited, Azea Networks, Inc., Neovus, Inc., and Xtera Asia Holdings, LLC, the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.    In my capacity as CFO, I am involved in and/or oversee all financial and other aspects of the Debtors' affairs, including treasury, investor relations, strategic planning, financial reporting, human resources, legal affairs, and other management activities.

3.    I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this Declaration on behalf of the Debtors in support of the Debtors' chapter 11 petitions and the first day pleadings described herein.

---

[1]    The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Xtera Communications, Inc. (4611); Xtera Communications, Ltd. (9610); Xtera Communications Canada, Ltd. (2053); Xtera Communications Hong Kong Ltd. (7411); PMX Holdings, Ltd (4611); Azea Networks, Inc. (7821); Neovus, Inc. (2940); and Xtera Asia Holdings, LLC (4611). The mailing address for the Debtors, solely for purposes of notices and communications, is 500 W. Bethany Drive Suite 100 Allen, TX 75013.

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

(the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the

"Bankruptcy Court").

5.      The Debtors have filed or anticipate filing the following motions and applications

(collectively, the "First Day Motions"):

(a)      Debtors' Motion For An Order Directing Joint Administration Of Cases
Pursuant To Fed. R. Bankr. P. 1015(B) (the "Joint Administration
Motion");

(b)      Application For An Order Authorizing Employment And Retention Of
Epiq Systems, Inc. As Claims And Noticing Agent For The Debtors
Pursuant To 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), Federal Rule Of
Bankruptcy Procedure 2002(f), And Local Bankruptcy Rule 2002-1(f) (the
"Claims Agent Application");

(c)      Motion Of The Debtors For Entry Of Interim And Final Orders
(I) Authorizing The Continued Use Of The Debtors' Cash Management
System, Existing Bank Accounts And Business Forms, And (II) Extending
The Time To Comply With The Requirements Of Section 345(B) Of The
Bankruptcy Code (the "Cash Management Motion");

(d)      Motion Of The Debtors For Entry Of Interim And Final Orders
Authorizing Debtors To Pay Prepetition Wages, Compensation, And
Employee Benefits (the "Wage Motion");

(e)      Debtors' Motion For Interim And Final Orders Authorizing The Debtors
To Pay Certain Prepetition Taxes And Fees (the "Tax Motion");

(f)      Motion Of The Debtors For Entry Of Interim And Final Orders
(I) Authorizing Debtors To (A) Maintain Existing Insurance Policies And
Pay All Insurance Obligations Arising Thereunder, And (B) Renew,
Revise, Extend, Supplement, Change, Or Enter Into New Insurance
Policies, And (II) Granting Certain Related Relief (the "Insurance
Motion");

(g)      Debtors' Motion For An Order Authorizing The Debtors To File A
Consolidated List Of Creditors In Lieu Of Submitting A Separate Mailing
Matrix For Each Debtor ("Consolidated Creditors List Motion");

(h)      Debtors' Motion For An Order Confirming The Administrative Expense

Priority Status Of The Debtors' Undisputed Obligations For The Postpetition Delivery Of Goods And Services ("Foreign Vendors Motion");

(i)    Motion Of The Debtors For Entry Of Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, And 507, Bankruptcy Rules 2002, 4001, 6004, And 9014, And Local Rule 4001-2 (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Granting Liens And Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Scheduling A Final Hearing, And (V) Granting Related Relief (the "DIP Financing Motion"); and

(j)    Motion Of The Debtors And Debtors In Possession, Pursuant To Sections 105(A), 363, And 365 Of The Bankruptcy Code For Entry Of Orders (I)(A) Approving Procedures In Connection With The Sale Of Substanially All Of The Debtors' Assets; (B) Scheduling Related Auctions And A Hearing To Consider Approval Of Sale; (C) Approving Procedures Related To The Assumption Of Certain Executory Contracts And Unexpired Leases; (D) Approving The Form And Manner Of Notice Thereof; (E) Approving Bid Protections; And (F) Granting Related Relief; And (Ii)(A) Authorizing The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (C) Granting Related Relief (the "Sale Motion").

The Debtors also anticipate filing at the outset of these chapter 11 cases, among other things, applications seeking authorization for the Debtors to retain certain professionals in connection with these cases, and a motion seeking to establish interim compensation procedures for such professionals.

6.    I am submitting this Declaration in support of the Debtors' chapter 11 petitions and First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, employees, or other representatives of the Debtors. If I were called as a witness, I would testify consistently with the facts set forth in this Declaration.

7.     This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these chapter 11 cases.  Section I of this Declaration provides an overview of the Debtors' operations and capital structure.  Section II recounts the events preceding the bankruptcy filings.  Section III affirms and incorporates facts that support the relief requested in the First Day Motions.

## I.     Overview of the Debtors' Business

### A.     Description of the Debtors' Operations

8.     Xtera is a publicly traded (NASDAQ:  XCOM)[2] Delaware corporation founded in January 1998 headquartered in Allen, Texas.  The Debtors and their subsidiaries (collectively, the "Company") maintain research and development staff in North America and Europe.  Sales support offices are located in North America, South America, Europe and the Middle East.  The Debtors maintain research and development administrative offices in North America and Europe, and currently have installations in more than 60 countries.

9.     The Company is a leading provider of high-capacity, cost-efficient optical transport solutions, supporting the high growth in global demand for bandwidth.  The Company sells its high-capacity optical transport systems to telecommunications service providers, content service providers, data center operators, enterprises and government entities worldwide to support their deployments of long-haul terrestrial and submarine optical cable networks.  The Company enables long-haul optical transmission infrastructure for inter-continental, regional and enterprise applications.

10.     The Company's primary service offerings include installation and deployment services, on-site hardware replacement services, system maintenance services, extended

---

[2]     Xtera is no longer publicly traded on NASDAQ; it is, however, listed on the OTC markets.

hardware warranty services and training across a broad spectrum of products within the optical networking industry.  These services are provided on a time-and-materials basis or as a fixed-price contract with contract terms ranging up to five (5) years.

11.    The Company derives a substantial majority of its revenue from the sale of its products.  The Company also generates revenue from the sales of support services related to its products, such as training, network planning and monitoring, on-call support, hardware and software warranties and upgrade planning.

12.    The Company primarily sells its products through its direct sales force comprised of employees and independent contractors located in the United States, South America, Europe and Asia.  The Company typically sells its products through third-party distributors only when logistics or local customs regulations make doing so more efficient.

