## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>XTERA COMMUNICATIONS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 16-12577 (KJC)<br><br>(Jointly Administered)<br><br>**Re D.I.: 13, 66, 83, & 86** |

**DEBTORS' REPLY IN SUPPORT OF MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105(A), 363, AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF ORDERS (I)(A) APPROVING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) SCHEDULING RELATED AUCTIONS AND A HEARING TO CONSIDER APPROVAL OF SALE; (C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (E) APPROVING BID PROTECTIONS; AND (F) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) <u>GRANTING RELATED RELIEF</u>**

The above captioned debtors and debtors in possession (together the "<u>Debtors</u>") hereby submit this omnibus reply (the "<u>Reply</u>") in support of *Motion Of The Debtors And Debtors In Possession, Pursuant To Sections 105(A), 363, And 365 Of The Bankruptcy Code For Entry Of Orders (I)(A) Approving Procedures In Connection With The Sale Of Substantially All Of The Debtors' Assets; (B) Scheduling Related Auctions And A Hearing To Consider Approval Of Sale; (C) Approving Procedures Related To The Assumption Of Certain Executory Contracts And Unexpired Leases; (D) Approving The Form And Manner Of Notice Thereof; (E) Approving Bid*

---

[1]   The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Xtera Communications, Inc. (4611); Xtera Communications, Ltd. (4611); Xtera Communications Canada, Ltd. (9560); Xtera Communications Hong Kong Ltd. (4611); PMX Holdings, Ltd (4611); Azea Networks, Inc. (7821); Neovus, Inc. (2940); Xtera Asia Holdings, LLC (4611); and Xtera Comunicacoes do Brasil LTDA (0174).  The mailing address for the Debtors, solely for purposes of notices and communications, is 500 W. Bethany Drive Suite 100 Allen, TX 750133.

*Protections; And (F) Granting Related Relief; And (II)(A) Authorizing The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) Approving The Assumption And Assignment Of Certain Executory Contracts* [D.I. 13] (the "<u>Motion</u>").[2] In support of this Reply, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    Upon commencement of these Chapter 11 Cases, the Debtors stressed the necessity of an expedited sale process in order to avoid liquidation of the estates and maintain the Debtors' businesses as a going concern. On the Petition Date, in addition to other "first day" relief, the Debtors filed the Motion and sought a hearing to consider the Bid Procedures to begin the marketing and sale process. The Debtors simply cannot withstand an extended stay in chapter 11. Time is of the essence in consummating a sale transaction and preserving the assets in these Chapter 11 Cases. The Debtors believe that such a transaction is in the estates' best interests. Therefore, the Debtors have sound business reasons for proceeding with the proposed sale process involving substantially all of their assets

2.    Disregarding this urgency and necessity for an expedited sale process, the Debtors' pre-petition subordinated lender, Horizon Technology Finance Corporation ("Horizon") and the Official Committee of Unsecured Creditors appointed in these cases (the "Committee," and together with Horizon, the "Objecting Parties") filed objections to the Motion [D.I. 83, 86], notwithstanding that the parties had already negotiated resolutions in principle to almost all of the issues raised by Horizon at the time it filed the objection.  More significantly, the Objecting Parties seek to limit the credit bidding rights of secured creditors in the face of case law which makes clear that infringing upon a secured creditor's credit bid rights is "the extraordinary

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

exception and not the norm." In re Aeropostale , Inc., 555 B.R. 369, 397 (Bankr. S.D.N.Y.

2016).  Indeed, rather than even try to meet this high standard, the Objecting Parties point to no

evidence of inequitable conduct that would constitute "cause" under section 363(k) to limit a

secured creditor's rights to credit bid.

3.    The Objective Parties' efforts may stall or derail the sale process, which is the only viable

option currently available to maximize the value of the Debtors' estates.  Absent the sale process

on the terms proposed in the Motion, H.I.G. Europe – Neptune, Ltd. (the "Purchaser") will not

purchase the Debtors' assets, and the Debtors will default on the debtor in possession financing

provided by the Purchaser.

4.    The Debtors believe the terms and conditions of the Purchase Agreement – which were

negotiated extensively with the Purchaser – are fair and reasonable under the circumstances and

that the proposed Bid Procedures will foster competitive bidding to ensure maximum value for

the Debtors' assets.  Accordingly, the Motion should be approved.

## RELEVANT BANKGROUND

5.    The Debtors are leading providers of high-capacity, cost-efficient optical transport

solutions, supporting the high growth in global demand for bandwidth. In the nine months

leading to the Petition Date (defined below), the Debtors experienced liquidity issues that

hindered their ability to make payments in the ordinary course of business. After careful

consideration and in consultation with their professionals, the Debtors sought to implement

restructuring initiatives and ultimately decided to pursue a sale transaction under section 363 of

the Bankruptcy Code.