13.    The Company's product portfolio consists of various products to help operators develop and improve their long-haul optical transmission infrastructure.  The Company's "Subsea" equipment includes optical subsea repeaters or long-haul subsea cable systems, branching units and "Remote Optically Pumped Amplifiers," or "ROPAs", for extending the reach of unrepeatered cable systems.  The Company's "Nu-Wave Optima" multi-purpose optical networking platform is used for terrestrial backbone networks, unrepeatered links, and subsea cable systems.   The "Nu-Wave" management system provides both element management functions for individual network elements, as well as sub-network management functions for end-to-end optical links (sub-networks).  The Company's "SDN" architecture provides network to enable customers to "self-manage" a wide range of services and applications.  The Xtera platform facilitates dynamic capacity upgrade for the customer simply by adding "boxes".  "NXT" equipment was the first submarine line terminal equipment designed by Xtera for

upgrading long repeatered submarine cable systems with submerged repeaters. The NXT equipment is no longer produced but the Company still supports the installed base worldwide.

14.     The Company also has a portfolio of intellectual property with more than 175 U.S. and foreign patents and patent applications.

**B.     Organizational Structure of the Debtors**

15.     Debtor Xtera Communications, Inc., a Delaware corporation is the ultimate parent company of its subsidiaries Debtors Xtera Communications Ltd.; Xtera Communications Canada Inc.; Neovus Inc.; and Azea Networks Inc.; Xtera Asia Holdings LLC; PMX Holdings, Limited and Xtera Communications Hong Kong, Ltd.

16.     Debtor Neovus Inc., a Delaware corporation, has no material assets and does not conduct any business. Debtor Azea Networks Inc., a Delaware corporation, does not conduct any business and its only material asset is its 100% ownership interest in Xtera Communications Ltd., a United Kingdom company ("XEU"). Debtor Xtera Asia Holdings does not conduct any business and its only material asset is its 100% ownership interest in Success Pearl Limited, a Seychelles company ("SPL").

17.     Debtor Xtera Communications Ltd. is currently the only subsidiary that own material assets; it also conducts business. Debtor Xtera Communications Canada, Inc. also conducts business.

**C.     The Debtors' Prepetition Capital Structure**

(i)     Senior Secured Credit Facility

18.     On January 16, 2015, Xtera and certain of its subsidiaries (collectively, the "Senior Borrowers") entered into in a Loan and Security Agreement (the "Senior Loan Agreement") with Square 1 Bank, whereby the Senior Borrowers obtained a $12.5 million revolving line of credit facility (as amended, the "Senior Loan") from Square 1, which was later

succeeded in interest by Pacific Western Bank by way of merger (together with Square 1 Bank, "Square 1"), as lender.  Borrowings under the Senior Loan bear interest at the greater of (i) 7.0% or (ii) the prime rate plus 3.5%.  In the event of default, the interest rate increases by 3% per annum.  The Senior Borrowers' obligations under the Senior Loan Agreement are secured by a security interest in all of the assets of the Senior Borrowers other than the Senior Debtors' voting stock in above 65% of the total combined voting power with respect to any foreign subsidiary of a each Senior Borrower (collectively, the "Senior Collateral").  The Senior Loan Agreement was amended to require the use of a lockbox account under the control of Square 1, and extending the maturity date to November 1, 2016.  The outstanding balance on the Senior Loan was $8.2 million as of November 30, 2016.

19.    Concurrently with entering into the Senior Loan Agreement, Xtera issued to Square 1 a warrant to purchase 769,231 shares of Xtera's preferred stock that expired on January 16, 2015 (the "SQ1 Warrant").  As of the completion of the Company's initial public offering, the SQ1 Warrant became exercisable for 29,586 shares of Xtera's common stock.

(ii)    Subordinated Secured Term Loans

20.    On May 10, 2011, Xtera entered into a Venture Loan and Security Agreement ("Horizon Loan Agreement"), as borrower, with Horizon Technology Finance Corporation "HTF"), as lender,[3] that provided for an initial term loan from HTF of up to $10.0 million ("Horizon Term Loan A") and an option for an additional term loan from HTF of up to $2.0 million ("Horizon Term Loan B", and collectively with the Horizon Term Loan A, the "Horizon Loans").  Xtera's repayment obligations under the Horizon Loan Agreement are secured by a

---

[3]    As described in more detail below, HTF subsequently transferred all right, title and interest in and to the Horizon Loan to Horizon Funding 2013-1 LLC ("Funding"). Funding subsequently transferred all right, title and interest in and to the Horizon Loan to Horizon Funding Trust 2013-1, LLC ("Horizon").

security interest, junior to that of Square 1, in all of Xtera's assets, including its intellectual property (the "Junior Collateral").    As explained in more detail below, due to various amendments to the Horizon Loan Agreement, the current interest rate applicable to each Horizon is 12.5%, which matured on October 1, 2016.    As of September 30, 2016, the outstanding balance of the Horizon Loans totaled $3.9 million.

21.    Concurrently with the execution of the Horizon Loan Agreement, Xtera issued to HTF a warrant to purchase 983,607 shares of the Xtera's preferred stock (the "Horizon Warrant").    The Horizon Warrant expires on November 17, 2020 and, upon completion of Xtera's initial public offering, became exercisable for 37,832 shares of the Company's common stock.

22.    The Horizon Term Loan A was evidenced by a certain Secured Promissory Note (Loan A) executed by Xtera in favor of HTF, dated as of May 10, 2011, in the original principal amount of Ten Million Dollars ($10,000,000) (as subsequently amended and restated, the "Horizon Loan A Note").    The Horizon Loan Note A initially bore interest at 11.5% per annum, matured on December 1, 2014, and required interest only payments through June 1, 2012 and principal and interest payment thereafter.    Xtera exercised the option to obtain the additional $2 million Horizon Term Loan B on December 27, 2011, which was evidence by a certain Secured Promissory Note (Loan B) executed by Xtera in favor of HTF, dated as of December 27, 2011, in the original principal amount of Two Million Dollars ($2,000,000) (as subsequently amended and restated, "Horizon Loan B Note" and together with the Horizon Loan B Note, the "Horizon Notes").    The Horizon Loan B Note originally accrued interest at 11.5% per annum, matured on July 1, 2015, and required interest only payments through January 1, 2013 and principal and interest payments thereafter.