6.    Pre-petition, the Debtors sought to implement a number of restructuring initiatives

including, without limitation, making appropriate adjustments in staffing, increasing negotiations

with vendors and suppliers, and realigning their business and seeking out additional sources of

funding and business opportunities, including soliciting equity investments.  In March 2016, the

Debtors retained the services of Cowen and Company ("Cowen") to undertake a refinancing

transaction.

7.   Beginning in July 2016, the Cowen solicited debtor-in-possession financing proposals

from forty-four (44) potential lenders.  Of those, seventeen (17) signed non-disclosure

agreements and received documentation.  The Debtors received five (5) term sheets for DIP

Financing, of which three (3) contained conditions precedent that the Debtors simply could not

satisfy. Ultimately, the Debtors and their advisors engaged in negotiations with the two

remaining parties in contemplation of a sale and debtor in possession financing.  Both of these

transactions contemplated "priming" financing senior to existing secured indebtedness.  After

consultation with the Debtors' senior pre-petition lender, Pacific Western Bank, successor in

interest by merger to Square 1 Bank ("Square 1"), and exploration of the alternatives, the

Debtors believed that it was in the best interests of all interested parties to pursue the currently

contemplated transaction with H.I.G.

8.   On November 15 and 23, 2016 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also filed

the *Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105(a), 363, and 365*

*of the Bankruptcy Code for Entry of Orders (i)(a) Approving Procedures in Connection with the*

*Sale of Substantially All of the Debtors' Assets; (b) Scheduling Related Auctions and a Hearing*

*to Consider Approval of Sale; (c) Approving Procedures Related to the Assumption of Certain*

*Executory Contracts and Unexpired Leases; (d) Approving the Form and Manner of Notice*

*Thereof; (e) Approving the Bid Protections; and (f) Granting Related Relief; and (ii)(a)*

*Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims,*

*Encumbrances, and Other Interests; (b) Approving the Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases; and (c) Granting Related Relief* [D.I. 13] (the "Sale

Motion"). The Debtors expect to consummate a sale of all or substantially all of their assets by

mid-February 2017.

## REPLY

1.   The Debtors have been involved in good faith negotiations with the Objecting Parties to

resolve their objections to the Motion.  While the Debtors, the Committee, Horizon, and the

Purchaser have made substantial progress to resolving the objections, and, to that end, the

Purchaser has made substantial concessions, including to the scope of its required bid

protections, as of the filing of this response, the parties have not reached agreement on a final

form of revised order to be proposed to this Court.  As such, the Debtors are compelled to file the

present response to the remaining objections.

**A.  The Stalking Horse Asset Purchase Agreement is the Best Offer Received by the
     Debtors and is Fair and Reasonable.**

2.   The Debtors have demonstrated sound business judgment in entering into the Stalking

Horse Agreement and pursuing the sale process.  See, e.g., Meyers v. Martin (In re Martin), 91

F.3d 389, 395 (3d Cir. 1996) (the use, sale, or lease of assets outside of the ordinary course of

business is appropriate where there are sound business reasons).  The Debtors' decision to enter

into the Stalking Horse Agreement is appropriate under the circumstances and should be

afforded deference by the Court.  See In re WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991)

("The trustee has ample discretion to administer the estate, including authority to conduct public

or private sales of estate property. Courts have much discretion on whether to approve proposed

sales, but the trustee's business judgment is subject to great judicial deference.").

3.    Numerous parties thoroughly examined the Debtors' assets and businesses and expressed interest in purchasing some or all of the Debtors' assets as part of their efforts.  The Debtors negotiated with these parties but, as described above, were unable to reach an acceptable agreement with any of them. When it became clear that the Debtors were going to run out of cash without being able to reach an agreement with any other party, H.I.G. stepped up to provide financing for thirteen weeks and negotiated the Purchase Agreement with the Debtors.

4.    The Purchase Agreement contains fair and reasonable terms and will satisfy the largest claims against the Debtors.  Importantly, as a result of the contemplated sale, the Debtors' most valuable assets, its patents, will retain their value.

5.    The Debtors could not reach an agreement before the commencement of these cases with any other party with terms better than those found in the Purchase Agreement and are hopeful that the additional time and liquidity during the post-petition sale process will yield a higher or otherwise better offer.  In addition, the Debtors believe the Purchase Agreement provides an appropriate floor for the value of the Debtors' assets and affords the Debtors a meaningful opportunity to retest the market for the Debtors' assets and continue negotiations with many of the interested parties that surfaced prior to the Petition Date.