23.      On April 1, 2013, the Horizon Loan Agreement was amended, extending the maturity date of the Horizon Term Loan A until March 1, 2015, and the maturity date of the Horizon Term Loan B until December 1, 2015.  The April 1, 2013 amendment also provided for a final payment by Xtera to HTF of $1,477,041.31 upon the repayment of the Term Loan A, and a final payment of $272,958.44 upon the repayment of the Term Loan B.

24.      On March 1, 2014, the Horizon Loan Agreement was amended to modify the repayment schedule of the Horizon Loans.  The amendment increased the interest rate on the Horizon Loans to 12.50%, and increased the final payments to $1,666,666.67 with respect to Horizon Term Loan A, and to $333,333.33 with respect to Horizon Term Loan B.  The March 1, 2014 amendment also provided HTF with board observation rights with respect to Xtera's board of directors.

25.      On or about June 28, 2013, HTF transferred all right, title and interest in and to the Horizon Notes to Horizon Funding 2013-1 LLC ("Funding").  On or about June 28, 2013, Funding subsequently sold all right, title and interest in and to the Horizon Notes to Horizon Funding Trust 2013-1, LLC ("Horizon").

26.      On January 16, 2015, in connection with the execution of the Senior Loan Agreement, Horizon, Square 1, and Xtera entered into a Subordination Agreement (the "Subordination Agreement").  Pursuant to the Subordination Agreement, Horizon's collection and enforcement rights under the Horizon Loan Agreement are subordinate to the rights of Square 1 with respect to the Senior Loan Agreement.

(iii)   Defaults

27.      As of January 31, 2016 and February 29, 2016, the Senior Borrowers breached a financial covenant in the Senior Loan Agreement for failing to maintain a minimum adjusted

cash flow, which caused a cross-default under the Horizon Loan Agreement. The default continued through April 2016. Despite the ongoing breach, Square 1 allowed the Company continued access to the Senior Loan during the second quarter of 2016.

28.    On April 27, 2016, the Senior Borrowers entered into a Limited Waiver and Third Amendment to Loan Agreement (the "Third Senior Loan Amendment") with Square 1 which waived the violations of the financial covenants under the Senior Loan Agreement. Pursuant to the Third Senior Loan Amendment, the Senior Lenders and Square 1 agreed to modify certain financial covenants, and to extend the term of the Senior Loan Agreement through July 31, 2016. The Third Senior Loan Amendment also required that, on or before May 31, 2016, the Senior Borrowers provided Square 1 with evidence of a term sheet (the "Senior Refinancing Documents"), evidencing a proposed sale of Xtera or an equity or debt transaction pursuant to which Square 1 would receive the cash proceeds (a "Senior Refinancing Transaction") on or before July 31, 2016. The amendment also provided that Square 1 would be paid $150,000 (the "Success Fee") upon repayment of the Senior Loan, which would be reduced to $50,000 if the Senior Loan was repaid on or before May 31, 2016, and to $100,000 if the Senior Loan was repaid after May 31, 2016 and before June 30, 2016.

29.    On May 31, 2016, the Senior Lenders and Square 1 entered into the Fourth Amendment to Loan Agreement (the "Fourth Senior Loan Amendment"). The Fourth Senior Loan Amendment extended the deadline to provide the Senior Refinancing Documents until June 10, 2016. It also added an additional $100,000 Success Fee upon the consummation of a qualifying transaction by the Senior Borrowers. The Fourth Senior Loan Amendment also required Xtera to deposit all funds into a lockbox account with Square 1 under Square 1's control.

30.     On May 31, 2016, Xtera and Horizon entered into the Eighth Amendment of Venture Loan and Security Agreement (the "Eighth Horizon Amendment"), amending certain terms of the Horizon Loan Agreement and Horizon Notes.  The Eighth Horizon Amendment extended the maturity dates of the Horizon Loans to July 31, 2016.  The amendment also increased the additional final payment by Xtera to $1,750,000 if the Horizon Term Loan A is repaid on or before June 30, 2016, increasing to $1,812,500.00 if not repaid on or before July 15, 2016, to $1,875,000.00 if not repaid on or before July 31, and thereafter increasing by $208,333.33 on the first day of each month until the loan is repaid.  Likewise, the amendment increased the additional final payment by Xtera to $350,000 if the Horizon Term Loan B is repaid on or before June 30, 2016, increasing to $362,500 if not repaid on or before July 15, 2016, to $375,000 if not repaid on or before July 31, and thereafter increasing by $41,666.67on the first day of each month until the loan is repaid.  Like the Fourth Senior Loan Amendment, the Eighth Horizon Amendment required Xtera to provide Horizon with documents evidencing a refinancing transaction (the "Horizon Refinancing Documents", and together with the Senior Refinancing Documents, the "Refinancing Documents") on or before June 30, 2016.

31.     On June 30, 2016, Xtera and the other Senior Borrowers defaulted on their obligations to deliver the Refinancing Documents to Horizon and Square 1.  Xtera and Horizon entered into a limited waiver and amendment with respect to such default.  The Senior Borrowers entered into a limited waiver with Square 1 with respect to the failure to provide the Senior Refinancing Documents, but Square 1 did not waive the requirement that the Refinancing Transaction close on or before July 31st.

32.     In an effort to timely effectuate the Refinancing Transaction, Xtera entered into extensive negotiations with:  Callidus Capital for a loan based upon monetizing intellectual

property with Fortress Investment Group ("Fortress"), whereby Callidus Capital would provide an asset-backed loan to Xtera and Fortress would provide a term loan combined with an intellectual property monetization program and a PIK loan.  However, negotiations broke down, and Xtera failed to effectuate a Refinancing Transaction by the July 31 deadline.

33.    The Debtors subsequently entered into limited waivers and amendments to the Senior Loan Documents and Horizon Loan Documents to waive the default caused by the Debtors' failure to timely effectuate a Refinancing Transaction.  Specifically, Square 1 agreed to extend the maturity date of the agreement to October 1, 2016, added an additional $100,000 success fee in the sixth amendment to the Senior Loan[4] and required the Senior Borrowers to deliver Senior Refinancing Documents upon three days' notice from Square 1.  Likewise, Horizon agreed to extend the maturity date of the Horizon Notes to October 1, 2016, and required Xtera to deliver Horizon Refinancing Documents upon three days' notice from Horizon.

34.    The Debtors entered into a Limited Waiver and Eighth Amendment to Loan Agreement, dated September 30, 2016, by and among the Borrowers and Pacific Western Bank as Successor in Interest by Merger to Square 1 Bank (the "Eighth Amendment"), further amending the Senior Loan to (i) waive an event of default by the Debtors; (ii) modify the definition of "Permitted Indebtedness" to allow the Debtors to incur additional indebtedness in October 2016, subject to certain limitations; and (iii) modify the maturity date of the Senior Loan to November 1, 2016.