## B.  The Stalking Horse Purchaser May Credit Bid All Prepetition Debt Up to the Amount of the Debt.

6.    As set forth in previous pleadings, the Debtors negotiated an agreement with the Purchaser that allows the Purchaser to exercise the right to acquire the pre-petition senior secured debt held by Square 1.  Both Horizon and the Committee argue that the Purchaser should not be permitted to exercise its fundamental right to credit bid such debt in any sale of the Debtors assets, notwithstanding that they have not – and cannot – point to any evidence of inequitable conduct that would support such an extraordinary limit on fundamental rights under section

6

363(k) of the Bankruptcy Code.  Moreover, Horizon and the Committee rely primarily on one case, Fisker, to support the contention that, if permitted to exercise their statutory rights under section 363(k) of the Bankruptcy Code, any credit of acquired secured debt, must be limited to the amount the Purchaser paid for such debt, rather than the face value of the debt based on the allowed secured claim pursuant to section 363(k) because the existence of a credit bid alone could "chill bidding."

7.  These objections are meritless.  First, nothing in the proposed bid procedures order limits the Committee's ability to challenge any proposed credit bid of acquired secured debt pursuant section 363(k) of the Bankruptcy Code and nothing otherwise overrides the application of section 363(k) to any proposed crediting of the Square 1 debt (if acquired by Purchaser) against the purchase price owing from the Purchaser after an auction (if any).  Second, the Objecting Parties can point to no precedent that supports their proposition that a secured party's rights under 363(k) may be foreclosed merely because a committee has yet to complete its review of the a secured creditor's liens and the credit bidding may have a "chilling effect."  Third, the Committee remains free to investigate the liens that support the secured debt held by Square 1 and other potential challenges (as provided for in this Court's interim debtor-in-possession financing order) and their right to challenge any crediting of such secured claims pursuant to 363(k) are fully preserved.

8.  Section 363(k) of the Bankruptcy Code codifies a secured creditor's right to credit bid its allowed claim.  Courts have described the right to credit bid as "fundamental." Paul T. v. Fifth Third Mortg. Co. (In re J & M Salupo Dev. Co.), 388 B.R. 795, 803 n.2 (B.A.P. 6th Cir. 2008) ("Simply stated, the dissent ignores the fact that if the Panel were to adopt the dissent's interpretation, secured creditors would be deprived of a fundamental protection in the foreclosure

context-the ability to credit bid at the sale and take the property into inventory.").  Indeed, courts have historically found "cause to limit credit bidding in limited circumstances where this a bona fide dispute regarding the extent or validity of a secured claim or misconduct by the secured creditor. In re L.L. Murphrey, No. 12-03837-8-JRL, 2013 WL 2451368 (Bankr. E.D.N.C. June 6, 2013) (restricting a credit bid due to issues regarding the validity of the relevant liens); Morgan Stanley Dean Witter Mortg. Capital v. Alon USA LP (In re Akard Street Fuels, L.P.), Civ. A. No. 3:01-CV-1927-D, 2001 U.S. Dist. LEXIS 21644 (N.D. Tex. Dec. 4, 2001) (same); see also In re Aloha Airlines, Case No. 08-00337, 2009 Bankr. LEXIS 4588 (Bankr. D. Haw. May 14, 2009) (denying a secured creditor the right to credit bid due to misconduct, including creating side deals with a competitor regarding the sale of confidential information).

9.  Further, and critically, the Purchaser has explicitly agreed that any competing bid it may make at an auction will not be conditioned on the Purchaser's ability to realize a credit against the final purchase price on account of the Square 1 debt (if acquired by Purchaser).  Given this agreement between the Purchaser and the Debtors, not only is there no basis under applicable law to foreclose crediting of the Square 1 debt pursuant to section 363(k) if it is ultimately acquired by the Purchaser, there is no risk to the Debtors that they will proceed to auction having to address a contingency related to the allowance or disallowance of a credit bid of that debt by this Court at a later date.

10. The Committee and Horizon rely primarily on In re Fisker Automotive Holdings, Inc., 510 B.R. 55 (Bankr. D. Del. 2014).  Fisker however provides no support for the proposed limitation on the Purchasers' rights under section 363(k) if it were to acquire the Square 1 debt. In Fisker, the debtors and the creditors' committee stipulated that if the bidder's credit bid right was eliminated or limited, the sale process would more likely be successful in creating value for

the estates. Id. at 58. Here, the Debtors and their advisors do not believe – given the Purchasers'

concession that any subsequent bid it makes at an auction (if any) would not be conditioned on

the allowance of any pre-petition secured claims for credit bidding purposes--that the Purchaser's

potential acquisition of the Square 1 debt and any effort to credit that debt against the purchase

price for the assets will have any impact on the sale process.  Indeed, in the present circumstance,

preserving the Purchaser's right to assert a crediting of the Square 1 debt may enhance the sale

process as it will be backed by the Purchaser's commitment to close on a sale transaction