35.    Similarly, the Debtors entered into a Limited Waiver and Twelfth Amendment to Venture Loan and Security Agreement, dated September 30, 2016, by and between Xtera Communications, Inc. and Horizon Technology Finance Corporation (the "Twelfth Horizon

---

[4]    As of the date hereof, the success fees added by Square 1 total $350,000.

Amendment," and together with the Eighth Amendment, the "September 30 Amendments"), further amending the Horizon Loan Agreement to (i) waive an event of default by the Debtors; (ii) modify the definition of "Permitted Indebtedness" to allow the Debtors to incur additional indebtedness in October 2016, subject to certain limitations; and (iii) modify the maturity date of the Senior Loan to November 1, 2016.

36.     As of November 1, 2016, the Senior Borrowers failed to comply with the requirement to pay all outstanding obligations under the Senior Loan Agreement and the requirement to pay all unpaid principal and accrued interest under the Horizon Loan Agreement, which triggered events of default under the Senior Loan Agreement and the Horizon Loan Agreement.  As of November 1, 2016, the outstanding principal and interest under the Senior Loan Agreement was $8.19 million and the outstanding principal and interest under the Horizon Loan Agreement was $6.91 million.

(iv)   Bridge Financing

37.     On September 13, 2016, Xtera issued and sold (i) secured promissory notes (the "Notes") in the aggregate principal amount of $500,000 and warrants (the "Warrants") to purchase up to an aggregate of 500,000 shares of Xtera's common stock for gross proceeds of $500,000.  The entire principal amount and any accrued and unpaid interest on the Notes are due and payable on December 31, 2016 but, holders of the Notes may demand payment any time after October 1, 2016.  The Notes bear interest at the rate of 10% per annum; provided, however, that if Xtera becomes subject to a bankruptcy proceeding, the default rate under the Notes will increase to 20% per annum.  Pursuant to a security agreement with the investors, Xtera's obligations under the Notes are secured by a general lien on all assets of Xtera.  The security interests are senior to the security interests of Square 1 and Horizon Technology Finance Corporation pursuant to a Subordination Agreement dated September 13, 2016.  In connection

with the Eighth Amendment and the Twelfth Horizon Amendment, the Bridge Loan Investors (defined below) entered into an Amendment to Subordination Agreement, dated September 30, 2016 with Square 1 and Horizon Technology Finance Corporation.

38.    The Notes and Warrants were sold in a private placement under rule 506 promulgated under the Securities Act of 1933, as amended, to certain accredited investors, including (i) Xtera's chief executive officer Jon Hopper, (ii) an entity affiliated with a member of Xtera's board of directors, and (iii) an affiliate and largest stockholder of Xtera (collectively, the "Bridge Loan Investors").  The Audit Committee of Xtera's board of directors reviewed and approved the issuance of the Notes as a potential related party transaction.  Additional Notes may be issued up to an aggregate principal amount of $1,700,000.  The proceeds of the Additional Notes were used to fund necessary expenses of the Debtors including payroll.

39.    In connection with the September 30 Amendments, the Bridge Loan Investors entered into Amendments to Subordination Agreement, dated September 30, 2016, (i) with Pacific Western Bank, successor by merger to Square 1 pursuant to which the Bridge Loan Investors expressly agreed to subordinate their liens to the liens of Pacific Western Bank and Pacific Western Bank agreed to pay, from the first proceeds received, $1,200,000 plus the amount of outstanding indebtedness under the October 2016 New Lender Indebtedness Outstanding, as defined in the Amendment to Subordination Agreement; and (ii) with Horizon pursuant to which the Bridge Loan Investors expressly agreed to subordinate their liens to the liens of Horizon and repayment to Horizon on the Senior Debtor was subordinate to repayment to the Bridge Loan Investors of $1,200,000 plus the amount of outstanding indebtedness under the October 2016 New Lender Indebtedness Outstanding, as defined in the Amendment to Subordination Agreement.

(v)    Other Indebtedness

40.    In addition, the Debtors regularly receive goods and services from various vendors and providers in the ordinary course of the Debtors' operations and have monthly rent obligations on certain real property leases.  As of the Petition Date, the Debtors' records show an aggregate amount of more than $25,000,000 was due and owing to prepetition vendors, service providers, and landlords.

## II.    Events Leading to Chapter 11

41.    Over the course of the past nine months, the Debtors have experienced significant liquidity issues that have hindered their ability to make payments in the ordinary course of business.  Revenues have declined in part due to the expiration of certain key contracts, revised terms on certain renewed contracts that are less favorable for the Debtors than prior contracts.

42.    The Debtors have sought to implement a number of restructuring initiatives over the last year including, without limitation, making appropriate adjustments in staffing, increasing negotiations with vendors and suppliers, and realigning their business and seeking out additional sources of funding and business opportunities, including soliciting equity investments.  In March 2016, the Debtors retained the services of Cowen and Company ("Cowen") to undertake the Refinancing Transaction described herein.  In June, Cowen's mandate was expanded to include mergers and acquisitions activity and in July 2016, Cowen's restructuring team began working with the Debtors.  Cowen was officially retained to provide restructuring investment banking services in September 2016.

43.    After careful consideration and consultation with their advisors, the Debtors ultimately determined that it was necessary to pursue a restructuring or financing transaction with one or more potential purchasers or other financing or strategic partners.  Beginning in July 2016, the Debtors, together with their advisors, identified and contacted more than seventy (70)

prospective strategic or financial partners regarding a potential financing, sale, or other restructuring transaction.

44.    Non-disclosure agreements were executed by nineteen (19) of such parties, and a management presentation prepared by the Debtors and their advisors containing information regarding, among other things, the Debtors' background and overview, industry overview, addressable market forecast, description of the Debtors' differentiated intellectual property, financial models and near term cash flow projections, was distributed to each party that executed a non-disclosure agreement.

45.    The Debtors and their advisors were in regular contact with these entities and facilitated such entities' due diligence efforts, including discussions around potential transaction scenarios.  In July 2016, the Debtors and their advisors executed a term sheet with Callidus Capital in connection with a proposed loan based upon monetizing intellectual property with Fortress whereby Callidus Capital would provide an asset-backed loan to Xtera and Fortress would provide a term loan combined with an intellectual property monetization program and a PIK loan; however, negotiations with Callidus Capital broke down during the diligence phase of the transaction.  The Debtors were unable to reach an agreement with any other party regarding a potential sale transaction or equity infusion.  As explained in more detail *infra*, the failure of the Debtors to effectuate a refinancing transaction constituted a default under the Senior Loan Agreement and the Horizon Loan Agreement.