regardless of the result of any future dispute in respect of such crediting.  Further, the Committee

and Horizon present no evidence that a credit bid by the Purchaser will chill bidding.  By

contrast, the committee in Fisker had proposed a beneficial alternative to the proposed private

sale, and the competing prospective purchaser was found to be "highly attractive and capable"

and to have a "vested interest in purchasing Fisker." Id. at 57, 60. The committee in Fisker also

presented evidence, which the debtors did not dispute, that this attractive potential purchaser

would not bid unless the credit bid was appropriately limited or eliminated.  Id.  As a result, the

court explained that "[t]he evidence in this case is express and unrebutted that there will be no

bidding—not just the chilling of bidding—if the Court does not limit the credit bid."  Id.  Here,

in stark contrast to Fisker, there is no current alternative going concern bid, let alone a "highly

attractive" bid.

    11. Finally, the parties asserting a right to credit bid in Fisker and the other cases cited by the

Committee and Horizon actively attempted to avoid an auction process. See Fisker, 510 B.R. at

57 (initially proposing a private sale); In re Free-Lance Star Publishing, 512 B.R. 798, 806

(Bankr. E.D. Va. 2014) (describing bidder's inequitable conduct impeding competitive bidding).

Here, by contrast, the Debtors have proposed a sale process anchored by a stalking horse

agreement with the Purchaser (who is also providing funding to support the sale process according to the Debtors' budget) and the offer remains subject to higher or otherwise better bids; bids that may be made for all or any portion of the assets the Purchaser seeks to purchase. There has been no effort by the Debtors or the Purchaser to impede or avoid an open auction process or chill competing bids for the Debtors' assets.

12. Even if the facts that the Fisker court relied on to conclude there was cause for limiting a credit bid pursuant to section 363(k) were not wholly absent from these cases, more recent decisions and commentary have cast substantial shade on Fisker.  In Aéropostale, the Court held that none of the cases commonly cited as a basis for limiting a credit bid involved bid chilling as the *sole factor* warranting such a limitation, thus emphasizing the very high burden imposed on any party seeking to limit a secured creditor's "fundamental" right to credit bid. 555 B.R. 369 (Bankr. S.D.N.Y. 2016).  Without any evidence of misconduct on the part of the lender or other factors that might justify limiting a right to credit bid, the Aéropostale court ruled that there was no "cause" to limit the term lenders' right to credit bid.  Here, contrary to Fisker, and similar to Aéropostale, the Debtors and their advisors have been approached by various third parties that have expressed interest in submitting a competing offer for the Debtors' assets. See also In re RML Dev. Inc., 528 B.R. 150 n. 11 (Bankr. W.D. Tenn. 2014) ("this court is not prepared to go as far as some of these courts and hold that the mere 'chilling' of third party bids is sufficient cause to justify modifying or denying a secured creditor's rights. The modification or denial of credit bid rights for cause under § 363(k) should be an extraordinary exception that is used only upon equitable considerations (e.g., competing claims, collusion, or other fraudulent or bad faith acts). This court is convinced that, where a creditor holds an uncontested secured claim, it should ordinarily be permitted to bid at a § 363 sale of its collateral regardless of its intrinsic impact on

other bidding."); <u>see also</u> American Bankruptcy Institute; Commission to Study the Reform of Chapter 11—Final Report and Recommendations at 146-147 (criticizing <u>Fisker</u> and <u>Free Lance-Star Publishing</u> and recommending that the chilling effect of a credit bid alone should not constitute cause to deny a credit bid).

13. The Debtors have sound business reasons for pursuing the sale process and entering into the Purchase Agreement, all of which the Debtors believe will result in the best possible outcome for these estates, both ensuring that a liquidation will not occur and providing the Debtors with the opportunity to receive further bids and conduct an auction.  The Objecting Parties have not shown otherwise and, accordingly, for all the foregoing reasons, the Objections should be overruled.

[*REMAINDER OF PAGE LEFT INTENTIONALLY BLANK*]

WHEREFORE, the Debtors respectfully requests that the Court (i) overrule the Objections in their entirety and enter the proposed Bid Procedures Order, and (ii) grant such other and further relief as this Court deems just and proper.

Dated:  December 2, 2016
       Wilmington, Delaware               Respectfully submitted,

**DLA PIPER LLP (US)**

 */s/ Stuart M. Brown* _____
Stuart M. Brown (Bar No. DE 4050)
Maris Kandestin (Bar No. DE 5294)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com
          maris.kandestin@dlapiper.com
-and-

Thomas R. Califano (admitted *pro hac vice*)
Jamila Justine Willis (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
Email:  thomas.califano@dlapiper.com
          jamila.willis@dlapiper.com

*Proposed Counsel to Debtors and*
*Debtors in Possession*