46.    On August 17, 2016, Xtera received a notice letter from the Nasdaq Stock Market ("NASDAQ") notifying Xtera of its failure to maintain a minimum stockholders' equity of $10 million, as required by NASDAQ Marketplace Rule 5450(b)(1)(A), which was disclosed by

Xtera in public filings dated August 22, 2016.  Xtera had until October 3, 2016 to demonstrate compliance with the minimum stockholders' equity requirement.

47.    On September 26, 2016, Xtera received a notice letter from the NASDAQ indicating that, based upon the closing bid price of Xtera's common stock for thirty consecutive business days, Xtera no longer met the requirement to maintain a minimum bid price of $1 per share, as set forth in NASDAQ Listing Rule 5450(a)(1).  In accordance with NASDAQ Listing Rule 5810(c)(3)(A), NASDAQ is providing Xtera with a period of 180 calendar days, or until March 27, 2017, in which to regain compliance with the minimum bid price requirement.  In order to do so, the closing bid price of Xtera's common stock must be at least $1 per share for a minimum of ten consecutive business days during the 180 period until March 27, 2017.

48.    On October 6, 2016, Xtera received a letter (the "Delisting Notice") from NASDAQ notifying Xtera that it had not regained compliance with NASDAQ Marketplace Listing Rule 5550(b), the continued listing requirement to maintain a total stockholders' equity of $2.5 million and, accordingly, its common stock will be delisted from NASDAQ.  The Delisting Notice states that unless Xtera requests an appeal of the determination to delist, trading of Xtera's common stock will be suspended at the opening of business on October 17, 2016 and a Form 25-NSE will be filed with the Securities and Exchange Commission, which will remove Xtera's common stock from listing on NASDAQ.  After careful consideration, Xtera's board of directors determined not to appeal NASDAQ's delisting determination.  Xtera is, and remains, listed on the OTC market.

49.    The Debtors, together with their advisors, carefully considered all options and determined in their business judgment that the commencement of these chapter 11 cases and the pursuit of a post-petition marketing and sale process is in the best interest of all creditors and the

estate since it will maximize the value of the Debtors' assets.  The Debtors do not have sufficient liquidity to continue operating outside of bankruptcy, and the pursuit of a sale transaction during these chapter 11 cases presents the best available option to maximize value for the Debtors' estates.

50.    The Debtors, together with their advisors, solicited debtor-in-possession financing ("DIP Financing") proposals from forty-four (44) potential lenders.  Of those, seventeen (17) signed non-disclosure agreements and received documentation.  The Debtors received five (5) term sheets for DIP Financing, of which three (3) contained conditions precedent that the Debtors could not satisfy.

51.    Ultimately, the Debtors and their advisors engaged in negotiations with the two remaining parties in contemplation of a sale and debtor in possession financing.  Both of these transactions contemplated "priming" financing senior to existing secured indebtedness.  After consultation with Square 1 and exploration of the alternatives, the Debtors believed that it was in the best interests of all interested parties to pursue the currently contemplated transaction with Neptune Bidco.

52.    The agreement with Neptune Bidco contemplates $7.4 million in senior debtor in possession financing secured by all assets of the Debtors to find the Debtors through a sale process.  Additionally, Neptune Bidco is acting as stalking horse bidder to purchase all of the Debtor's assets for a purchase price of $10.0 million inclusive of amounts due under the DIP Financing.

## III.    Facts in Support of First Day Motions [5]

53.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors have

---

[5]    Capitalized terms used but not defined in this Section III shall have the meanings ascribed to them in the applicable First Day Motion.

filed the First Day Motions.  The Debtors request that each of the First Day Motions described below be granted, as each constitutes a critical element in ensuring a successful outcome for the Debtors and their estates in these chapter 11 cases.

### A.    Joint Administration Motion

54.     By the Joint Administration Motion, the Debtors request that the Bankruptcy Court authorize and direct the joint administration of the chapter 11 cases of the Debtors, and the consolidation thereof only for procedural purposes pursuant to Bankruptcy Rule 1015.  In addition, the Debtors request that the Clerk of the Bankruptcy Court make an entry on the dockets of the Debtors stating that an order has been entered directing joint administration of these chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the Xtera docket.

55.     The Debtors are related entities and are filing petitions in the same Bankruptcy Court.  I believe that joint administration will be less costly and burdensome than separate procedural administration of the estates due to the combined docket and combined notice to creditors and parties in interest.  Many applications, motions, orders, hearings, and notices will be made in these cases and will affect both Debtors and their estates.  Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.  In addition, since the Debtors are seeking only administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be impacted.

56.     I believe that if each Debtor's case was administered independently, there would be a number of duplicative pleadings and overlapping service.  This unnecessary duplication of identical documents would be wasteful of the resources of the Debtors', other parties' and this Court.  Therefore, I believe that the chapter 11 cases should be jointly administered for procedural

purposes only, and the Joint Administration Motion should be approved.

**B.**     **Consolidated Creditors List Motion**

57.     By the Consolidated Creditors List Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to file a consolidated list of creditors in lieu of separate mailing matrices for each Debtor during the Interim Period

58.     I have been advised that, under the local rules, each Debtor is required to maintain a creditor mailing matrix.  Certain of the Debtors do not presently maintain lists of the names and addresses of their creditors on a Debtor-specific basis.  I believe that segregating the Debtor's records to a specific creditor matrix format, in particular given the size and scope of these Chapter 11 Cases and the number of the Debtors' creditors, will require the time provided during the Interim Period to complete.  Moreover, the new requirement that each debtor maintain a separate creditor matrix was implemented to provide parties with information that may be necessary in the event of conversion to Chapter 7 liquidation—an unlikely occurrence during the Interim Period.  Therefore, I believe that permitting the Debtors to maintain a single Creditor Matrix is warranted and the Consolidated Creditors' List Motion should be granted.

**C.**     **Foreign Vendors Motion**

59.     The Debtors are multinational corporations and certain of the Debtors' operations based in foreign countries.  Debtors Xtera Communications Ltd., Xtera Communications Canada, Inc., PMX Holdings, Ltd., and Xtera Communications Hong Kong Ltd. are incorporated under the laws of and based in foreign countries.  Given this and the global nature of the business, certain parties in interest, are located outside of the United States and its territories, including but not limited to financial institutions, vendors, creditors and suppliers that provide goods, services, data and materials in the ordinary course of the Debtors' businesses that are

essential to the Debtors' business operations.

60.     I believe that it is especially important that the Debtors have the flexibility to deal with the International Parties, which may have confused and guarded reactions to the bankruptcy process.  These parties may stop providing goods, services, data and materials to the Debtors on a timely basis or completely sever their business relationship with the Debtor.  I believe that issuing substitute purchase orders on a postpetition basis would be administratively burdensome, time consuming and counterproductive to the Debtors' continuing operations.   Such a requirement imposed by the International Parties for assurance of payment would inevitably lead to delays in the Debtors' receipt of goods or services and could severely harm the Debtors' operations, diminishing the Debtors' chance of a successful reorganization.

61.     By the Foreign Vendors Motion, the Debtors seek entry of an order confirming the administrative expense priority status of the Debtors' undisputed obligations for the postpetition delivery of goods and provision of services and authorizing the Debtors to pay the International Parties for the delivery of goods and provision of services in the ordinary course of their business on a post-petition basis.  In order to maintain the Debtors' ongoing operations, I believe that the Foreign Vendors Motion should be granted.

### D.     Insurance Motion

62.     By the Insurance Motion, the Debtors seek authorization to maintain their existing insurance policies and pay all premiums, deductibles, administration fees, and consulting fees arising thereunder or in connection therewith in accordance with the DIP Budget, and renew, revise, extend, supplement, change, or enter into new insurance coverage and insurance premium financing as needed in their business judgment.

63.     In the ordinary course of the Debtors' business, the Debtors maintain various insurance programs providing coverage for, among other things, workers' compensation liability,

automobile liability, employment practices liability, crime liability, directors and officers liability, and general and umbrella liability.  The Insurance Programs include coverage primarily from the insurance policies listed on Schedule 1 to the Insurance Motion, which the Debtors have obtained through third-party insurance carriers.

64.    The premiums for the Insurance Policies covering property and workers' compensation liability and the premiums for the Insurance Policies covering directors and officers liability, employment practices liability, professional liability, and fiduciary liability are financed through premium finance agreements.   I believe the Debtors are current on all obligations owing in connection with the Premium Financing Agreements.

65.    For the policy periods expiring January 2017, the total annual premiums under the Insurance Policies totaled over $1,778,700, including accruals of $386,730 recorded as of September 30, 2016. As of the Petition Date, the Debtors believe that they are current on all of their premium and other payment obligations under the Insurance Policies.  The Insurance Policy for directors and officers liability (the "D&O Policy") expired on November 12, 2016, and will be replaced post-petition.   Although the Debtors believe they are current, to the extent the Debtors discover that there are any outstanding prepetition obligations due, the Debtors seek, out of an abundance of caution, authorization to make payments of Insurance Obligations plus any unforeseen deductible payment amounts for prepetition claims.

66.    I believe that payment of any obligations, whether prepetition or postpetition, in connection with the Insurance Policies and Premium Finance Agreements and the renewal, revision, extension, supplementation, or change of existing Insurance Policies and entering into new insurance policies or premium finance agreements as needed in the Debtors' business judgment are necessary to protect and safeguard the Debtors' ongoing operations and ensure

compliance with the UST Guidelines.

67.    Therefore, I believe that the relief requested in the Insurance Motion is in the best interest of the estates and should be granted.

**E.    Cash Management Motion**

68.    By the Cash Management Motion, the Debtors seeks entry of orders, among other things, (a) approving the Debtors' continued use of their current cash management system and the Debtors' existing bank accounts and business forms, and (b) granting the Debtors a 30-day extension to either comply with the requirements of section 345(b) of the Bankruptcy Code or file a motion seeking an additional extension or waiver of the requirements of section 345(b) of the Bankruptcy Code.

69.    As part of their Cash Management System, the Debtors maintain twenty-eight Bank Accounts worldwide in the ordinary course of their business with Silicon Valley Bank, Bank of Montreal, HSBC, and Square 1 Bank – including operating accounts, zero-balance controlled disbursement accounts, cash collateral accounts, money market collateral accounts and zero-balance FSA Accounts.  Through the Bank Accounts, the Debtors efficiently collect, transfer, and disburse funds generated from their operations on a daily basis.

70.    The Debtors employ various methods to deposit, withdraw, and otherwise transfer funds to, from, and between the Bank Accounts, including checks, ACH transactions, direct deposits, and electronic funds transfers.  The Debtors believe that the Bank Accounts are generally in financially stable banking institutions insured by the Federal Deposit Insurance Corporation or other appropriate government-guaranteed deposit protection insurance.

71.    Customers make payments directly into operating accounts.  Payroll, ACH, and wire transfers for various accounts payable are made from the operating accounts, and certain funds are also transferred from time to time from these operating accounts to the controlled

disbursement accounts, and any physical checks issued by the Debtors are paid from the controlled disbursement accounts.  In the ordinary course of business, the Debtors use numbered checks and other business forms, including electronic forms and paper forms, preprinted letterhead, and related documents.

72.    Post-petition, the Debtors expect to open a Funding Account for DIP Proceeds. Nevertheless, believe that by using the existing Cash Management System, Bank Accounts and Business Forms, the Debtors will avoid unnecessary expense and delay that would disrupt the ordinary financial affairs and business operations of the Debtors, delay the administration of the Debtors' estates, and increase the costs to the estates.  I believe that the relief requested in the Cash Management Motion will help to ensure the Debtors' orderly entry into chapter 11 protection and will avoid many of the possible disruptions and distractions that could divert Debtors' attention from more pressing matters during the initial days of these chapter 11 cases. Any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates, and altering the Cash Management System may disrupt payments to key vendors and employees.

73.    I believe that preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition operations and (b) assist the Debtors in their efforts to consummate a sale transaction in these cases.  In addition, allowing the Debtors to continue to use their prepetition Bank Accounts will assist the Debtors in accomplishing a smooth transition to operating in chapter 11 and help avoid any disruption in the Debtors' relationships with critical customers, contractors, and suppliers.

74.    Further, due to the nature and scope of the Debtors' business operations, I believe

it is important that the Debtors be permitted to continue to use the Business Forms without alteration or change and without the "Debtor in Possession" designation. Otherwise, the estates will be required to bear a potentially significant expense that I believe is unwarranted. Note, however, that once the paper Business Forms are depleted, the Debtors will then replace them with forms containing the "Debtor in Possession" designation.

75.     I believe that the relief requested in the Cash Management Motion is essential to avoid unnecessary and potentially costly disruptions to the Debtors' operations, is in the best interest of the estates and, therefore, should be granted.

**F.     Claims Agent Application**

76.     Pursuant to the Claims Agent Application, the Debtors seek authorization to retain Epiq Systems, Inc. ("Epiq") as their claims and noticing agent ("Agent") in these chapter 11 cases. Upon information and belief, Epiq is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe Epiq is well qualified to provide such services, expertise, consultation, and assistance to the Debtors and serve as Agent in these chapter 11 cases.

77.     The Debtors believe that Epiq is capable of handling the requisite noticing responsibilities, thereby relieving the Clerk, or in the alternative, the Debtors, of such burden and expense. The employment of Epiq will provide efficient management of the claims and noticing processes in these cases, thereby allowing the Debtors' management and advisors to focus on the Debtors' reorganization efforts for the benefit of the Debtors, their estates their creditors, and other parties in interest.

**G.     Wage Motion**

78.     By the Wage Motion, the Debtors are requesting (i) authorization (a) to pay and/or perform, as applicable, prepetition obligations to employees and independent contractors,

including accrued prepetition wages, salaries and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Claims"); (b) to honor and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' vacation, sick time and holiday time policies, workers' compensation, and employee benefit plans and programs (collectively, the "Employee Benefit Obligations"), and to pay all fees and costs in connection therewith, except as otherwise set forth in the Wage Motion; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); and (d) to pay all related prepetition withholdings, and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "Employee Taxes" and, together with the Employee Claims, the Employee Benefit Obligations, the Employee Expense Obligations and the Employee Taxes collectively, the "Prepetition Employee Obligations"), and, among other things, (ii) authorizing and directing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments requests relating to the foregoing.

79.    The Debtors' workforce comprises approximately 65 Employees and nine independent contractors.  Separately, the Debtors' have three contractors contracted through Robert Half International.  The Debtors request authorization to pay all pre-petition amounts owed to Robert Half International on account of services provided by the contractors.

80.    All Employees are paid in arrears on a semi-monthly basis via direct deposit. Salaried employees are paid the current pay period and hourly employees are paid the previous pay period.  The Debtors utilize the services of Alliance Payroll Services, Inc. and e-Financial Management Company, third-party payroll administrators, to process their payroll and coordinate the payment of Payroll Taxes.  I believe that continuing to use Alliance Payroll

Services, Inc. and e-Financial Management Company to administer the Debtors' payroll and

benefits programs postpetition is in the best interests of the Debtors' estates.  Wages, salaries,

commissions and any applicable payments under the Bonus Programs (as defined below) for the

payroll cycle was processed on November 12, 2016 for a pay date of November 15, 2016.  The

Debtors' next scheduled payroll date is November 30, 2016.  Because Employees are paid in

arrears, the Employees will not have been paid all of their prepetition wages as of the Petition

Date.  Additionally, in connection with the wages and salaries paid to their Employees, the

Debtors are required by law to withhold from their Employees' paychecks certain amounts for

federal, state, and local income taxes, employee benefits and employee programs (the "Payroll

Withholding Amounts").

81.    As of the Petition Date, the Debtors estimate that approximately $241,000 in

wages, commissions, salaries and Payroll Withholding Amounts have accrued but remain

unpaid.  To the best of the Debtors' understanding, two Employees may be owed more than

$12,850 in accrued and unpaid prepetition wages or salaries, excluding outstanding and un-

cashed payroll checks, bonus amounts and paid time off ("PTO"), which Employees will only be

paid a maximum amount of $12,850 for prepetition amounts owed.

82.    As described in more detail in the Wage Motion, the Debtors also have

commissions and incentive programs, and offer Employees various other forms of compensation

and benefits, including holiday time, paid time off, reimbursement of certain business expenses,

health plans, disability plans, and savings plans.  I believe these forms of compensation and

benefits are usual, customary and necessary if the Debtors are to retain qualified employees to

operate their businesses during the pendency of these cases.

83.    The Debtors' Employees are essential to the operation of the Debtors business as

is required to achieve a sale.  The Employees have an intimate knowledge of the operation of the Debtors' businesses and any deterioration in employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the Debtors' ability to service their customers, and the value of the Debtors' assets and businesses.

84.    In addition, to the best of my knowledge, only two Employees are owed in excess of the $12,850 cap set forth in Bankruptcy Code section 507(a)(4).  All payments to Employees for pre-petition amounts will be within the cap set forth in Bankruptcy Code section 507(a)(4) and (5).

85.    For these reasons, and for the reasons and legal arguments set forth in the Wage Motion, I believe that the relief sought in the Wage Motion should be granted.

**H.    Tax Motion**

86.    By the Tax Motion, the Debtors are requesting authority to pay certain prepetition sales, use, income, business franchise, property, employment and other taxes as well as certain other business licensing and reporting fees (collectively, the "Taxes") to various federal, state, county and city taxing and licensing authorities (collectively, the "Taxing Authorities"), and to continue paying Taxes to the Taxing Authorities postpetition in the ordinary course.

87.    Prior to the Petition Date, the Debtors in their ordinary course of business, incurred various Taxes, including payroll, property, franchise, state and local sales and use tax liabilities.  In addition, the Debtors are required to pay certain other Taxes constituting annual report and registration fees, license fees, franchise taxes, and personal property taxes.  As of the Petition Date, the Debtors' financial records indicate that approximately $280,000 in Taxes have accrued prepetition but will not become payable to the applicable Taxing Authorities until after the Petition Date.

88.    I believe that authority to pay prepetition Taxes and to pay postpetition Taxes as

they come due in the ordinary course is necessary to prevent disruptions to the Debtors' operations postpetition and will help preserve the estate's resources. Accordingly, I believe the relief requested in the Tax Motion is in the best interest of the estates and should be granted.

## I.      DIP Financing Motion

89.      By the DIP Financing Motion, the Debtors request the entry of an Interim Order and a Final Order, among other things, (a) authorizing the Debtors to enter into a postpetition financing arrangement on the terms as set forth in the Postpetition Loan Agreement, (b) granting liens and providing super-priority administrative expense status, (c) granting adequate protection to the Debtors' prepetition secured lender, (d) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (e) granting related relief. Square 1 and the Senior Bridge Lenders have consented to the priming aspect of the DIP Financing.

90.      The DIP Facility consists of a single tranche of term loan in the amount of $7.4 million on the terms set forth in the DIP Credit Agreement attached as an exhibit to the DIP Financing Motion, senior in interest to the pre-petition loan facilities. The Debtors and one or more affiliates of H.I.G. European Capital Partners LLPs will execute the DIP Loan Documents and the entire principal amount of the DIP Loans will be available to be borrowed by Xtera upon entry of the Interim Order. While the DIP loan proposes to "prime" the existing secured lenders, Square 1 has agreed to the DIP proposal. The proceeds of the DIP Facility will be used to pay operating expenses and the costs and expenses of administering these chapter 11 cases subject to and in accordance with the DIP Budget.

91.      The DIP Loans will bear interest at a rate of Adjusted LIBOR (subject to a 1.00% floor) plus 6.0% per annum, which interest shall be paid in cash monthly and upon any repayment or prepayment of principal; provided that upon the occurrence of any event of default under the DIP Facility such interest rate margin shall automatically increase by an additional

2.00%. A customary alternate base rate option will be available (or required) as an alternative to Adjusted LIBOR.

92.     The DIP Documents require entry of the Bid Procedures Order within 21 days of the Petition Date, entry of a sale order under section 363 of the Bankruptcy Code within 60 days of the Petition Date, and for the sale to be consummated within 75 days of the Petition Date.

93.     In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their businesses. In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases while working towards a successful sale transaction. Postpetition financing is necessary in order for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper servicing of customers post-petition, and fund working capital needs. Absent postpetition financing, the Debtors will be forced to wind-down their operations due to a lack of funds. Additionally, the Debtors propose that the sale process and payment of professional fees up to a maximum amount of $100,000 will provide adequate protection to Square 1. I believe that it is imperative that the Debtors have access to sufficient liquidity to avoid imminent irreparable harm and successfully consummate a sale transaction.

94.     Beginning in July 2016, the Debtors, together with their advisors, identified and contacted more than seventy (70) prospective strategic or financial partners regarding a potential financing, sale, or other restructuring transaction. No other entity offered to provide financing on terms more favorable than those being provided by the Postpetition Lender. The DIP Facility adequately addresses the Debtors' working capital needs, and the DIP Facility will provide the Debtors' various constituencies, including customers, employees, and vendors with confidence in the Debtors' ability to maintain operations while working towards a sale.

95.     The Interim Order also sets forth certain stipulations and agreements by the Debtors regarding, *inter alia*, among other things, the validity, perfection, and amount of liens held by Square 1 and the Debtors' obligations under the Senior Loan Facility.  Each of the stipulations and agreements set forth in the Interim Order are true and correct to the best of my knowledge.

96.     I believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtors, their estates and their creditors, and absent such relief, the Debtors will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

**J.     Sale Motion**

97.     The Debtors file the Sale Motion to, among other things, approve certain bid procedures related to a sale under section 363 of the Bankruptcy Code to sell all or substantially all of the Debtors' assets and approve the Stalking Horse Purchaser as the stalking horse purchaser for the assets.  In light of the Debtors' liquidity constraints, an expedited sale of the Debtors' businesses and assets is essential to not only preserve the underlying value of their operations by providing customers and employees with a clear path forward, but also to maximize the value of the Debtors' assets for the benefit of their estates, creditors, and other parties in interest.

98.     By the Sale Motion, Debtors request entry of the Bidding Procedures Order:  (a) approving Bidding Procedures for (i) submitting bids for any or all of the Debtors' assets, and (ii) conducting an auction with respect to the Debtors' assets in the event the Debtors receive at least one bid in addition to that submitted by the Stalking Horse Purchaser; (b) scheduling the auction; (c) scheduling a hearing to approve any sale of Debtors' assets with respect to any bid(s) accepted by the Debtors; (d) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases of the Debtors to any purchaser(s) of their assets, and to

resolve any objections thereto; and (e) approving the form of notice of the auction and sale.

99.    Further, the Debtors seek entry of a Sale Order pursuant to sections 105, 363, and 365 of the Bankruptcy Code (i) approving the sale of the assets to the Purchaser, free and clear of all liens, claims, encumbrances and liabilities, except as provided in the Purchase Agreement, (ii) authorizing and approving the assumption and assignment of executory contracts and unexpired leases to the purchaser or purchasers; and (iii) authorizing the Debtors to consummate the sale and all documents, agreements and contracts executed in conjunction therewith.

100.    The Debtors will enter into that certain Asset Purchase Agreement by and Between Xtera Communications, Inc. and H.I.G. Europe – Neptune, Ltd. pursuant to which the Stalking Horse Purchaser shall acquire the Assets on the terms and conditions specified therein. The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth therein.  Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to purchase the Assets for a purchase price of $10 million in cash.

101.    The Stalking Horse Purchaser, in making this offer, has relied on promises by the Debtors to seek the Court's approval of (a) the payment of a breakup fee in the amount of 3½% of the aggregate amount of the Purchase Price under the Stalking Horse Agreement if the Debtors enter into an Alternative Transaction (the "Break Up Fee"), (b) reimbursement of the reasonable fees, costs, and expenses incurred by the Stalking Horse Purchaser and its affiliates in connection with the transactions contemplated by the Stalking Horse Agreement, subject to a cap of $500,000 (the "Expense Reimbursement"), and (c) the provision in the Bidding Procedures Order (as defined below) that the bid procedures approved thereunder provide for an initial overbid amount equal to not less than:  (i) an amount equal to (x) the Cash Consideration, the DIP Credit Bid and Release, and (y) cash consideration in an amount equal to the Break Up Fee

and Expense Reimbursement, plus (ii) $250,000 in cash, and minimum bid increments thereafter of $250,000 (the "<u>Overbid Protections</u>," and together with the Break Up Fee and the Expense Reimbursement, the "<u>Bid Protections</u>").

102.    I believe that the Bid Protections are market, a necessary inducement for the Stalking Horse Purchaser, will establish a "floor" for the sale of the Assets, and ultimately encourage competitive bidding and realization of the highest value for the Assets.

## CONCLUSION

103.    For all of the foregoing reasons, I respectfully request that the Bankruptcy Court grant the relief requested in the First Day Motions.  I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and current to the best of my knowledge and belief.

Dated: November 15, 2016

By:      Joseph R. Chinnici
Title:   Chief Financial Officer